UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

BAI WEN, CAO XIAOLING, CAO YAN, CAO YEQIAN,   :
CHEN BIN, CHEN LI, CHEN QIANG, CHEN WEILI,   :
CHENG FANGZHOU, CHU MIN, FENG YING, GAO   :
GUANGFENG, GU DANHUI, HAN MINGYUAN, HU LAN,   :    No. 22 civ._____
HU MIN, HU WENSHU, HUANG HUI, HUANG WEI,   :
HUANG XIUWEN, JIANG GUOSHUN, JIANG PEIYU,   :
JIANG XUEFEN, JING LILI, HAN WENSHENG, KIT PING   :
JACKY KWOK, LAI YONGHE, LAU KWAN, LI HUILING,   :
LI JINLONG, LI LIQIAN, LI MINGHUA, LI PEIJUN, LI   :    **COMPLAINT**
QIANG, LI QINGHUA, LI XUE, LI YUHAO, LI YUHUAI,   :
LIANG WEI, LIN SHUANGPING, LIN YONGQIANG, LIU   :    JURY TRIAL DEMANDED
JINGHUI, LIU MING, LIU WENJIE, LIU ZHE, MA AIQIN,   :
MA ZHANHUA, MAO ZHENG, NI LI, PING JIE, QI   :
PEIXIN, WU LIANGLIANG, QUE WEI, REN RONGRONG,   :
SHAN DANDAN, SHAN WEI, SHEN CONGYING, SHEN   :
HUIYU, SHI YIQUN, SHU LINGLI, SONG CHAO, SONG   :
XIAOYING, SUN HAO, SUN XIN, SUN YAN, SUN YUXIN,   :
TAN MANFANG, TENG LEZHI, WAN LILI, WANG   :
YINGMING, WANG CHAO, WANG CHUANHONG,   :
WANG NINGHONG, WANG YANG, WANG YATAO,   :
WANG JIANPING, WU DING, XIONG XIN, XU JIEPING,   :
XU MINXIA,YANG LI, YANG MENG, YANG XUELI, YE   :
QIANG, YE XIN, YIN YOUGENG, YING JIANFENG, YU   :
QIZHEN, YU ZHAOHUI, YVONNE ZHU, ZHANG HUI,   :
ZHANG PINGJUN, ZHANG QIAN, ZHANG SHOUTAO,   :
ZHANG XUEMEI, ZHANG YUESHENG, ZHANG YUMEI,   :
ZHANG ZEYU, ZHAO JIAXU, ZHAO MENGSHI, ZHAO   :
YANGYANG, ZHENG HONGFEI, ZHENG YONG, ZHOU   :
LINA, ZHOU YIN, ZHU FENGBO, and ZHU LIYI,   :
individually and derivatively on behalf of GEORGE   :
WASHINGTON BRIDGE BUS STATION AND   :
INFRASTRUCTURE DEVELOPMENT FUND, LLC and   :
GEORGE WASHINGTON BRIDGE BUS STATION AND   :
INFRASTRUCTURE DEVELOPMENT FUND, PHASE II,   :
LLC,   :

                       Plaintiffs,   :
  :
     – against –   :
  :
NEW YORK CITY REGIONAL CENTER, LLC,   :
  :
                      Defendant.   :

------------------------------------------------------------------------x

The 107 individual Plaintiffs (the "Investor Plaintiffs"), each an investor in George Washington Bridge Bus Station And Infrastructure Development Fund, LLC or George Washington Bridge Bus Station And Infrastructure Development Fund, Phase II, LLC (the "Derivative Plaintiffs") (all collectively "Plaintiffs"), by their attorneys Ford O'Brien Landy LLP, assert the following for their Complaint, upon knowledge as to their own actions, and otherwise on information and belief, on behalf of themselves and derivatively on behalf of George Washington Bridge Bus Station and Infrastructure Development Fund, LLC and George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC:

## NATURE OF THE CASE

1.     This action is brought individually by 107 purchasers of membership interests in one of two separate New York limited liability companies against the manager of those companies, Defendant New York City Regional Center, LLC ("NYCRC" or "Defendant"). NYCRC induced each of the Investor Plaintiffs to purchase their interests by promoting the investment opportunity with a stream of materially false statements and by intentionally withholding critical information and documents that would have contradicted those false statements.  The Investor Plaintiffs also bring this action derivatively on behalf of the Derivative Plaintiffs – two limited liability companies in which the Investor Plaintiffs were induced to purchase non-managing membership interests.

2.     In the years that followed the investments, NYCRC, as manager of the Derivative Plaintiff entities, consistently pursued a pattern of conduct that involved actions and omissions designed to benefit NYCRC's own economic interests, but which acted to the detriment of the non-managing members, including all Plaintiffs here, as well as the LLCs as a whole.  In addition, NYCRC representatives continued to repeat the falsehoods that they had used to solicit the Investor Plaintiffs' investments in order to avoid detection.

3.      The Investor Plaintiffs are a group of 107 current and former citizens of the People's Republic of China who were each induced to make either a $540,500 or a $549,000 investment in one of two special purpose vehicles that were established by NYCRC for the specific purpose of lending the entirety of the capital raised to the beleaguered private developer of the George Washington Bridge Bus Station Redevelopment Project (non-party George Washington Bridge Bus Station Development Venture LLC) which had, years earlier, entered into an agreement with the Port Authority of New York and New Jersey (the "Port Authority") to expand and renovate the retail portion of the bus station in exchange for a long-term ground lease (the "Project").  The Investor Plaintiffs constitute 107 of the total 166 non-managing members (64.4%) in the Derivative Plaintiff entities.

4.      Defendant NYCRC is a U.S. Citizenship and Immigration Services ("USCIS")-approved "Regional Center." A "Regional Center" is a privately-owned LLC that is authorized to pool investments from foreign investors and use such capital to finance projects within an approved geographic region (hence the name "Regional Center") for the dual purpose of qualifying the investors for green cards under the EB-5 visa program and making a financial return for the investors. Regional Centers sometimes use the funds they raise to finance mixed-use development projects involving both commercial/retail and government-run infrastructure occupying a single space—projects such as the bus station retail space redevelopment at issue here, or the Brooklyn Arena (Barclays Center) built on top of a rail transportation hub.

5.      Under the EB-5 visa program, which is governed by USCIS regulations, foreign investors can obtain investment-based permanent resident status in the United States ("green cards") by making a $500,000 investment in a qualifying project and proving that their investment created ten full-time jobs.

3

6.     NYCRC as the manager of the Derivative Plaintiff entities had duties *only* to the non-managing members and the Derivative Plaintiff entities.  But it ignored these duties in favor of its own economic interests, which were not aligned with those of the non-managing members and the Derivative Plaintiffs.  In this respect, while the non-managing members, including the Investor Plaintiffs here, wanted their capital to be carefully managed to optimize the possibility of a quick repayment, NYCRC's economic interest was to maintain the outstanding loans for as long as possible so it could optimize the amount of quarterly management fees it collected on the money it raised.

7.     NYCRC also had other economic interests that were not aligned with those of the Investor Plaintiffs. For instance, NYCRC had an interest in preserving its reputation as a flexible lender in the world of New York developers so that it could continue to find New York developers who would select NYCRC to raise capital via the EB-5 markets.  NYCRC further had an interest in maintaining its image in the Chinese capital market as a company that uses EB-5 funds to finance only safe investment projects so that it could continue going back to China to raise capital for multiple projects without that market learning that NYCRC's earlier projects ended in default and a loss of capital.

8.     In sum, NYCRC had a strong interest to avoid taking actions (for instance, by declaring a default on a loan) that would damage its standing in China's EB-5 market or in the world of New York developers.  NYCRC had similarly strong incentives to avoid any actions that could impair the stream of interest payments that funded the management fees it drew from the special purpose vehicles it managed, even if it foresaw a substantial risk that the non-managing members of those vehicles would lose their capital.

9.       Due to the nature of the EB-5 program, investor-immigrants are never repeat customers.  As such, once investors commit their capital to an EB-5 project, they cease to be a prospect for any future business for NYCRC, and their interests become misaligned with those of NYCRC.  While NYCRC has legal duties to protect the investors' interests above its own interests (which hinge on the successful funding of future projects and keeping capital deployed as long as possible), here NYCRC most certainly did not.

10.       Indeed, because NYCRC did not invest its own capital in the project, its tolerance for risk of loss was substantial, and not aligned with the Investor Plaintiffs to whom NYCRC had advertised and sold a supposedly safe/conservative.

11.       And it is precisely these conflicts of interest that caused NYCRC in this case to pursue its own interests in disregard of the interests of the Investor Plaintiff non-managing members.  In order to persuade foreign investors to invest in two investment vehicles, NYCRC, as manager of the investment vehicles, made substantial misrepresentations regarding the state of the Project and the nature of the collateral protecting the investment vehicles' loans to the developer. Moreover, after making such misrepresentations, NYCRC, as manager of the investment vehicles, took no action on several events of default when the non-managing members' capital could still have been protected.

12.       Not only did NYCRC fraudulently induce the Investor Plaintiffs to invest in its investment vehicles and fail to protect those investors' interests upon the occurrence of several loan defaults, but NYCRC also failed to inform the Investor Plaintiffs of the Project's problems after they had invested.  As a result, NYCRC was able to prolong the period during which it managed the Project and therefore prolonged the period during which it received management fees from the investment vehicles, ultimately collecting more than $20 million in

fees (more than $13 million of which were management fees).

13.    In the months leading up to the COVID-19 pandemic in the U.S. (and after it had begun in China), the beleaguered developer that had borrowed the EB-5 funds from the investment vehicles declared bankruptcy at the end of October 2019.  As a result, while NYCRC made more than $20 million, the Investor Plaintiffs have lost the entirety of their investments.

14.    In meetings with the Investor Plaintiffs even *after* the developer sought bankruptcy protection, NYCRC continued to make substantial misrepresentations regarding the collateral pledged for the EB-5 loans.

15.    Though many of the Investor Plaintiffs did receive either temporary or permanent green cards, this does not excuse NYCRC's actions.  The investments were real and came with an opportunity to earn interest.  From each investment, approximately 8% was paid in fees and never considered capital.  As such, the investors stood to obtain an effective interest rate of nearly 3% (on capital only) for a term of eight or more years.  The immigration aspect of the investment gave NYCRC no license to make and repeat falsehoods, and no license to breach its fiduciary duties to the Investor Plaintiffs or the Derivative Plaintiffs in order to bolster its own (and divergent) economic interests.

## PARTIES AND RELEVANT NON-PARTIES

16.    Twenty-seven of the 107 Investor Plaintiffs are individuals and residents of the People's Republic of China.

17.    Eighty of the 107 Investor Plaintiffs are individuals and permanent residents of the United States and live in several different U.S. states.

18.    Non-party George Washington Bridge Bus Station Development Venture LLC ("GWB Dev. Co.") is a Delaware limited liability company registered to do business in the State of New York.  GWB Dev. Co. is not a public company and its membership interests do not

trade on any exchange.

19.     GWB Dev. Co. is an affiliate of SJM Partners, Inc., the real estate company designated by the Port Authority to conduct the redevelopment of the retail portion of the George Washington Bridge Bus Station.

20.     Derivative Plaintiff George Washington Bridge Bus Station and Infrastructure Development Fund, LLC ("Dev. Fund 1") is a New York limited liability company.  Eighty-nine Investor Plaintiffs own non-managing membership interests in Dev. Fund 1 (the "Phase 1 Investors").

21.     Dev. Fund 1's non-managing membership interests were marketed by NYCRC after NYCRC caused Dev. Fund 1 to file documents with the SEC, indicating that the membership interests would not be registered under the Securities Act of 1933.

22.     Derivative Plaintiff George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC ("Dev. Fund 2") is a New York limited liability company. Eighteen Investor Plaintiffs own non-managing membership interests in Dev. Fund 2 (the "Phase 2 Investors").

23.     Dev. Fund 2's non-managing membership interests were marketed by NYCRC after NYCRC caused Dev. Fund 2 to file SEC Form D, indicating that the membership interests would not be registered under the Securities Act of 1933.

24.     Defendant NYCRC is a New York limited liability company located at 99 Hudson Street, New York, New York.  NYCRC is a U.S. promoter of EB-5 investment programs.

25.     The membership interest in Dev. Fund 1 and Dev. Fund 2 do not constitute "covered securities" under the definition of a "covered security" in the Securities Act

(15 U.S.C. §§ 78bb(f)(5)(E) and 77p(f)(3)).

26.    As a "Regional Center," NYCRC solicits investments from foreigners and pools their investments in special purpose limited liability companies ("EB-5 SPVs"), of which NYCRC is always the sole managing member.  Ordinarily, NYCRC then causes the EB-5 SPV to lend its capital to a pre-selected development company for a pre-selected project that is intended to satisfy the requirements of the EB-5 program.  This procedure was followed in connection with Dev. Fund 1.

27.    However, this procedure was not followed in connection with Dev. Fund 2, because NYCRC and SJM Partners needed to find a way to provide additional capital to GWB Dev. Co. without increasing its debt load.  This was done by establishing an uncapitalized intermediary company that took the Phase 2 investors' capital in the form of a loan, but then contributed it to GWB Dev. Co. as equity pledging nothing but valueless shares in return.  This was not disclosed to investors. A full set of the documents that, taken together, reflected the true nature of the transaction were not fully discoverable until after GWB Dev. Co. filed for bankruptcy and records were made public.

28.    NYCRC charges both a one-time administrative fee to its investors of approximately 8% of the sum invested, and then charges the EB5-SPV an annual management fee of 2% to 3% of funds under management.

29.    Non-party Qiaowai Group ("Qiaowai") is a Beijing-based company that partnered with NYCRC to solicit investments from Chinese citizens.  Qiaowai obtained notoriety in 2017 for its work with Presidential advisor Jared Kushner and companies owned by his family.

30.    Non-party Wailian Group ("Wailian") is a Shanghai-based company that

partnered with NYCRC to solicit investments from Chinese citizens.

31.    Non-party Tutor Perini Corp. ("Tutor Perini") is a general contractor headquartered in Los Angeles that, in 2013, was awarded the role of lead contractor for the Project.

32.    Non-Party Port Authority is the owner and operator of the George Washington Bridge Bus Station.

33.    Non-Party Gregg D. Hayden ("Hayden") is the Director of Global Markets for NYCRC and personally participated in the solicitation of Investor Plaintiffs at issue in this action.

34.    Non-Party Lin Wu ("Wu") is the Director of Marketing and Business Development for NYCRC and personally participated in the solicitation of Investor Plaintiffs at issue in this action.

35.    NYCRC is the sole managing member of Dev. Fund 1 and Dev. Fund 2.

## JURISDICTION AND VENUE

36.    This Court has subject-matter jurisdiction pursuant to the "mass action" provisions of the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in scattered sections of 28 U.S.C.).

37.    Under CAFA, original jurisdiction in this Court exists because: the amount in controversy exceeds $5,000,000, exclusive of interests and costs, 28 U.S.C. § 1332(d)(2); Defendant NYCRC is a citizen of New York and at least one plaintiff is a citizen of a state different from NYCRC or is a citizen or subject of a foreign state, *id.* § 1332(d)(2)(A)– (B); the action involves "monetary relief claims of 100 or more persons . . . proposed to be tried jointly on the ground that the plaintiffs' claims involve common questions of law or fact," *id.* § 1332(d)(11)(B)(i); and each plaintiff's individual claims exceed $75,000, exclusive of interest

and costs, *id.*

38.    This Court has personal jurisdiction over NYCRC by virtue of its business activities within the State of New York and this judicial district, including its maintenance of offices within the state, its numerous contacts with this jurisdiction, and its conduct of business in this state, including in connection with the disputes that are the subject of this action.

39.    Venue is proper because Defendant NYCRC resides in this district.  28 U.S.C. § 1391(b).

## STATEMENT OF FACTS

### *The GWB Bus Station Redevelopment Project*

40.    The George Washington Bridge Bus Station (the "Station") is located at the east end of the George Washington Bridge in Manhattan.  The Station, built on top of the Trans-Manhattan Expressway (where Interstate 95 crosses the island of Manhattan), opened in 1963.

41.    In 2005, a Port Authority study identified the Station's retail space and its bus terminal as requiring upgrades that could enhance their revenue generation.  The Port Authority determined that building additional retail in the Station could act as a catalyst to create jobs in the Washington Heights neighborhood, and also concluded that additional modifications to the facility could improve the quality and frequency of service for bus passengers.

42.    In February 2006, the Port Authority issued a request for proposals, and in December 2006 it entered into an exclusivity agreement with GWB Dev. Co., which at the time was a joint venture between Acadia-P/A GWB LLC (an affiliate of P/A Associates) and Crown GWB LLC.  Beneficial ownership of GWB Dev. Co. would later change hands.

43.    On or about October 1, 2008 – after two years of protracted negotiation

10

with potential developers – the Port Authority finally announced a public-private partnership plan to renovate and quadruple the retail space in the Station from approximately 30,000 square feet to approximately 120,000 square feet, as well as restore and redesign the bus terminal itself to accommodate a higher volume of buses and passengers and increase the efficiency of traffic passing through the terminal.

44.     Under the initial plan, GWB Dev. Co. agreed to spend approximately $100 million to upgrade the retail space in exchange for a 49-year lease, and the Port Authority agreed to simultaneously spend approximately $78 million to upgrade the bus terminal facilities.

45.     At the time—which was the very beginning of the 2008-2011 "Great Recession" and just two weeks after the Lehman bankruptcy—the parties anticipated that financing would take time to arrange.  As a result, the parties agreed to allow 18 months to draw plans, agree on a lease, and obtain financing.

46.     The 18-month timeframe was overly optimistic, as the recession upended countless plans and expectations.

47.     At some point during that time frame, the initially-identified general contractor Skanska USA Building Inc. ("Skanska") pulled out of the Project, meaning that a new bidding process would need to be held.  In addition, ownership of GWB Dev. Co. changed to a group led by SJM Partners and Slayton Equities.

48.     In 2011, with SJM Partners as the Port Authority's new lead partner, the Project began to move forward on several fronts (but not all).

49.     In early 2011, SJM Partners decided to bypass institutional lenders and seek to finance the Project via pooled foreign investments through the EB-5 program.  To do so, it entered into an agreement with NYCRC, which agreed to raise EB-5 funds from China to loan

to the Project.

50.     In or about July 2011, SJM Partners and Slayton Equities announced that the approximately $100 million renovation of the Station's retail space, and the Port Authority-financed renovation of the Station's bus terminal, would finally begin, and was slated to be completed at some point in 2013.  Around the same time, the Port Authority executed a 49-year lease with GWB Dev. Co. which permitted an extension of up to 99 years.

51.     In November 2011, SJM Partners announced that it had secured commitments from three anchor tenants to take up approximately half of the renovated space—the discount apparel seller Marshalls, Fine Fare Supermarket, and Blink Fitness.

52.     However, construction did not begin in 2011 as anticipated.

### NYCRC Establishes an EB-5-Funded LLC to Act as Lender to the Project

53.     On approximately March 11, 2011, NYCRC established Dev. Fund 1, an EB5-SPV that would seek investments from investors overseas and which would pool and then loan such capital to GWB Dev. Co. to finance the upgrade of the Station's retail space.  Under the operating agreement for that LLC effective July 18, 2011, NYCRC was both the "manager" and the "initial member."

54.     Under the operating agreement, non-managing membership interests were limited to a total of 144 investors, and cost $540,500 each.  Of this amount, $500,000 was considered a capital investment, and the remaining $40,500 per membership interest was payable to NYCRC under a schedule of fees.  As such, NYCRC would be entitled to approximately $5.83 million after selling all of the membership units to investors.

55.     In addition, NYCRC was entitled to an annual management fee of 2% of total capital under management ($1.44 million/year) to be paid out of interest income.

56.     Under the operating agreement, non-managing members (including the

12

Investor Plaintiffs here) were entitled to an annual distribution of $1,250 until such time when Dev. Fund 1 was repaid by the borrower and all capital and retained interest was distributed.

57.     All interest received by Dev. Fund 1 that was not paid out as part of the annual management fee, operating expenses, or the annual payments to members, was to be retained until the final distribution of capital and profit.  At that point, the non-managing members were to recover their initial capital investment, plus 50% of any retained interest payments with the remainder going to NYCRC.

58.     Under the Dev. Fund 1 operating agreement, the non-managing members "irrevocably" appointed NYCRC "to manage the business affairs of the Company, carry on the activities of the Company and to do and to perform any and all things necessary for, or incidental to or connected with carrying on the activities of the Company and represent and bind the Company."

59.     Also in July 2011, Dev. Fund 1 entered into a "Permanent Loan Agreement" with GWB Dev. Co.  The loan agreement provided for an up-to $72 million loan, depending on how many EB-5 investors NYCRC could find during a defined "Availability Period."

60.     Absent an event of default, the loan carried an annual interest rate of 4.75%.  For a $72 million loan, this meant that Dev. Fund 1 would receive $3.42 million in interest annually, $1.44 million of which would go to NYCRC, $180,000 of which would go to the non-managing member investors as annual distributions, and the remainder of which would be used for operating expenses or be retained.

61.     The maturity date of the loan was 5 years after the final advance, but GWB Dev. Co. was provided an option to extend for 810 days.

62.    The loan agreement contained several defined events of default, including:

A.  Failure to pay interest when due;

B.  The borrower making any materially incorrect representation or warranty;

C.  The borrower becoming subject to any judgment in excess of $250,000 and not paying such judgment in 60 days (unless fully covered by insurance);

D.  The "Mortgaged Property" becoming "materially injured" by a natural event;

E.  The work not being "diligently and substantially completed" in accordance with the agreed "Project Cost Statement;" and

F.  Any material change to GWB Dev. Co.'s contracts with the Port Authority that were not approved by NYCRC in advance.

***NYCRC Engages Qiaowai and Wailian to Assist Its Marketing Efforts in China***

63.    In or about 2011, NYCRC engaged Qiaowai and Wailian (among others) to act as its agents for the purpose of marketing membership interests in Dev. Fund 1 to potential investors in China.

64.    As asserted by one of these agents -- Wailian -- in an action pending in the Southern District of New York, case 1:17-cv-09004-LLS, "NYCRC would prepare and provide written advertising materials for Wailian's use, which NYCRC would update over the course of the project as necessary. Then, with NYCRC's approval, Wailian would disseminate the materials provided by NYCRC and organize and finance investor seminars and other investor outreach in China, keeping NYCRC informed of the events, so NYCRC representatives could attend if desired. NYCRC also provided Wailian with approved communications to be shared with investors over the life of the project, which addressed, for example, project approval delays

and other developments."

65.     NYCRC executives, including Hayden and Wu, met with Qiaowai, Wailian, and other local agencies for the purpose of providing trainings on exactly what to say and what not say to prospective investors.  Among other things, NYCRC instructed Qiaowai, Wailian, and the other mainland-China-based marketing agents that during their marketing of Dev. Fund 1 to potential investors, they should not provide or discuss any formal legal documentation regarding the investments (including an unregistered private placement memorandum).

66.     In lieu of providing potential investors with legal documents concerning the offering, NYCRC prepared and provided to its agents in China Chinese-language marketing materials that were used in meetings with potential investors.  These materials were usually color brochures and slides that provided misleading information about the investments.

67.     While a small minority of investors were provided with offering memoranda in English (which they could not understand) at some point prior to their execution of the subscription agreements, even the formal documentation contained misrepresentations.

68.     Among other things, the offering memorandum misleadingly described the scope of the "Project" in which the investors would put their money – falsely suggesting that the EB-5 investment was only a small portion of a single large government-funded project, when the retail redevelopment and infrastructure redevelopment were in fact separate, and none of the government funding would be used for the retail.  Indeed, the entire reason the Port Authority offered the lease to GWB Dev. Co. was so that it could pass off the expense of redeveloping and managing the retail space and thereby reduce the amount of government funds needed (and lock in a revenue stream for itself).

69.     In addition, the offering memorandum asserted that the construction work would be performed by Skanska AB, a Stockholm-based international construction company with global operations that would be recognizable in China.  This was false, as Skanska had already abandoned the Project and, in 2011, no replacement had even been identified.

***During its China "Roadshow," NYCRC Makes Multiple Misrepresentations to Investors About the Risk of Investment by Intentionally Overstating the Collateral Provided to Investors, and Withholds Written Disclosure Materials***

70.     In meetings that occurred in the spring, summer, and fall of 2011 in China, NYCRC (either directly or through a hired marketing agent) made the following misrepresentations to potential investors:

A.  Dev. Fund 1 would have the first lien mortgage on both the retail and infrastructure (bus terminal) portions of the Station (when in fact the security interest only related to the lease for the retail portion, and was not a mortgage interest on any real property, as the entire terminal is the property of the Port Authority).

B.  If the borrower of EB-5 funds were to default on its loan from Dev. Fund 1the fund could take possession of the Station's bus terminal and redevelop it into additional retail space. (This was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.)

C.  The value of the collateral (which was misrepresented as the entire bus station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment.  (This was false, as the appraisal NYCRC possessed, but did not disclose, showed that the collateral would be worth significantly less.)

D.  The collateral was comprised of two buildings (when in fact the Station is a single building and the collateral was the ground lease, not the real property itself).

E.  All funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false).

F.  Construction on the Project had already commenced using public funds (which was false).

G.  The "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project.  (This was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million in funds it was providing for the bus terminal.  None of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing, and which constituted the only collateral for the EB-5 loan.)

H.  Skanska was the general contractor and as one of the largest contractors in the world had provided the developer a completion guarantee, which was a pledge secured by its own assets to complete the construction Project within budget and on time.  (This was false, as Skanska was no longer involved in the Project at this time.)

71.     Hayden and Wu conducted trainings with NYCRC's China-based

17

marketing agents, instructing them on what to say to potential investors to secure investments.

72.     In these trainings, Hayden spoke in English and Wu or another employee of NYCRC translated his statements into Mandarin.

73.     In these trainings, which were recorded in at least one instance, Hayden made the following statements:

A.     *General instructions on "pre-selling" to investors:*

(1)     "Now, it's really important to Qiaowai, obviously Vivian, as well as to New York City Regional Center that we keep all this information close to our vest while we pre-sell to clients or talk to clients because we have a launch on July 9th."  Ex. 1 at 1.

(2)     "A good rule to remember is don't answer questions [from clients] with documents.  Respond to the question as you know you are confident you've been given all the information."  Ex. 1 at 6.

(3)     "Let's control the information.  We're not sending anything out until we authorize it.  This presentation is for you to have and hold and use in in-office presentations to pre-sell your clients." Ex. 1 at 18.

B.     *Specific information to emphasize verbally when "pre-selling" to investors:*

(1)     "These four points, again, the hallmark of our program should always be repeated to your clients.  All of our projects are on government-owned land.  We bring in additional political and financial support, significantly supporting your EB-5 investors'

investments, as well provide specific assets and first mortgage security, creating a surplus in job creation.  All of these points are our mantra.  Repeat it all the time to your clients."  Ex. 1 at 8.

(2)      "Again, repeating again, government-owned land, minimizing risk by involving government, a lot of support.  As you know from all of our projects, we have a huge amount of government money that does not need to be repaid, something that should always be repeated to your client.  Not having to repay that money allows us to provide first mortgage security to your client." Ex. 1 at 8.

(3)      "This is a $358 million project for the city or Port Authority of New York and New Jersey.  The project's already begun.  It's going to happen anyway regardless of EB-5. That's the significant point to make to your investors about New York City Regional Center projects."  Ex 1 at 12.

(4)      "Your collateral to the firstly sold mortgage security for your investors is the George Washington Bridge Bus Station and the retail that's created in that bus station, all assignments of rent, leases, operating accounts, furnitures, and fixtures.  Very, very good collateral in this project."  Ex. 1 at 13.

(5)      "So when your investor, who doubts everything in the world, when they come into the room, asks you, 'What if this fails,' you say to them, 'What retail tenant, what company would

19

not want to have a store at a location with two universities, a

densely populated neighborhood and 50 million cars and trucks

traveling through the store every year?'  And of course, there's

infrastructure work on the bridge, again, being used or performed

with the capital from the government and EB-5.  Very important.

The bridge is old, it needs repair, and some of that work is going

into this particular part of the project."  Ex. 1 at 13.

(6)     "Here's the money that is used to calculate job creation and

we can use all of it for job creation.  It's a little bit over $277

million of government on account, $70 million from EB-5 and $11

million from SJM Partners, a hand-selected government

contractor-developer by the Port Authority. . . .  [The Port

Authority has] the money on account for this particular project."

Ex. 1 at 13.

(7)     "Here's the pie chart that we always like to use.  EB-5 in

yellow, $70 million representing only 19% of total project costs.

Minimal risk, very low exposure, government providing $277

million plus for this particular project.  And that money is all free,

does not need to be repaid.  Make no mistake and be very

confident, this is not a government bond.  Bonds need to be

repaid."  Ex. 1 at 14.

(8)     "As always first lease hold mortgage on the George

Washington Bridge bus station and related retail, including all

20

rents, leases, furniture, fixtures, and operating accounts, very significant, very safe, its first highest priority ahead of all government and SJM.  The safest EB-5 project on the market today." Ex. 1 at 14.

(9)     "The government project with the New York City Regional Center and your investor involved this recognition agreement further states that the mortgage that we hold on the property is law in the state of New York, very significant for your investors to know and appreciate.  We already know of two regional centers try to emulate us on this because it is so important and they have had trouble getting it.  So it is a very, very good tool to sell our projects to your investors." Ex. 1 at 15.

(10)     "Very important, as I said before, to understand the relationship of all the parties in the project to the EB-5 investor. [Skanska is] the fifth largest contracting company in the world. They have bonding and insurance exceeding $7 billion and they 100% guarantee completion of this project and all of its components.  With such an important asset to the State of New York and New Jersey, there can be no mistake on the George Washington Bridge or the bus station.  Their sales, their revenues, their balance sheet has assets exceeding 16 and as high as $21 billion per year, very significant company in the world of contracting." Ex. 1 at 15.

(11)    "Collateral is the bus station and the 120,000 square feet or 11,148 square meters of retail space, the assignment of all rents and leases, operating accounts, furnitures, and fixtures." Ex. 1 at 20.

(12)    "And it's actually two buildings, as you saw in the earlier photograph, more easily seen here, the one with the funny white roof, then you have the circular plaza, and then you have the building below.  That's the collateral."  Ex. 1 at 21.

(13)    "I can tell you that the value of this collateral is well in excess of two times the EB-5 investment."  Ex. 1 at 20.

(14)    "[I]n addition to the promissory note, [your investors have] the mortgage security that we hold against the collateral . . . .  We can take that anytime they fail.  All the value, and all the cash, all the leases, and everything is held in this right hand box, and it's very direct for us to have.  It's the safest way to structure EB-5." Ex. 1 at 16.

(15)    "The [EB-5 loan] transaction is 19% of the total project cost, and we have a recognition agreement as well as a completion guarantee on this EB-5 project that makes it extra safe and extra secure for your investors." Ex. 1 at 20.

(16)    "The three components, the bus station, the retail, and the bridge all have different timelines. The bridge is out towards 4 years, the bus station is a little over 2 years, and the retail is a little

22

longer than 2 and a half years." Ex. 1 at 30.

74.     The specific instructions above were all false and/or misleading.  (As a demonstrative, Exhibit 1 – a transcript of the English-language portion of the recording – is highlighted to note every false and misleading statement made during the recorded training session, all of which were repeated to the Phase I Investors by Qiaowai and the other China-based agents, as well, in certain instances, by Hayden and Wu in meetings with potential investors.)

75.     As set forth in further detail below, the falsehoods that Hayden stated to Qiaowai (as well as the other local representative agencies) were repeated in NYCRC's instructions to potential investors and relied on to their substantial detriment.

***NYCRC Lends Dev. Fund 1's Capital to GWB Dev. Co., but Then Purposefully Fails to Act When Events of Default Occur***

76.     Dev. Fund 1 was fully subscribed by approximately the end of 2011, with 144 investors, 89 of which are Investor Plaintiffs here.  Dev. Fund 1 advanced its capital to GWB Dev. Co. and NYCRC began collecting its management fees.

77.     However, no work on the Project commenced in 2011.  Indeed, the developer had not even hired a general contractor by that time.

78.     On October 22, 2012, Superstorm Sandy caused significant damage to the Station, which further delayed the start of construction.

79.     The damage constituted an event of default under the Dev. Fund 1 loan agreement.  However, NYCRC did not declare a default, nor did it inform the Dev. Fund 1 investors of the events and its reasons for not declaring a default.  Newsletters sent to the investors in 2012 and 2013 made no mention of the storm's impact on the Project.

80.     Because GWB Dev. Co. was making its interest payments, NYCRC received its $1.44 million in management fees from Dev. Fund 1 for 2012.

***Construction Finally Begins***

81.     In June 2013, GWB Dev. Co. entered into an agreement with Tutor Perini to act as the general contractor for the Project, agreeing to pay more than $100 million for construction of the Bus Station's new retail space.  In the fall of that year, construction finally began.

82.     Because GWB Dev. Co. was making its interest payments, NYCRC received its $1.44 million in management fees from Dev. Fund 1 for 2013.

83.     By early 2014, it became clear that the retail portion of the Project would cost at least $119 million instead of the approved cost of $102 million.  NYCRC was aware of this possibility by the third quarter of 2013.

84.     This constituted another event of default under the loan agreement. However, NYCRC did not declare a default, nor did it inform the investors in Dev. Fund 1 of the events and its reasons for not declaring a default.

85.     Because GWB Dev. Co. was making its interest payments, NYCRC received its $1.44 million in management fees from Dev. Fund 1 for 2014.

***Notwithstanding GWB Dev. Co.'s Defaults Under the Loan Agreement with Dev. Fund 1, NYCRC Solicits Additional Investors of Dev. Fund 2***

86.     Indeed, rather than declare a default in 2014 as a result of the cost increase, NYCRC agreed to create and promote Dev. Fund 2 to raise additional EB-5 funds in order to cover the shortfall.

87.     In fact, on or about September 6, 2013, in anticipation of the cost overrun and the potential opportunity to earn additional fees, NYCRC established Dev. Fund 2 as a New

York limited liability company.

88.     At no time prior to October 31, 2019 did NYCRC inform the investors in Dev. Fund 1 about the existence of Dev. Fund 2, or of NYCRC's involvement with raising additional funds.

89.     On April 7, 2014, NYCRC prepared and executed an operating agreement for Dev. Fund 2 that was substantially similar to Dev. Fund 1, except that the administrative fees to NYCRC were increased to $49,000 per investor and the management fee was increased to 3%.

90.     Dev. Fund 2 was designed to raise a total of $19 million from 36 EB-5 investors, which would entitle NYCRC to $1,764,000 in up-front administrative fees and $570,000 in management fees annually.

91.     However, Dev. Fund 2 did not loan any funds to GWB Dev. Co.  Rather, Dev. Fund 2 entered into a loan agreement with GWB Leverage Lender, LLC, an entity that was wholly owned by GWB Development Partners LLC, which was the private joint venture that owned 91% of GWB Dev. Co.

92.     This structure allowed the NYCRC-organized Dev. Fund 2 to send its capital to GWB Dev. Co. via a pass-through entity.

93.     The loan agreement with GWB Leverage Lender, LLC was substantially similar to the agreement with GWB Dev. Co.  However, it acknowledged that the GWB Leverage Lender, LLC's operating agreement contained a loan from Dev. Fund 2 (which is the source of its funds), and pledged all shares in GWB Leverage Lender, LLC to Dev. Fund 2. Moreover, even though Dev. Fund 2 was not a party to the agreement, the loan agreement required that all funds be disbursed towards EB-5 qualifying expenditures.

94.     On information and belief, there is a loan agreement between Dev. Fund 2 and GWB Leverage Lender, LLC that contains substantially similar terms as the agreement between Dev. Fund 1 and GWB Dev. Co., except that the collateral pledged to Dev. Fund 2 is merely an equity interest in GWB Dev. Co., the ultimate recipient of the funds.

95.     This structure left Dev. Fund 2 without any actual collateral interest, because in any bankruptcy or dissolution, the equity holders of GWB Dev. Co. would not recover until after all creditors, including unsecured creditors, were fully repaid.

96.     Once again, NYCRC engaged marketing agents in China to promote this new investment.

97.     In soliciting investments for Dev. Fund 2, NYCRC did not disclose the several events of default that had already occurred under the loan agreement between Dev. Fund 1 and GWB Dev. Co., set forth above.

98.     In soliciting investments, NYCRC stated falsely that Dev. Fund 1 had funded a "Phase 1" of the construction of the Project which was already complete, and that Dev. Fund 2 would be used to fund a "Phase 2" of construction.  However, the project that Dev. Fund 1 had agreed to fund was the complete renovation, not just a phase of it, and that renovation was not complete.  At no time did NYCRC reveal to potential investors in Dev. Fund 2 that the capital raised would be used to fund a shortfall for the entire renovation.  In March 2014, when NYCRC commenced its sales efforts for Dev. Fund 2, construction had only just begun.

99.     On information and belief, in marketing Dev. Fund 2, NYCRC told certain prospective investors that the Phase 2 funds would be added to the same capital stack as the Phase 1 funds, and therefore would be secured by the same first-position mortgage on both the retail section of the Station as well as the bus operation areas as Dev. Fund 1. However, neither

26

Dev. Fund 1 or Dev. Fund 2 had any collateral rights with respect to the operational portion of the Station, and Dev. Fund 2 had no security rights in the real property at all. Rather, as discussed above, Dev. Fund 1 only had a security interest in GWB Dev. Co.'s leasehold interest as well as future rents, while Dev. Fund 2's loan was collateralized by a pledge of GWB Development Partners LLC's equity interest in GWB Dev. Co.  This structure—a pledge of equity in the developer/debtor—effectively subordinated the investors in Dev. Fund 2 behind *all* of GWB Dev. Co.'s creditors, not just Dev. Fund 1.

100.    In sum, NYCRC told prospective investors in Dev. Fund 2 that:

A.  There were two construction phases of the Project and that Phase 1 was complete and had been a success (when in fact the original plans for the Project did not include two construction phases, but a second round of fund raising became necessary when the Project ran out of money);

B.  Dev. Fund 2 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (just as Phase 1 had);

C.  If the borrower of the EB-5 funds were to default on its loan, the Phase 2 investors could take possession of the Station's bus terminal and redevelop it into additional retail space;

D.  The value of the Phase 2 collateral was worth more than twice the total Phase 2 EB-5 investment;

E.  All funds paid by the Port Authority to improve the station would increase the value of the collateral because the Phase 2 investors would maintain their position as the senior secured creditor on the entire Project; and

F.  The "government" was providing $48.2 million for the Project and the

developer was providing $9.2 million, so the $19 million from the EB-5 investments comprised less than 25% of the total capital for "Phase 2," but the EB-5 investors would obtain a first lien on the entire Project.  Indeed, prospective investors were given an NYCRC-branded document that made these misleading claims.

101.    However, prospective investors in Dev. Fund 2 were specifically not told that:

A.  The collateral for Phase 2 consisted of only a lien on the shares that the developers owned in the Project (which would be worthless in any bankruptcy or insolvency); and

B.  The funds raised in Phase 1 were not sufficient to complete the redevelopment and this shortfall was the reason why a "Phase 2" raise was needed.

102.    In connection with raising funds for Dev. Fund 2, NYCRC actively solicited investments from Chinese citizens who were already present in the United States.

103.    In a Chinese-language investor update NYCRC sent in September 2014 to all Plaintiffs, NYCRC touted several specific milestones achieved in the construction process and reported on retail lease commitments, but did not disclose the cost overruns, the needs for increased capital, or the fact that construction had only begun in late 2013 as opposed to 2011.

104.    NYCRC never informed the Dev. Fund 1 investors of the existence of Dev. Fund 2.  NYCRC collected its $1.44 million in management fees for 2013 from Dev. Fund 1 and additional fees from Dev. Fund 2 for the partial year.

*NYCRC Lends Dev. Fund 2's Capital to GWB Dev. Co., but Then Continues to Purposefully Fail to Act When Events of Default Occur in Connection with Either Dev. Fund 1's Loan or Dev. Fund 2's Loan*

105.   In early 2015, Tutor Perini commenced a confidential arbitration against GWB Dev. Co. alleging mismanagement, defective designs, and other material deviations from the construction contract.  GWB Dev. Co. cross-claimed, blaming Tutor Perini and its subcontractors for construction delays and cost overruns.

106.   NYCRC was aware of the arbitration, but did not inform the non-managing members of Dev. Fund 1 or Dev. Fund 2 that it was occurring.

107.   Because GWB Dev. Co. was making its interest payments, NYCRC received its $1.44 million in management fees from Dev. Fund 1 for 2015 and its $570,000 from Dev. Fund 2, for a total of $2.01 million.

108.   In March 2016, due to the many delays, the ground lease was amended by the Port Authority to defer the beginning of rent payment by 4 years and delay the anticipated completion date by approximately 6 months in exchange for a daily penalty that amounted to $880,000.

109.   In approximately April 2016, the Port Authority temporarily halted funding, as did other lenders.  GWB Dev. Co. stopped paying Tutor Perini and stopped making interest payments on some or all of its loans (but not on its EB-5 loans).

110.   All of these events constituted events of default under the Dev. Fund 1-GWB Dev. Co. loan agreement, as well as, on information and belief, the Dev. Fund 2-GWB Leverage Lender, LLC agreement.

111.   However, NYCRC did not declare a default, nor did it inform the investors in Dev. Fund 1 or Dev. Fund 2 of the events and its reasons for not declaring a default.  Indeed, in May 2016, NYCRC issued another update to investors, again touting the Project's smooth

progression.

112.    Because GWB Dev. Co. was making its interest payments, NYCRC received its $1.44 million in management fees from Dev. Fund 1 for 2016 and its $570,000 from Dev. Fund 2, for a total of $2.01 million.

113.    Although the Project was supposed to be completed by late 2016 and the terminal was supposed to be opened in late 2016 (already after several delays), these goals were not met.  During this time, GWB Dev. Co. was forced to pay a $5,000/day penalty for each day opening was delayed, until the Station finally reopened in May 2017.  However, the retail portion of the Station remained closed.  NYCRC did not inform the non-managing members of Dev. Fund 1 or 2 of these developments, nor take any action with respect to GWB Dev. Co.'s defaults.

114.    Because GWB Dev. Co. was making its interest payments, NYCRC received its $1.44 million in management fees from Dev. Fund 1 for 2017 and its $570,000 from Dev. Fund 2, for a total of $2.01 million.

115.    Again in 2018, NYCRC took no actions to protect the interests of the non-managing members of Dev. Fund 1 or 2, i.e., the Investor Plaintiffs.  Because GWB Dev. Co. was making its interest payments, NYCRC received its $1.44 million in management fees from Dev. Fund 1 for 2018 and its $570,000 from Dev. Fund 2, for a total of $2.01 million.

116.    In October 2019, just before the start of the COVID-19 pandemic, GWB Dev. Co. filed for bankruptcy protection in the Southern District of New York.

117.    In meetings with investors after the bankruptcy petition was filed, including certain Plaintiffs here, NYCRC reiterated its misrepresentations regarding the collateral pledged to Dev. Fund 1 and Dev. Fund 2, in order to prevent the investors from taking any formal actions, and to conceal the falsity of their earlier misrepresentations.

118.     However, by January 2020, the COVID-19 pandemic was already a severe epidemic in China, and by March 2020, the entire world went into lockdown.  However, in mid-December 2019, certain investors retained separate counsel.  Through the efforts of counsel, the Investor Plaintiffs were eventually put in a position where they could share information and compare stories.  It was not until April 2021, at the earliest, that any of the Investor Plaintiffs in possession of sufficiently complete information to recognize that NYCRC had misled them in connection with their investment decisions, misled them in connection with the status and progress of the Project, and misled them regarding the protection their supposed security interests provided them in connection with the bankruptcy.

119.     In an attempt to avoid litigation, NYCRC and all Plaintiffs herein entered into a tolling agreement, halting the running of all applicable statutes of limitation and repose, for the period commencing on September 1, 2021 and ending as of the filing of this action.

120.     In a further attempt to prevent the Investor Plaintiffs from commencing this action, in the fall of 2021, NYCRC commenced an action on behalf of Dev. Fund 1 (as manager) against the Port Authority in New York State Supreme Court.  The complaint in that action claimed that the Port Authority was ultimately responsible for Dev. Fund 1's loss of capital.

121.     On information and belief, the Port Authority action was commenced and maintained to create the impression the Investor Plaintiffs would be biting the proverbial hand the feeds them if they commenced an action against NYCRC, and to create the impression that the investors' only chance and recovering their losses was to continue to trust NYCRC.  Within weeks of the date that the Investor Plaintiffs provided NYCRC with notice of their intent to commence this action, NYCRC voluntarily discontinued the action against the Port Authorities,

further flouting their obligation as a fiduciary for the investors in the fund the that managed (as the Port Authority action was commenced, primarily, to protect NYCRC and not based on any serious expectation of recovery for the investors).

### THE INVESTOR PLAINTIFFS

1.    ***Bai Wen*** (柏文**)**

A.  Bai Wen is an individual and resident of the State of Michigan.

B.  In 2011, Bai Wen attended a meeting hosted by the general manager of the Guangzhou City office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects.

C.  At the meeting, an employee of Qiaowai gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 1).  The substance of the presentation had been previously provided to Qiaowai by NYCRC.

D.  In that meeting, Bai Wen was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan); (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in fact the Station is a single building and the collateral was the ground

lease, not the real property itself); (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vi) construction on the Project had already commenced using public funds (which was false); and (vii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue, as the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan).

E. On the basis of these several misrepresentations, Bai Wen signed a subscription agreement to become a Phase 1 Investor.  Bai Wen was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment.  Bai Wen believed they were investing in a government-backed project with a first lien on the bus Station itself.

2.    *Cao Xiaoling* (曹筱玲)

A.  Cao Xiaoling is an individual and resident of the State of California.

B.  In 2011, Cao Xiaoling attended a meeting at the Beijing office of Kun

Peng, a marketing agent hired by NYCRC to promote its investment projects.

C.  At the meeting, Huang Lin, an employee of Kun Peng, gave a presentation

regarding the GWB Bus Station Redevelopment Project (Phase 1).  Cao

Xiaoling was provided with a brochure and photographs of other projects. The

substance of the presentation had been previously provided to Kun Peng by

NYCRC.

D.  In that meeting, Cao Xiaoling was told that: (1) Dev. Fund 1 would have a

first lien mortgage on both the retail and public (bus terminal) portions of the

Station (when in fact the security interest only related to the retail portion); (ii)

if the borrower of EB-5 funds were to default on its loan from the SPV, the

SPV could take possession of the Station's bus terminal and redevelop it into

additional retail space (which was false because the bus terminal portion of

the Station was not included in the collateral pledged to the EB-5 loan.); (iii)

the value of the collateral (which was misrepresented as the entire bus Station

including the public portion) was worth more than twice the anticipated $72

million EB-5 investment; (iv) the collateral was comprised of two buildings

(when in fact the Station is a single building and the collateral was the ground

lease, not the real property itself); (v) all funds paid by the Port Authority to

improve the Station would increase the value of the collateral because Dev.

Fund 1 would maintain its position as the senior secured creditor on the entire

Project (which was false); and (vi) the "government" was providing $277

million for the Project so that the EB-5 investments would only provide 19%

of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal. None of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).

E. On the basis of these several misrepresentations, Cao Xiaoling signed a subscription agreement to become a Phase 1 Investor. Cao Xiaoling was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Cao Xiaoling believed they were investing in a government-backed project with a first lien on the bus Station itself.

3. ***Cao Yan (曹妍)***

A. Cao Yan is an individual and resident of the People's Republic of China.

B. In 2014, Cao Yan met Dong Chun Li, an employee at the Beijing office of Kun Peng, a marketing agent hired by NYCRC to promote its investment projects.

C. Dong Chun Li and/or other employees of Kun Peng gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 2).

D. Dong Chun Li, and/or other employees of Kun Peng, relayed the following false information to Cao Yan (as Dong Chun Li had been trained to

by NYCRC): (i) the Phase 1 Project was complete and had been a success; (ii) Dev Fund 2 would have the first lien mortgage on both the retail and public (bus terminal) portions of the station; and (iii) the "government" was providing $277 million for the project so that the EB-5 investments would only provide a small percentage of the total capital but obtain a first lien on the entire Project.

E.   At no time was Cao Yan told that (i) the collateral for Phase 2 consisted of only a lien on the shares that the developers owned in the Project (which would be worthless in any bankruptcy or insolvency) or that (ii) the funds raised in Phase 1 were not sufficient to complete the redevelopment (thus necessitating the Phase 2 capital raise).

F.   On the basis of these several misrepresentations, Cao Yan signed the signature page of a subscription agreement in English that Cao Yan had been given to become a Phase 2 Investor.  Cao Yan had been given a brochure, but did not receive any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 2 and the GWB Leverage Lender LLC, or that disclosed any risks relating to the investment.  Cao Yan believed they were investing in a government-backed project with a first lien on the bus Station itself.

4.   ***Cao Yeqian* (曹叶倩)**

A.   Cao Yeqian is an individual and resident of the State of New York.

B.   In the summer of 2011, Cao Yeqian attended a seminar and a one-on-one meeting at the Shanghai City office of Qiaowai, a marketing agent hired by

NYCRC to promote its investment projects.

C.  At the meeting, Ms. Zhang, an employee of Qiaowai, gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 1).  The substance of the presentation had been previously provided to Qiaowai by NYCRC. Cao Yeqian was given a brochure.

D.  In that meeting, Cao Yeqian was told that: (1) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.); (iii) the value of the collateral (which was misrepresented as the entire bus station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) all funds paid by the Port Authority to improve the station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (v) construction on the Project had already commenced using public funds (which was false); and (vii) the "government" was providing $277 million for the Project and that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of

37

the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).

E.   On the basis of these several misrepresentations, Cao Yeqian signed a subscription agreement to become a Phase 1 Investor.  Cao Yeqian was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment.  Cao Yeqian believed they were investing in a government-backed project with a first lien on the bus station itself.

5.     ***Chen Bin*** (陈斌)

A.   Chen Bin is an individual and resident of the Commonwealth of Pennsylvania.

B.   In 2011, Chen Bin attended at least one meeting at the Shanghai office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects, where Chen Bin learned about the GWB Bus Station Redevelopment Project (Phase 1) including from Laurent Yuan, a now-former employee of Qiaowai.  At one meeting Chen Bin attended, an American was also present to assist with promoting the Project.  Chen Bin was provided with an NYCRC brochure about the Project, and was given a presentation about the Project, the substance of which had been previously provided to Qiaowai by NYCRC.

C.   Specifically, Chen Bin was told that: (i) Dev. Fund 1 would have a first

lien mortgage on both the retail and public (bus terminal) portions of the
Station (when in fact the security interest only related to the retail portion); (ii)
if the borrower of EB-5 funds were to default on its loan from the SPV, the
SPV could take possession of the Station's bus terminal and redevelop it into
additional retail space (which was false because the bus terminal portion of
the Station was not included in the collateral pledged to the EB-5 loan.); (iii)
the value of the collateral (which was misrepresented as the entire bus Station
including the public portion) was worth more than twice the anticipated $72
million EB-5 investment; (iv) the collateral was comprised of two buildings
(when in fact the Station is a single building and the collateral was the ground
lease, not the real property itself); (v) all funds paid by the Port Authority to
improve the Station would increase the value of the collateral because Dev.
Fund 1 would maintain its position as the senior secured creditor on the entire
Project (which was false); (vi) construction on the Project had already
commenced using public funds (which was false); and (vii) the "government"
was providing $277 million for the Project so that the EB-5 investments
would only provide 19% of the total capital but obtain a first lien on the entire
Project (which was entirely untrue; the $277 figure represented $199 million
in funds the Port Authority was providing for the repair and improvement of
the George Washington Bridge itself and $78 million on the bus terminal, and
none of those funds were being injected into the capital stack for the retail
mall renovation, which was the only project that the EB-5 investors were
financing and which constituted the only collateral for the EB-5 loan.).

D.  On the basis of these several misrepresentations, Chen Bin signed a subscription agreement to become a Phase 1 Investor.  Chen Bin was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. In fact, Chen Bin received only the signature page of the agreement they signed.  Chen Bin believed they were investing in a government-backed project with a first lien on the bus Station itself.

6.    *Chen Li* (陈莉）

A.  Chen Li is an individual and resident of the State of California.

B.  In 2011, Chen Li attended a visa promotion meeting hosted by the Shanghai office of Jinghong Exit-Entry Service Co. Ltd. ("Jinghong"), a marketing agent hired by NYCRC to promote its investment projects.

C.  At the meeting, employees of Jinghong, gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 1).  A male employee of NYCRC also attended the meeting.  Chen Li was provided with promotional material. The substance of the presentation had been previously provided to Jinghong by NYCRC.

D.  In the meeting described above, Chen Li was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and

redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.); (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in fact the station is a single building and the collateral was the ground lease, not the real property itself); (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vi) construction on the Project had already commenced using public funds (which was false); and (vii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).  Chen Li was also told that the Project would generate more than twice as many jobs as was required under the EB-5 program, and that a famous construction contractor was involved with the Project and had already issued a letter ensuring that the Project would finish as scheduled.

E.   On the basis of these several misrepresentations, Chen Li signed a subscription agreement to become a Phase 1 Investor.  Chen Li was not provided with the private placement memorandum or any other formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment.  Chen Li believed they were investing in a government-backed project with a first lien on the bus Station itself.

7.    ***Chen Qiang* (陈强**）

A.  Chen Qiang is an individual and resident of the State of California.

B.  In 2011, Chen Qiang attended a meeting at the Shanghai office of Wailian, a marketing agent hired by NYCRC to promote its investment projects.

C.  At the meeting, Wailian employees gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 1). Yang Qiu "Bella" Yan, a now-former employee of Wailian, had provided Chen Qiang with a brochure and a powerpoint presentation.

D.    In the meeting, Chen Qiang was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iii) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1

would maintain its position as the senior secured creditor on the entire Project (which was false); (v) construction on the Project had already commenced using public funds (which was false); and (vi) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only Project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).  At no time was Chen Qiang told that a land lease was part of the collateral; they understood the collateral to be actual real property.

E.   On the basis of these several misrepresentations, Chen Qiang signed a subscription agreement to become a Phase 1 Investor.  Chen Qiang did not receive the private placement memorandum or any other formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment.  Chen Qiang believed they were investing in a government-backed Project with a first lien on the bus Station itself.

8.     *Chen Weili* (陈伟立)

A.  Chen Weili is an individual and resident of the State of California.

43

B.  In 2011, Chen Weili attended a meeting hosted by general manager of the Zhuhai office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects.

C.  At the meeting, a presentation was given regarding the GWB Bus Station Redevelopment Project (Phase 1).  Chen Weili was given a brochure. The substance of the presentation had been previously provided to Qiaowai by NYCRC.

D.  In the meeting, Chen Weili was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.); (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in fact the Station is a single building and the collateral was the ground lease, not the real property itself); (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vi) construction on the Project had already commenced using public funds (which was false); and (vii) the "government"

44

was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only Project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).

E.   On the basis of these several misrepresentations, Chen Weili signed a subscription agreement to become a Phase 1 Investor.  Chen Weili was not given any formal documentation and did not receive any documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Chen Weili believed they were investing in a government-backed project with a first lien on the bus Station itself.

9.     ***Cheng Fangzhou*** **(成方舟)**

A.  Cheng Fangzhou is an individual and resident of the State of Indiana.

B.  In 2014, Cheng Fangzhou was informed of the GWB Bus Station Redevelopment Project (Phase 2) by employee(s) of the Shanghai office of Gaiwei Commercial Information Consultant Ltd. ("Gaiwei"), a marketing agent hired by NYCRC to promote its investment projects.

C.  Gaiwei employees relayed the following false information to Cheng Fangzhou (as they had been trained to do by NYCRC): (i) the Phase 1 Project

was complete and had been a success; and (ii) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because the Phase 2 investors would maintain their position as the senior secured creditor on the entire Project (Phase 2 investors had the first lien).

D.  At no time was Cheng Fangzhou told that (i) the collateral for Phase 2 consisted of only a lien on the shares that the developers owned in the Project (which would be worthless in any bankruptcy or insolvency) or that (ii) the funds raised in Phase 1 were not sufficient to complete the redevelopment (thus necessitating the Phase 2 capital raise).

E.  On the basis of these misrepresentations, Cheng Fangzhou signed the signature page of a subscription agreement to become a Phase 2 Investor. Cheng Fangzhou did not receive any formal documentation and did not receive any documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 2 and the GWB Leverage Lender LLC, or that disclosed any risks relating to the investment. Cheng Fangzhou believed they were investing in a government-backed project with a first lien on the bus Station itself.

10.    *Chu Min* (初敏)

A.  Chu Min is an individual and resident of the People's Republic of China.

B.  In or about 2014, Chu Min attended a meeting with NYCRC representatives that was held in a coffee shop in the Qiaoyang District of Beijing.  When Chu Min and a friend arrived at the coffee shop, they were introduced to Gregg Hayden, as well as two other NYCRC employees,

Hayden's assistant Qing Mei and another young man whose name Chu Min does not recall but who appeared to be an American.. At the meeting, Hayden gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 2).  (Chu Min also met with Hayden another time in the lobby of Hayden's hotel.)

C.   Chu Min was not yet aware of the EB-5 program before meeting with Hayden.  During the meeting, Hayden first explained how the EB-5 program works.  He touted NYCRC's track record and talked about how its experienced due diligence team makes sure they choose only very solid projects.  In discussing NYCRC's policy for selecting projects, Hayden also said that NYCRC always ensures that EB-5 investors are the first position creditors and that the developer puts a lot of money into the project.

D.   Hayden was initially promoting a different project.  However, Hayden said that a few people had just dropped out of the GWB Phase 2 Project and that he could put Chu Min in that project if she desired.

E.   Hayden stated that the Phase 2 Project was a better choice because Phase 1 of the construction Project was "basically done" (which was false) and the second Phase already had 526 green card approvals, which meant her visa application would be approved more quickly.

F.   Hayden relayed the following false information to Chu Min:

G.   (i) the Phase 2 investors would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station; (ii) the value of the Phase 2 collateral was worth more than twice the total Phase 2 EB-5 investment; (iii)

47

all funds paid by the Port Authority to improve the Station would increase the value of the collateral because the Phase 2 investors would maintain their position as the senior secured creditor on the entire Project (Phase 2 investors had the first lien); (iv) construction on the retail redevelopment project had already commenced using public funds; (v) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide a small percentage of the total capital, but obtain a first lien on the entire Project; and (vi)  Phase 1 involved the hard construction of the bus Station, and that Phase 2 primarily involved soft construction (which was false, as Hayden failed to mention that Phase 1 had gone over budget precipitating the need for Phase 2).

H.  At no time was Chu Min told that (i) the collateral for Phase 2 consisted of only a lien on the shares that the developers owned in the Project (which would be worthless in any bankruptcy or insolvency) or that (ii) the funds raised in Phase 1 were not sufficient to complete the redevelopment (thus necessitating the Phase 2 capital raise).

I.   On the basis of these several misrepresentations, Chu Min signed the signature page of a subscription agreement to become a Phase 2 Investor.  Chu Min did not receive any Chinese-language documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 2 and the GWB Leverage Lender LLC.  Chu Min believed they were investing in a government-backed project with a first lien on the bus Station itself.

11.   *Feng Ying* (冯颖)

A.  Feng Ying is an individual and resident of the State of California.

B.  In 2011, Feng Ying learned about the GWB Bus Station Redevelopment Project (Phase 1) from an employee with the Shanghai office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects, and received a brochure about the Project.

C.   Feng Ying was told by the Qiaowai employee that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.); (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in fact the Station is a single building and the collateral was the ground lease, not the real property itself); (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vi) construction on the Project had already commenced using public funds (which was false); and (vii) the "government" was providing $277 million for the Project so that the

49

EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.). In addition, Feng Ying was told that the contractor guaranteed the timely completion of the Project, so there was no risk of delayed completion.

D.  On the basis of these several misrepresentations, Feng Ying signed a subscription agreement to become a Phase 1 Investor.  Feng Ying was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Feng Ying believed they were investing in a government-backed project with a first lien on the bus Station itself.

12.    ***Gao Guangfeng*** (高广峰)

A.  Gao Guangfeng is an individual and resident of the State of California.

B.  In 2011, Gao Guangfeng's ex-wife attended a meeting on his behalf hosted by the Qingdao office of Wailian, a marketing agent hired by NYCRC to promote its investment projects. This meeting took place in a hotel meeting room in the City of Qingdao, lasted approximately two hours long, and was

attended by approximately 100-200 people.

C.  At the meeting, which was hosted by Wailian's manager (a woman with the last name Liu), Wailian employees gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 1). Gao Guangfeng's ex-wife was provided marketing and promotional material. The substance of the presentation had been previously provided to Wailian by NYCRC.

D.  In that meeting, Gao Guangfeng's ex-wife was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.); (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (v) construction on the Project had already commenced using public funds (which was false); and (vi) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented

51

$199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and  none of those funds were being injected into the capital stack for the retail mall renovation, which was the only Project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).

E.   On the basis of these several misrepresentations, Gao Guangfeng signed a subscription agreement to become a Phase 1 Investor.  Neither Gao Guangfeng nor his ex-wife was given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. In fact, neither Gao Guangfeng nor his ex-wife received any formal legal documents in Chinese.  Gao Guangfeng believed they were investing in a government-backed project with a first lien on the bus Station itself.

13.   ***Gu Danhui* (顾丹辉)**

A.  Gu Danhui is an individual and resident of the People's Republic of China.

B.  In 2011, Gu Danhui met with Ms. Wu, an employee of NYCRC.

C.  At the meeting, Ms. Wu presented to Gu Danhui the investment opportunity regarding the GWB Bus Station Redevelopment Project (Phase 1). Gu Danhui was given promotional materials.

D.   In the meeting described above, Gu Danhui was told that: (i) Dev. Fund 1

would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.) (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in fact the Station is a single building and the collateral was the ground lease, not the real property itself); (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vi) construction on the Project had already commenced using public funds (which was false); and (vii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral

for the EB-5 loan.).

E.   On the basis of these several misrepresentations, Gu Danhui signed a subscription agreement to become a Phase 1 Investor.  Gu Danhui was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Gu Danhui believed they were investing in a government-backed project with a first lien on the bus Station itself.

14.   *Han Mingyuan* (韩铭嫒)

A.   Han Mingyuan is an individual and resident of the State of Illinois.

B.   In 2011, Han Mingyuan was informed of the GWB Bus Station Redevelopment Project (Phase 1) by employee(s) of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects. Han Mingyuan was only provided with a promotional brochure.

C.   Qiaowai employees relayed the following false information to Han Mingyuan: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iii) the collateral was comprised of real property (when in fact the collateral was the ground lease, not the real property itself (iv) construction on the Project had already commenced using public funds (which was false); and (v) the

"government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).  At no time was Han Mingyuan told that a land lease was part of the collateral; they understood the collateral to be actual real property.

D.  On the basis of these several misrepresentations, Han Mingyuan signed a subscription agreement to become a Phase 1 Investor. Han Mingyuan was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Han Mingyuan believed they were investing in a government-backed project with a first lien on the bus Station itself.

15.    *Hu Lan* (胡兰)

A.  Hu Lan is an individual and resident of the People's Republic of China.

B.  In 2011, Hu Lan attended a meeting at the Guangzho City office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects.

C.  At the meeting Qiaowai employees discussed the investment opportunity regarding the GWB Bus Station Redevelopment Project (Phase 1). Hu Lan was given promotional material.

D.  In the meeting described above, Hu Lan was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.) (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in fact the Station is a single building and the collateral was the ground lease, not the real property itself); (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vi) construction on the Project had already commenced using public funds (which was false); and (vii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the

56

repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).

E.   On the basis of these several misrepresentations, Hu Lan signed a subscription agreement to become a Phase 1 Investor.  Hu Lan was only shown the agreement in English and was directed where to sign without discussion or explanation. Hu Lan was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. This investor believed they were investing in a government-backed project with a first lien on the bus Station itself.

16.   ***Hu Min* (胡旻)**

A.   Hu Min is an individual and resident of the State of New York.

B.   In 2011, Hu Min was informed of the GWB Bus Station Redevelopment Project (Phase 1) by employee(s) of the Beijing office of Kun Peng, a marketing agent hired by NYCRC to promote its investment projects. Hu Min was provided with promotional material about the Project.

C.   Kun Peng employees relayed the following false information to Hu Min: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default

on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.) (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in fact the Station is a single building and the collateral was the ground lease, not the real property itself); (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vi) construction on the Project had already commenced using public funds (which was false); and (vii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).  Hu Min was also told that the Project was guaranteed by the American government and that they would not let an infrastructure project fail.

D.  On the basis of these several misrepresentations, Hu Min signed a subscription agreement to become a Phase 1 Investor. Hu Min was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Hu Min believed they were investing in a government-backed project with a first lien on the bus Station itself.

17.  ***Hu Wenshu*** (胡文姝)

A.  Hu Wenshu is an individual and resident of the State of California.

B.  In 2011, Hu Wenshu was informed of the GWB Bus Station Redevelopment Project (Phase 1) by employee(s) of the Beijing office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects.  Hu Wenshu was given a brochure and shown a PowerPoint presentation about the Project.

C.  In the meeting described above, Hu Wenshu was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan) (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice

the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in fact the Station is a single building and the collateral was the ground lease, not the real property itself);  (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vi) construction on the Project had already commenced using public funds (which was false); and (vii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).

D.  On the basis of these several misrepresentations, Hu Wenshu signed a subscription agreement to become a Phase 1 Investor. Hu Wenshu was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Hu Wenshu believed they were investing in a government-backed project with a first lien on the bus Station itself.

18.    ***Huang Hui*** (黄慧)

A.  Huang Hui is an individual and resident of the State of Washington.

B.  In 2014, Huang Hui attended meetings with employees of the Guangxi office of Huaya Foreign Service Ltd., a marketing agent hired by NYCRC to promote its investment projects. Huang Hui was given a brochure.

C.  At at least one of the meetings, a representative of NYCRC, gave a presentation regarding multiple projects, including the GWB Bus Station Redevelopment Project (Phase 2).

D.  At another meeting, Huang Hui met again with employees of Huaya Foreign Service Ltd., to discuss the Project.

E.  At these meetings, Huang Hui was told the following false information: (i) the Phase 1 project was complete and had been a success; (ii) the funds from the Phase 2 EB-5 investors would be used for an additional expansion of the bus Station; (iii) the Phase 2 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station; (iv) if the borrower of EB-5 funds were to default on its loan, the Phase 2 investors could take possession of the Station's bus terminal and redevelop it into additional retail space; (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because the Phase 2 investors would maintain their position as the senior secured creditor on the entire Project (Phase 2 investors had the first lien); (vi) construction on the retail redevelopment project had already commenced using public funds and was told that the Government was a co-investor; and (vii) the "government" was

providing $277 million for the Project so that the EB-5 investments would only provide a small percentage of the total capital, but obtain a first lien on the entire Project.

F.   At no time was Huang Hui told that (i) the collateral for Phase 2 consisted of only a lien on the shares that the developers owned in the Project (which would be worthless in any bankruptcy or insolvency) or that (ii) the funds raised in Phase 1 were not sufficient to complete the redevelopment (thus necessitating the Phase 2 capital raise).

G.   On the basis of these several misrepresentations, Huang Hui signed the signature page of a subscription agreement in English that Huang Hui had been given to become a Phase 2 Investor.  Huang Hui did not receive any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 2 and the GWB Leverage Lender LLC, or that disclosed any risks relating to the investment, before signing the subscription agreement. Huang Hui believed they were investing in a government-backed project with a first lien on the bus Station itself.

19.   ***Huang Wei* (黄维)**

A.   Huang Wei is an individual and resident of the State of California.

B.   In 2011, Huang Wei attended a meeting at Jinghong Immigration Company (n/k/a "Jinghua"), a marketing agent hired by NYCRC to promote its investment projects.

C.  At the meeting, Jackie, an employee of Jinghua, gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 1). Jackie gave Huang Wei a brochure and showed Huang Wei a video.

D.  In the meeting described above, Huang Wei was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.); (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in fact the Station is a single building and the collateral was the ground lease, not the real property itself); (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vi) construction on the Project had already commenced using public funds (which was false); and (vii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the

repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).  Huang Wei was also told that the government investment was 70% and the EB-5 investors' investment was 30%, guaranteeing the payback through collateral and first lien.

E.   On the basis of these several misrepresentations, Huang Wei signed a subscription agreement to become a Phase 1 Investor.  Huang Wei was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Huang Wei believed they were investing in a government-backed project with a first lien on the bus Station itself.

20.   ***Huang Xiuwen* (黄秀文)**

A.  Huang Xiuwen is an individual and resident of the People's Republic of China.

B.  In 2011, Huang Xiuwen attended a meeting with at least one employee of the Shanghai office of Wailian, a marketing agent hired by NYCRC to promote its investment projects.

C.  At the meeting, Xie Yin, an employee of Wailian, gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 1). Huang Xiuwen was given promotional materials.

E.  In the meeting described above, Huang Xiuwen was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iii) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (iv) construction on the Project had already commenced using public funds (which was false); and (v) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).  Xie Yin also told Huang Xiuwen that the Project was the safest she had to offer, with EB5 investments making up only 20% of the funds and the EB5 investors retaining the first lien on the Project.

D.  On the basis of these several misrepresentations, Huang Xiuwen signed a subscription agreement to become a Phase 1 Investor.  Huang Xiuwen was not given any formal documentation in Chinese that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Huang Xiuwen believed he was investing in a government-backed project with a first lien on the bus Station itself.

21.   *Jiang Guoshun* (江国顺)

A.  Jiang Guoshun is an individual and resident of the State of California.

B.  In 2011, Jiang Guoshun was informed of the GWB Bus Station Redevelopment Project (Phase 1) by employee(s) of Wailian, a marketing agent hired by NYCRC to promote its investment projects. Jiang Guoshun was given a brochure and PowerPoint.

C.  Wailian employees relayed the following false information to Jiang Guoshun: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iii) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (iv) construction on the Project had already commenced using public funds (which

was false); and (v) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal.  None of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).  Jiang Guoshun was never told that the collateral was a land lease. If Jiang Guoshun had been told this, he would have never invested in the Project.

D.  On the basis of these several misrepresentations, Jiang Guoshun signed a subscription agreement to become a Phase 1 Investor. Jiang Guoshun was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Jiang Guoshun believed they were investing in a government-backed project with a first lien on the bus Station itself.

22.    *Jiang Peiyu* (蒋佩予)

A.  Jiang Peiyu is an individual and resident of the State of New York.

B.  In 2011, Jiang Peiyu attended a meeting at the Shanghai City office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects.

C.  At the meeting, Ms. Zhang Yu, an employee of Qiaowai, gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 1).  The substance of the presentation had been previously provided to Qiaowai by NYCRC. Jiang Peiyu was given a brochure.

D.  In that meeting, Jiang Peiyu was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the station (when in fact the security interest only related to the retail portion); (ii); the value of the collateral (which was misrepresented as the entire bus station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in fact the station is a single building and the collateral was the ground lease, not the real property itself); (v) all funds paid by the Port Authority to improve the station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.); and (viii) the

general contractor, Skanska was one of the largest contractors in the US and that it had given the developer a completion guarantee, guaranteeing the Project would be built on time and within budget.

E.   On the basis of these several misrepresentations, Jiang Peiyu signed a subscription agreement to become a Phase 1 Investor.  Jiang Peiyu was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment.  Jiang Peiyu believed they were investing in a government-backed project with a first lien on the bus station itself.

23.   *Jiang Xuefen* (蒋雪芬)

A.   Jiang Xuefen is an individual and resident of the State of Illinois.

B.   In 2011, Jiang Xuefen was informed of the GWB Bus Station Redevelopment Project (Phase 1) by Gu Yingli, an employee with the Shanghai office of Wailian, a marketing agent hired by NYCRC to promote its investment projects. Jiang Xuefen was given a brochure and a project brief.

C.   In the meeting described above, Jiang Xuefen was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iii) the collateral was comprised of two buildings (when in fact the Station is a single building and the collateral

was the ground lease, not the real property itself); (iv) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (v) construction on the Project had already commenced using public funds (which was false); and (vi) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).

D.  On the basis of these several misrepresentations, Jiang Xuefen signed a subscription agreement to become a Phase 1 Investor.  Jiang Xuefen was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Jiang Xuefen believed they were investing in a government-backed project with a first lien on the bus Station itself.

24.  ***Jing Lili (景丽丽)***
A.  Jing Lili is an individual and resident of the People's Republic of China.

B.  In 2014, Jing Lili was informed of the GWB Bus Station Redevelopment Project (Phase 2) by employees of the Wutong Immigration Agent ("Wutong"), a marketing agent hired by NYCRC to promote its investment projects.

C.  Wutong employees relayed the following false information to Jing Lili: (i) the Phase 1 project was complete and had been a success; (ii) the funds from the Phase 2 EB-5 investors would be used for an additional expansion of the bus Station, as the Phase 1 project was complete; (iii) the value of the Phase 2 collateral was worth more than twice the total Phase 2 EB-5 Investment; (iv) construction on the retail development project had already commenced using public funds; and (v) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide a small percentage of the total capital, but obtain a first lien on the entire Project.

D.  At no time was Jing Lili told that (i) the collateral for Phase 2 consisted of only a lien on the shares that the developers owned in the Project (which would be worthless in any bankruptcy or insolvency) or that (ii) the funds raised in Phase 1 were not sufficient to complete the redevelopment (thus necessitating the Phase 2 capital raise).

E.  On the basis of these several misrepresentations, Jing Lili signed the signature page of a subscription agreement in English that Jing Lili had been given to become a Phase 2 Investor. Jing Lili did not receive any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 2 and the GWB Leverage Lender

LLC, or that disclosed any risks relating to the investment. Jing Lili believed they were investing in a government-backed project with a first lien on the bus Station itself.

25. ***Han Wensheng* (韩文胜)**

A.  Han Wensheng is an individual and resident of the State of Colorado.

B.  In the summer of 2011, Han Wensheng attended a meeting at the Beijing office of Kunpeng, a marketing agent hired by NYCRC to promote its investment projects.

C.  At the meeting, a middle-aged Caucasian representative of NYCRC gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 1). Han Wensheng was given promotional materials.

D.  In that meeting, Han Wensheng was told by the NYCRC representative that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the station and that in the event the developer defaulted on its loan, the EB-5 investors could turn the bus terminal into additional rental (when in fact the security interest only related to the retail portion); (ii) the value of the collateral (which was misrepresented as the entire bus station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iii) all funds paid by the Port Authority to improve the station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); and (v) the "government" was providing $277 million for the Project so that the EB-5 investments would

only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal. None of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.). In addition, Han Wensheng was told he would receive his capital back plus interest within 5 years, which was inconsistent with the agreement between the fund and the developer.

E.  On the basis of these several misrepresentations, Han Wensheng signed a subscription agreement to become a Phase 1 Investor. Han Wensheng was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment.

26.   ***Kit Ping Jacky Kwok*** (郭杰平)

A.  Kit Ping Jacky Kwok is an individual and resident of the State of Washington.

B.  In 2011, Kit Ping Jacky Kwok was informed of the GWB Bus Station Redevelopment Project (Phase 1) by employee(s) of the Guangzhou office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects. The substance of the presentation had been previously provided to Qiaowai by NYCRC.

C.  Qiaowai employee(s) relayed the following false information to Kit Ping

Jacky Kwok: (i) Dev. Fund 1 would have a first lien mortgage on both the

retail and public (bus terminal) portions of the Station (when in fact the

security interest only related to the retail portion); (ii) the value of the

collateral (which was misrepresented as the entire bus Station including the

public portion) was worth more than twice the anticipated $72 million EB-5

investment; (iii) the collateral was comprised of two buildings (when in fact

the Station is a single building and the collateral was the ground lease, not the

real property itself); (iv) all funds paid by the Port Authority to improve the

Station would increase the value of the collateral because Dev. Fund 1 would

maintain its position as the senior secured creditor on the entire Project (which

was false); (v) construction on the Project had already commenced using

public funds (which was false); and (vi) the "government" was providing

$277 million for the Project so that the EB-5 investments would only provide

19% of the total capital but obtain a first lien on the entire Project (which was

entirely untrue; the $277 figure represented $199 million in funds the Port

Authority was providing for the repair and improvement of the George

Washington Bridge itself and $78 million on the bus terminal, and none of

those funds were being injected into the capital stack for the retail mall

renovation, which was the only project that the EB-5 investors were financing

and which constituted the only collateral for the EB-5 loan.).

D.  On the basis of these several misrepresentations, Kit Ping Jacky Kwok

signed a subscription agreement to become a Phase 1 Investor.  Kit Ping Jacky

Kwok was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Kit Ping Jacky Kwok believed they were investing in a government-backed project with a first lien on the bus Station itself.

27.    *Lai Yonghe (*赖永和*)*

A.  Lai Yonghe is an individual and resident of the State of California.

B.  In 2011, Lai Yonghe was informed of the GWB Bus Station Redevelepment Project (Phase 1) by employee(s) of the Shenzhen office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects.

Qiaowai employee(s) relayed the following false information to Lai Yonghe: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.); (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the

senior secured creditor on the entire Project (which was false); (v)

construction on the Project had already commenced using public funds (which

was false); and (vi) the "government" was providing $277 million for the

Project so that the EB-5 investments would only provide 19% of the total

capital but obtain a first lien on the entire Project (which was entirely untrue;

the $277 figure represented $199 million in funds the Port Authority was

providing for the repair and improvement of the George Washington Bridge

itself and $78 million on the bus terminal, and none of those funds were being

injected into the capital stack for the retail mall renovation, which was the

only project that the EB-5 investors were financing and which constituted the

only collateral for the EB-5 loan.).  Lai Yonghe was also told that the all of

the stores were rented out, and 90% were rented to top-tier tenants

C.  On the basis of these several misrepresentations, Lai Yonghe signed a

subscription agreement to become a Phase 1 Investor.  Lai Yonghe never

received formal documentation disclosing risks or correctly describing the

actual nature of the investment before signing. Lai Yonghe believed they were

investing in a government-backed project with a first lien on the bus Station

itself.

28.　　***Lau Kwan* (刘军)**

A.  Lau Kwan is an individual and resident of the State of California.

B.  In 2011, Lau Kwan attended an introduction event hosted by the Beijing

office of Qiaowai, a marketing agent hired by NYCRC to promote its

investment projects, and Wu Lin and Paul Levinsohn from NYCRC.

At the event, Levinsohn and Lin made a presentation regarding the GWB Bus Station Redevelopment Project (Phase 1). Lau Kwan was given a promotional brochure by Yang Lian, an employee of the Beijing office of Qiaowai.

C.  At the event, Lau Kwan was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.); (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in fact the Station is a single building and the collateral was the ground lease, not the real property itself); (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vi) construction on the Project had already commenced using public funds (which was false); (vii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of

the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).  Lau Kwan was also told that the Project management company called Skanska would provide a certificate for the EB-5 project, guaranteeing that this project will be finished.

D.  On the basis of these several misrepresentations, Lau Kwan signed a subscription agreement to become a Phase 1 Investor.  Lau Kwan was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment.  Lau Kwan believed they were investing in a government-backed project with a first lien on the bus Station itself.

29.    *Li Huiling* (李慧玲)

A.  Li Huiling is an individual and resident of the State of California.

B.  In 2013, Li Huiling attended a meeting at the Shanghai City office of Jinhong, a marketing agent hired by NYCRC to promote its investment projects.

C.  At the meeting, Ms. Yu Jiexin and Ms. Lihui employees of Jinhong, gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 1).  The substance of the presentation had been previously provided to Jinhong by NYCRC. Li Huiling was given a brochure.

D.  In that meeting, Li Huiling was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the station (when in fact the security interest only related to the retail portion); (ii) the value of the collateral (which was misrepresented as the entire bus station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iii) all funds paid by the Port Authority to improve the station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (iv)  the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.); (v) the term of the EB5 loan would be five years; and (vi) the general contractor, Skanska, had given the developer a completion guarantee, guaranteeing the Project would be built on time and within budget.

E.  On the basis of these several misrepresentations, Li Huiling signed a subscription agreement to become a Phase 1 Investor.  Li Huiling was given no formal documentation and did not receive any documentation that

described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co.  Li Huiling believed they were investing in a government-backed project with a first lien on the bus Station itself.

30.  *Li Jinlong* (李金龙)

A.  Li Jinlong is an individual and resident of the People's Republic of China.

B.  In 2014, Li Jinlong attended a meeting at the Beijing office of Kun Peng, a marketing agent hired by NYCRC to promote its investment projects.

C.  Dong Chun Li, an employee of Kun Peng, gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 2).

D.  Dong Chun Li relayed the following false information to Li Jinlong (as Dong Chun Li had been trained to by NYCRC): (i) The Phase 1 project was complete and was a success; (ii) the funds from the Phase 2 was going to be used to do different aspects of the overall project; (iii) Dev. Fund 2 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (just as Phase 1 had); (iv) if the borrower of the EB-5 funds were to default on its loan, the Phase 2 investors could take possession of the Station's bus terminal and redevelop it into additional retail space; (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because the Phase 2 investors would maintain their position as the senior secured creditor on the entire Project (Phase 2 investors had the first lien); (vi) construction on the retail redevelopment project had already commenced using public funds (which was false); and (vii) the

"government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and  none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).

E.   At no time was Li Jinlong told that (i) the collateral for Phase 2 consisted of only a lien on the shares that the developers owned in the Project (which would be worthless in any bankruptcy or insolvency) or that (ii) the funds raised in Phase 1 were not sufficient to complete the redevelopment (thus necessitating the Phase 2 capital raise).

F.   On the basis of these several misrepresentations, Li Jinlong signed the signature page of a subscription agreement in English to become a Phase 2 Investor. Li Jinlong did not receive any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 2 and the GWB Leverage Lender LLC, or that disclosed any risks relating to the investment.  Li Jinlong believed they were investing in a government-backed project with a first lien on the bus Station itself.

31.   *Li Liqian* (李励谦)

A.  Li Liqian is an individual and resident of the State of California.

B.  In 2011, Li Liqian attended a meeting at the Shenzhen City office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects.

C.  At the meeting, M. Yu Li, an employee of Qiaowai, gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 1).  The substance of the presentation had been previously provided to Qiaowai by NYCRC. Li Liqian was given a brochure.

D.  In that meeting, Li Liqian was told that: (1) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.); (iii) the value of the collateral (which was misrepresented as the entire bus station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in fact the station is a single building and the collateral was the ground lease, not the real property itself); (v) all funds paid by the Port Authority to improve the station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vi) construction on the Project had already commenced using public funds (which was false); and (vii) the "government"

was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.); and (viii) the general contractor, Skanska, had given the developer a completion guarantee, guaranteeing the Project would be built on time and within budget.

E.  On the basis of these several misrepresentations, Li Liqian signed a subscription agreement to become a Phase 1 Investor.  Li Liqian was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Li Liqian believed they were investing in a government-backed project with a first lien on the bus station itself.

32.  ***Li Minghua*** (李明华)

A.  Li Minghua is an individual and resident of the State of North Carolina.

B.  In 2011, Li Minghua was informed over the phone of the GWB Bus Station Redevelopment Project (Phase 1) by Sunny Liu, an employee at the Guangzhou office of Wailian, a marketing agent hired by NYCRC to promote its investment projects. Sunny Liu then subsequently sent an e-mail to Li

Minghua that contained additional information about the Project. Li Minghua was provided with an American/U.S. Immigration Projects Introduction document.

C.  Between the Introduction document and communications with Sunny Liu, Li Minghua was informed that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station, which was approved by the Port Authority and which included the 11,148 square feet of the transportation hub, and all assets of the retail spaces, including all rent, equipment, and operations accounts (when in fact the security interest only related to the retail portion); (ii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iii) the collateral was comprised of two buildings (when in fact the Station is a single building and the collateral was the ground lease, not the real property itself); (iv) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue, as the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan).  Li Minghua was also told that Skanska had

provided a completion guarantee for the Project.

D.  On the basis of these several misrepresentations, Li Minghua signed a subscription agreement to become a Phase 1 Investor.  Li Minghua was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Li Minghua believed they were investing in a government-backed project with a first lien on the bus Station itself.

33.    *Li Peijun* (李佩君）

A.  Li Peijun is an individual and resident of the State of Maryland.

B.  In 2011, Li Peijun was informed of the GWB Bus Station Redevelopment Project (Phase 1) by employee(s) of the Shenzhen office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects.

C.  Qioawai employee(s) relayed the following false information to Li Peijun: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possessions of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan); (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) all

funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior creditor on the entire Project (which was false); (v) construction on the Project had already commenced using public funds (which was false); (vi) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and  none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).  Li Peijun was also told that this project would be successful because of the cooperation of the New York government, and that the stores in the retail center would be collateral for the investments.

D.  On the basis of these several misrepresentations, Li Peijun signed a subscription agreement to become a Phase 1 Investor, but was told not to date it.  Li Peijun was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment.  Li Peijunbelieved they were investing in a government-backed project with a first lien on the bus Station itself.

34.    *Li Qiang* (李明华)

A.  Li Qiang is an individual and resident of the People's Republic of China.

B.  In 2014, Li Qiang was informed of the GWB Bus Station Redevelopment Project (Phase 2) by employee(s) of the Beijing office of Kun Peng, a marketing agent hired by NYCRC to promote its investment projects. Li Qiang was given only the signature page of the English language subscription agreement as well as an English-language version of a document he would later learn was an offering memorandum.

C.  Kun Peng employee(s) relayed the following false information to Li Qiang (as they had been trained to by NYCRC): (i) that the Phase 1 project was complete and had been a success; (ii) the funds from the Phase 2 EB-5 investors would be used for an additional expansion of the bus Station; (iii) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because the Phase 2 investors would maintain their position as the senior secured creditor on the entire Project (Phase 2 investors had the first lien); (iv) construction on the retail redevelopment project had already commenced using public funds and was told that the Government was a co-investor; and (v) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide a small percentage of the total capital, but obtain a first lien on the entire Project.

D.  At no time was Li Qiang told that (i) The collateral for Phase 2 consisted of only a lien on the shares that the developers owned in the Project (which would be worthless in any bankruptcy or insolvency) or that (ii) the funds raised in Phase 1 were not sufficient to complete the redevelopment (thus

necessitating the Phase 2 capital raise).

E.   On the basis of these several misrepresentations, Li Qiang signed a
subscription agreement to become a Phase 2 Investor. Li Qiang was given no
formal documentation and did not receive any Chinese documentation that
described the actual structure of the investment or the nature of the agreement
between Dev. Fund 2 and the GWB Leverage Lender, LLC. Li Qiang believed
they were investing in a government-backed project with a first lien on the bus
Station itself.

### 35.   *Li Qinghua* (李清花)

A.  Li Qinghua is an individual and resident of the State of California.

B.  In 2011, Li Qinghua was informed of the GWB Bus Station
Redevelopment Project (Phase 1) at a meeting held at the Beijing office of
Qiaowai, a marketing agent hired by NYCRC to promote its investment
projects. The substance of the presentation had been previously provided to
Qiaowai by NYCRC. Li Qinghua was given a promotional brochure.

C.   The hosts of the meeting were NYCRC's Paul Levinsohn, who spoke at
the event, and NYCRC's Wu Lin.

D.    At the meeting, Li Qinghua was told that: (i) Dev. Fund 1 would have a
first lien mortgage on both the retail and public (bus terminal) portions of the
Station (when in fact the security interest only related to the retail portion); (ii)
if the borrower of EB-5 funds were to default on its loan from the SPV, the
SPV could take possession of the Station's bus terminal and redevelop it into
additional retail space (which was false because the bus terminal portion of

the Station was not included in the collateral pledged to the EB-5 loan); (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in facts the Station is a single building and the collateral was the ground lease, not the real property itself; (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vi) construction on the Project had already commenced using public funds (which was false); and (vii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).  Li Qinghua was also told that Skanska was the architect and was giving a completion guarantee.

E.  On the basis of these several misrepresentations, Li Qinghua signed a subscription agreement to become a Phase 1 Investor.  Li Qinghua was not given any formal documentation that described the actual structure of the

investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment.  Li Qinghua believed he was investing in a government-backed project with a first lien on the bus Station itself.

36. ***Li Xue* (李雪)**

A.  Li Xue is an individual and resident of the State of California.

B.  In the Summer of 2014, Li Xue attended a meeting at the Beijing office of Kun Peng, a marketing agent hired by NYCRC to promote its investment projects.

C.  At the meeting, Connie Dong, an employee of Kun Peng, gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 2).

D.  At the meeting, Connie Dong relayed the following false information to Li Xue (as Connie Dong had been trained to by NYCRC): (i) the Phase 1 project was complete and had been a success; (ii) the Phase 1 and Phase 2 projects were separate and that Phase 2 investors would issue a first position loan with a first position security in Phase 2 assets; and (iii) the Phase 2 funds would be a small percentage (approximately 25%) of the cost of the overall Phase 2 project.

E.  At no time was Li Xue told that (i) the collateral for Phase 2 consisted of only a lien on the shares that the developers owned in the Project (which would be worthless in any bankruptcy or insolvency) or that (ii) the funds raised in Phase 1 were not sufficient to complete the redevelopment (thus

necessitating the Phase 2 capital raise).

F.   On the basis of these several misrepresentations, Li Xue signed the signature page of a subscription agreement in English that Li Xue had been given to become a Phase 2 Investor.  Li Xue had been given promotional materials, but did not receive any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 2 and the GWB Leverage Lender LLC, or that disclosed any risks relating to the investment.  Li Xue believed they were investing in a government-backed project with a first lien on the bus Station itself.

37.     *Li Yuhao* (李宇豪)

A.   Li Yuhao is an individual and resident of the State of New Jersey.

B.   In 2014, Li Yuhao attended a meeting at the New York office of attorney Xiang Xie, who was acting as a marketing agent for NYCRC to promote its investment projects.

C.   At the meeting, Xiang Xie gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 2).

D.   At the meeting, Xiang Xie relayed the following false information to Li Yuhao (as Xiang Xie had been trained to by NYCRC): (i) the Phase 1 project was complete and had been a success; (ii) the funds from the Phase 2 EB-5 investors would be used for an additional expansion of the bus Station; (iii) the Phase 2 funds would be a small percentage (approximately 25%) of the cost of the overall Phase 2 project; (iv) the Phase 2 project was a government-funded project, which made it a particularly secure investment; (v) NYCRC

would repay his investment immediately after his permanent green card was approved in approximately three years.

E.   At no time was Li Yuhao told that (i) the collateral for Phase 2 consisted of only a lien on the shares that the developers owned in the Project (which would be worthless in any bankruptcy or insolvency) or that (ii) the funds raised in Phase 1 were not sufficient to complete the redevelopment (thus necessitating the Phase 2 capital raise).

F.   On the basis of these several misrepresentations, Li Yuhao signed the signature page of a subscription agreement in English that Li Yuhao had been given to become a Phase 2 Investor.  Li Yuhao did not receive any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 2 and the GWB Leverage Lender LLC, or that disclosed any risks relating to the investment. Li Yuhao believed he was investing in a government-backed project with a first lien on the bus Station itself.

38.   *Li Yuhuai* (李宇怀)

A.   Li Yuhuai is an individual and resident of the State of Colorado.

B.   In 2011, Li Yuhuai attended a meeting at the Beijing office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects.

C.   At the meeting, Yang Lian, an employe of Qiaowai gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 1). The substance of the presentation had been previously provided to Qiaowai by NYCRC. Li Yuhuai was given a promotional brochure.

D.  In the meeting described above, Li Yuhuai was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan); (iii) the value of the collateral (which was mispresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in facts the Station is a single building and the collateral was the ground lease, not the real property itself; (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vi) construction on the Project had already commenced using public funds (which was false); and (vii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5

investors were financing and which constituted the only collateral for the EB-5 loan.).  Li Yuhuai was also told that the American government was 70% involved in the investment, and that there was a 100% payback rate, which made the Project very stable and reliable compared to other projects. Additionally, this investor was told the Project was operating normally when in communications with Wu at NYCRC after officially signing.

E.   On the basis of these several misrepresentations, Li Yuhuai signed a subscription agreement to become a Phase 1 Investor.  Li Yuhuai was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment.  Li Yuhuai believed they were investing in a government-backed project with a first lien on the bus Station itself.

39.   *Liang Wei* (梁玮)

A.  Liang Wei is an individual and resident of the State of Washington.

B.  In 2011, Liang Wei attended at least one meeting hosted by the Shanghai office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects, where Liang Wei learned about the GWB Bus Station Redevelopment Project (Phase 1). The substance of the presentation had been previously provided to Qiaowai by NYCRC.

C.   Qiaowai employee(s) relayed the following information to Liang Wei: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only

related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan); (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in facts the Station is a single building and the collateral was the ground lease, not the real property itself; (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vi) construction on the Project had already commenced using public funds (which was false); and (vii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).  Liang Wei was also told that Skanska provided a guarantee of completion, but was never shown the certificate for

this.

E. After the presentation, Liang Wei spoke with Zhang Yun again by phone and later went to the Qiaowai office to sign documents.  When Liang Wei arrived at the office, they were only given the English language subscription and escrow agreements.  This investor could not understand the documents and asked to take them home to have a lawyer review them.  Zhang Yun told this investor that there were only a few seats left and that this investor would likely miss the chance to subscribe if they did so.  Zhang Yun also said that the documents cannot be negotiated or edited so there would be no point in retaining a lawyer.  Liang Wei accepted Zhang Yun's admonition and signed the documents, on the basis of the several misrepresentations this investor was told described above. Liang Wei believed they were investing in a government-backed project with a first lien on the bus Station itself. Days or weeks later Liang Wei was provided with signed copies of the subscription agreement and escrow agreement, but was never provided with the private placement memorandum.

F.  In March 2019, Liang Wei wrote to NYCRC's Wu to ask when they would get a return on the investment.  Wu replied that there were plans to pay back the money in 2020.

40.    *Lin Shuangping* (林双平)

A.  Lin Shuangping is an individual and resident of the State of California.

B.  In 2014, Lin Shuangping was informed of the GWB Bus Station Redevelopment Project (Phase 2) by employee(s) of the Beijing office of Kun

Peng, a marketing agent hired by NYCRC to promote its investment projects. The substance of the presentation had been previously provided to Qiaowai by NYCRC. Lin Shuangping was given promotional materials.

C.   Kun Peng employee(s) relayed the following false information to Lin Shuangping (as they had been trained to by NYCRC): (i) the Phase 1 project was complete and had been a success; (ii) the funds from the Phase 2 EB-5 investors would be used for an additional expansion of the bus Station, as the Phase 1 project was complete; (iii) the Phase 2 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station; (iv) if the borrower of EB-5 funds were to default on its loan, the Phase 2 investors could take possession of the Station's bus terminal and redevelop it into additional retail space; (v) the value of the Phase 2 collateral was worth more than twice the total Phase 2 EB-5 investment; (vi) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because the Phase 2 investors would maintain their position as the senior secured creditor on the entire Project (Phase 2 investors had the first lien); (vii) construction on the retail redevelopment project had already commenced using public funds; and (viii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide a small percentage of the total capital, but obtain a first lien on the entire Project.

D.   At no time was Lin Shuangping told that (i) the collateral for Phase 2 consisted of only a lien on the shares that the developers owned in the Project

97

(which would be worthless in any bankruptcy or insolvency) or that (ii) the funds raised in Phase 1 were not sufficient to complete the redevelopment (thus necessitating the Phase 2 capital raise).

E.   On the basis of these several misrepresentations, Lin Shuangping signed the signature page of a subscription agreement in English that Lin Shuangping had been given to become a Phase 2 Investor.  Lin Shuangping did not receive any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 2 and the GWB Leverage Lender LLC, or that disclosed any risks relating to the investment. Lin Shuangping believed they were investing in a government-backed project with a first lien on the bus Station itself.

41.   ***Lin Yongqiang* (林永强)**

A.  Lin Yongqiang is an individual and resident of the Commonwealth of Massachusetts.

B.  In 2011, Lin Yongqiang was informed of the GWB Bus Station Redevelopment Project (Phase 1) by Liang Jiawen, a consultatant of the Guangzhou office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects. Lin Yongqiang was given a promotional brochure and written evaluation.

C.  Lin Yongqiang also attended a promotional seminar at a 5-star hotel in Zhujiang, which was hosted by Qiaowei's Vice General Manager, Mr. Wu.

D.  In the promotional seminar described above, Mr. Wu and other Qiaowei employees told Lin Yongqiang that: (i) Dev. Fund 1 would have a first lien

mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possessions of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan); (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in facts the Station is a single building and the collateral was the ground lease, not the real property itself); (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vi) construction on the Project had already commenced using public funds (which was false); and (vii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-

5 loan.).

E.   On the basis of these several misrepresentations, Lin Yongqiang signed a subscription agreement to become a Phase 1 Investor.  Lin Yongqiang was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Lin Yongqiang believed they were investing in a government-backed project with a first lien on the bus Station itself.

42.   *Liu Jinghui* (刘晶辉)

A.  Liu Jinghui is an individual and resident of the State of California.

B.  In 2011, Liu Jinghui attended a one-on-one meeting with Ying Lian, an employee at the Beijing office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects.

C.  At the meeting, Ying Lian gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 1). The substance of the presentation had been previously provided to Qiaowai by NYCRC. Liu Jinghui was given a promotional brochure.

D.   In the meeting described above, Liu Jinghui was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which

was false). Liu Jinghui was also told in this meeting that Skanska would guarantee completion of the Project and provide a certificate of completion and that investors in other NYCRC projects all got their visas approved.

E.   On the basis of these several misrepresentations, Liu Jinghui signed a subscription agreement to become a Phase 1 Investor. Liu Jinghui was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Liu Jinghui believed they were investing in a government-backed project with a first lien on the bus Station itself.

43.   *Liu Ming* (刘明)

A.   Liu Ming is an individual and resident of the People's Republic of China.

B.   In 2014, Liu Ming was informed of the GWB Bus Station Redevelopment Project (Phase 2) by an American friend, who then introduced him to Xie Xiang, an employee of Xie and Associates PLLC, a marketing agent hired by NYCRC to promote its investment projects.

C.   At the meeting, and in separate e-mails,  Xie Xiang relayed the following false information to Liu Ming (as Xie Xiang had been trained to by NYCRC): (i) that the Phase 1 project was complete and had been a success; (ii) that the funds from the Phase 2 EB-5 investors would be used for an additional expansion of the bus Station, as the Phase 1 project was complete; (iii) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because the Phase 2 investors would maintain their

position as the senior secured creditor on the entire Project (Phase 2 investors had the first lien); and (iv) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide a small percentage of the total capital, but obtain a first lien on the entire Project.

D.  At no time was Liu Ming told that (i) the collateral for Phase 2 consisted of only a lien on the shares that the developers owned in the Project (which would be worthless in any bankruptcy or insolvency) or (ii) the funds raised in Phase 1 were not sufficient to complete the redevelopment (thus necessitating the Phase 2 capital raise).

E.  On the basis of these several misrepresentations, Liu Ming signed the signature page of a subscription agreement in English that Liu Ming had been given to become a Phase 2 Investor.  Liu Ming did not receive any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 2 and the GWB Leverage Lender LLC, or that disclosed any risks relating to the investment.  Liu Ming believed they were investing in a government-backed project with a first lien on the bus Station itself.

44.  *Liu Wenjie* (刘文杰)

A.  Liu Wenjie is an individual and resident of the State of Texas.

B.  In 2014, Liu Wenjie was informed of the GWB Bus Station Redevelopment Project (Phase 2) by Dong Chung Li, an employee at the Beijing office of Kun Peng, and Hu Weihang, Kun Peng's owner. Kung Peng is a marketing agent hired by NYCRC to promote its investment projects. Liu

Wenjie was given promotional materials.

C.  Hu Weihang, Dong Chun Li, and at least one member from NYCRC relayed the following false information to Liu Wenjie (as they had been trained to by NYCRC): (i) the Phase 1 project was complete and had been a success; (ii) the funds from the Phase 2 EB-5 investors would be used for an additional expansion of the bus Station; (iii) the Phase 2 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station; (iv) construction on the retail redevelopment project had already commenced using public funds; and (v) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide a small percentage of the total capital, but obtain a first lien on the entire Project.

D.  At no time was Liu Wenjie told that (i) the collateral for Phase 2 consisted of only a lien on the shares that the developers owned in the Project (which would be worthless in any bankruptcy or insolvency) or that (ii) the funds raised in Phase 1 were not sufficient to complete the redevelopment (thus necessitating the Phase 2 capital raise).

E.  On the basis of these several misrepresentations, Liu Wenjie signed the signature page of a subscription agreement in English that Liu Wenjie had been given to become a Phase 2 Investor.  Liu Wenjie did not receive any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 2 and the GWB Leverage Lender LLC, or that disclosed any risks relating to the investment. Liu Wenjie

believed they were investing in a government-backed project with a first lien on the bus Station itself.

45. *Liu Zhe* (刘喆)

A. Liu Zhe is an individual and resident of the People's Republic of China.

B. In 2011, Liu Zhe attended a meeting at the China World Hotel in Beijing, hosted by Liu Zhen Meng, the Business Director of Kun Peng International, a marketing agent hired by NYCRC to promote its investment projects.

C. At the meeting, Liu Zhen Meng gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 1). Liu Zhe was given a promotional brochure.

D. In the meeting described above, Liu Zhe was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan); (iii) the value of the collateral (which was mispresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in facts the Station is a single building and the collateral was the ground lease, not the real property itself; (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral

because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vi) construction on the Project had already commenced using public funds (which was false); and (vii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).  Liu Zhe was also told that a green card and payback were guaranteed.

E.   On the basis of these several misrepresentations, Liu Zhe signed a subscription agreement to become a Phase 1 Investor.  Liu Zhe was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Liu Zhe believed they were investing in a government-backed project with a first lien on the bus Station itself.

46.   *Ma Aiqin* (马爱勤〕

A.   Ma Aiqin is an individual and resident of the State of California.

B.  In 2011, Ma Aiqin was informed of the GWB Bus Station Redevelopment Project (Phase 1) by Yu Wenqing, an employee at the Zhuhai office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects. The substance of the presentation had been previously provided to Qiaowai by NYCRC. Ma Aiqin was given a promotional brochure.

C.  Yu Wenqing relayed the following false information to Ma Aiqin: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iii) the collateral was comprised of two buildings (when in facts the Station is a single building and the collateral was the ground lease, not the real property itself; (iv) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (v) construction on the Project had already commenced using public funds (which was false); and (vi) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into

106

the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).  Ma Aiqin was also promised guaranteed payback.

D.   On the basis of these several misrepresentations, Ma Aiqin signed a subscription agreement to become a Phase 1 Investor.  Ma Aiqin was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment.  Ma Aiqin believed they were investing in a government-backed project with a first lien on the bus Station itself.

47.   *Ma Zhanhua* (马展华)

A.  Ma Zhanhua is an individual and resident of the State of New Jersey.

B.  In 2011, Ma Zhanhua was informed of the GWB Bus Station Redevelopment Project (Phase 1) at an introduction meeting hosted by Mr. Liu, the Manager of the Qingdao office of Wailian, a marketing agent hired by NYCRC to promote its investment projects. A representative named Liu Yang of NYCRC attended the meeting and took part in the presentation. Ma Zhanhua was given a promotional brochure

C.  In the meeting described above, Ma Zhanhua was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of Eb-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and

redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the Eb-5 loan) (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in facts the Station is a single building and the collateral was the ground lease, not the real property itself; (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vi) construction on the Project had already commenced using public funds (which was false); and (vii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).  Ma Zhanhua was also repeatedly told by NYCRC that the Project was going well with no issues

D.  On the basis of these several misrepresentations, Ma Zhanhua signed a subscription agreement to become a Phase 1 Investor.  Ma Zhanhua was not

given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Ma Zhanhua believed they were investing in a government-backed project with a first lien on the bus Station itself.

48.    *Mao Zheng* (毛政)

A.  Mao Zheng is an individual and resident of the Commonwealth of Massachusetts.

B.  In 2011, Mao Zheng met in the City of Hangzhou with Jin Yi and Liu Xipu, employees at the Guangzhou office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects.

C.  At the meeting, Jin Yi and Liu Xipu gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 1). The substance of the presentation had been previously provided to Qiaowai by NYCRC. Mao Zheng was given a promotional brochure.

D.  In the meeting described above, Mao Zheng was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of Eb-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the Eb-5 loan) (iii) the value of the collateral (which was misrepresented as

the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in facts the Station is a single building and the collateral was the ground lease, not the real property itself; (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vi) construction on the Project had already commenced using public funds (which was false); and (vii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).

E.   On the basis of these several misrepresentations, Mao Zheng signed a subscription agreement to become a Phase 1 Investor.  Mao Zheng was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. In fact, when Mao Zheng received the agreement for signature, the effective date had

already been written as September 6, 2011. Mao Zheng believed they were investing in a government-backed project with a first lien on the bus Station itself.

49.     *Ni Li* (倪莉)

A.  Ni Li is an individual and resident of the People's Republic of China.

B.  In 2014, Ni Li received a promotional e-mail regarding GWB Bus Station Redevelopment Project (Phase 2) from Feng Feng, an employee at the Beijing office of Kun Peng, a marketing agent hired by NYCRC to promote its investment projects.

C.  After receiving the promotional email, Ni Li attended a seminar in Beijing regarding the second phase of the Project that was hosted by Li Kai, a Kun Peng employee. After the seminar, Ni Li also communicated by e-mail about the second phase of the Project with an individual acting on the behalf of NYCRC.

D.  Between the seminar and the e-mail correspondence described above, Ni Li was told that: (i) the Phase 1 project was complete and had been a success; (ii) the funds from the Phase 2 EB-5 investors would be used for an additional expansion of the bus Station, as the Phase 1 project was complete; (iii) construction on the retail redevelopment project had already commenced using public funds and was told that the Government was a co-investor; and (iv) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide a small percentage of the total capital, but obtain a first lien on the entire Project.

E.   At no time was Ni Li told that (i) the collateral for Phase 2 consisted of only a lien on the shares that the developers owned in the Project (which would be worthless in any bankruptcy or insolvency) or that (ii) the funds raised in Phase 1 were not sufficient to complete the redevelopment (thus necessitating the Phase 2 capital raise).

F.   On the basis of these several misrepresentations, Ni Li signed the signature page of a subscription agreement in English that Ni Li had been given to become a Phase 2 Investor. Ni Li did not receive any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 2 and the GWB Leverage Lender LLC, or that disclosed any risks relating to the investment.  Ni Li believed they were investing in a government-backed project with a first lien on the bus Station itself.

50.   ***Ping Jie (平洁)***

A.   Ping Jie is an individual and resident of the State of Washington.

B.   In 2011, Ping Jie was informed of the GWB Bus Station Redevelopment Project (Phase 1) by employee(s) of Wailian, a marketing agent hired by NYCRC to promote its investment projects. Ping Jie received an email introducing the Project.

C.   Wailian employee(s) relayed the following false information to Ping Jie: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of Eb-5 funds were to default

on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the Eb-5 loan) (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) construction on the Project had already commenced using public funds (which was false); and (v) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).

D.  On the basis of these several misrepresentations, Ping Jie signed a subscription agreement to become a Phase 1 Investor. Ping Jie was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. In fact, Ping Jie only received the signature page of the agreement. Ping Jie believed they were investing in a government-backed project with a first lien on the bus Station

itself.

51. *Qi Peixin* (齐培新)

A. Qi Peixin is an individual and resident of the People's Republic of China.

B. In 2011, Qi Peixin was informed of the GWB Bus Station Redevelopment Project (Phase 1) at a meeting at a Mercedes Benz dealership in the City of Wenzhou. The meeting was an introduction seminar held by the Shanghai office of Wailian, a marketing agent hired by NYCRC to promote its investment projects. The host of the meeting was Na Kong, an employee of Wailian. Qi Peixin was given a brochure and promotional materials.

C. In the meeting described above, Ka Nong told Qi Peixinthat: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of Eb-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the Eb-5 loan) (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in facts the Station is a single building and the collateral was the ground lease, not the real property itself; (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior

secured creditor on the entire Project (which was false); (vi) construction on the Project had already commenced using public funds (which was false); and (vii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.). At the time of the meeting, Qi Peixin was also told that the investment project was very safe.

D.   On the basis of these several misrepresentations, Qi Peixin signed a subscription agreement to become a Phase 1 Investor.  Qi Peixin was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment.  Qi Peixin believed they were investing in a government-backed project with a first lien on the bus Station itself.

52. ***Wu Liangliang (乔佳娜)***

A.  Wu Liangliang is an individual and resident of the State of California.

B.  In the summer of 2011, Wu Liangliang attended a one-on-one meeting at the Shanghai City office of Qiaowai, a marketing agent hired by NYCRC to

promote its investment projects.

C.  At the meeting, Ms. Zhang, an employee of Qiaowai, gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 1).  The substance of the presentation had been previously provided to Qiaowai by NYCRC. Wu Liangliang was given a brochure.

D.  In that meeting, Wu Liangliang was told that: (1) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.); (iii) the value of the collateral (which was misrepresented as the entire bus station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) all funds paid by the Port Authority to improve the station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (v) the "government" was providing $277 million for the Project and that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of

116

those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.); (vi) the general contractor was Skanska and that it had provided a construction completion guarantee that guaranteed the Project would be completed on time and within budget.

E.  On the basis of these several misrepresentations, Wu Liangliang signed a subscription agreement to become a Phase 1 Investor.  Wu Liangliang was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment.  Wu Liangliang believed they were investing in a government-backed project with a first lien on the bus station itself.

53.  *Que Wei* (阙伟)

A.  Que Wei is an individual and resident of the Commonwealth of Virginia.

B.  In 2011, Que Wei attended a meeting at the Beijing office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects.

C.  At the meeting, Chang Gao, a now former employee of Qiaowai, and Rui Zhang an employee of Qiaowai and NYCRC gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 1).

E.  In the meeting described above, Que Wei was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the

retail portion); (ii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iii) the collateral was comprised of two buildings (when in facts the Station is a single building and the collateral was the ground lease, not the real property itself; (iv) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (v) construction on the Project had already commenced using public funds (which was false); and (vi) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.). Que Wei was also told at the time that Skanska would guarantee the completion of the Project and would provide a completion certificate.

F. On the basis of these several misrepresentations, Que Wei signed a subscription agreement to become a Phase 1 Investor.  Que Wei was not given any formal documentation that described the actual structure of the investment

or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment.  Que Wei believed they were investing in a government-backed project with a first lien on the bus Station itself.

54.  ***Ren Rongrong (任蓉蓉)***

A.  Ren Rongrong is an individual and resident of the State of Washington.

B.  In 2011, Ren Rongrong's mother attended a meeting on his behalf hosted by the Guangzhou office of Qiaowai and a second meeting at the Zhuhai office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects.

C.  At the Guangzhou meeting, which was hosted by Yang Xiao Jia, Guangzhou Qiaowei's General Manager, Yang Xiao Jia gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 1).

D.  In the meeting described above, Ren Rongrong's mother was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station, which was approved by the Port Authority and which included the 11,148 square feet of the transportation hub, and all assets of the retail spaces, including all rent, equipment, and operations accounts (when in fact the security interest only related to the retail portion); (ii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iii) the collateral was comprised of two buildings (when in facts the Station is a single building and the collateral

was the ground lease, not the real property itself).  Ren Rongrong was also told that the Project management company called Skanska would provide a certificate for the EB-5 project, guaranteeing that this project will be finished.

E.   On the basis of these several misrepresentations, Ren Rongrong signed a subscription agreement to become a Phase 1 Investor.  Ren Rongrong or his mother were not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Ren Rongrong believed they were investing in a government-backed project with a first lien on the bus Station itself.

55.    *Shan Dandan* (单丹丹)

A.  Shan Dandan is an individual and resident of the State of Washington.

B.  In 2011, Shan Dandan was informed of the GWB Bus Station Redevelopment Project (Phase 1) by Ma Xiaoli, an employee at the Shanghai office of Jinghong, a marketing agent hired by NYCRC to promote its investment projects. The substance of the presentation had been previously provided to Jinghong by NYCRC.

C.  Ma Xiaoli relayed the following information to Shan Dandan: (i) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (ii) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which

was false); (iii) construction on the Project had already commenced using public funds (which was false); and (iv) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue, as the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).

D.  On the basis of these several misrepresentations, Shan Dandan signed a subscription agreement to become a Phase 1 Investor.  Shan Dandan was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. After the investment, Shan Dandan was provided the operation agreement, subscription agreement, and escrow agreement. Shan Dandan believed they were investing in a government-backed project with a first lien on the bus Station itself.

56.    ***Shan Wei (单伟)***

A.  Shan Wei is an individual and resident of the State of California.

B.  In 2011, Shan Wei was informed of the GWB Bus Station Redevelopment Project (Phase 1) by Shi Zhicong, an employee at the Qingdao office of Wailian, a marketing agent hired by NYCRC to promote its investment

121

projects. The substance of the presentation had been previously provided to Wailian by NYCRC.

C.  Shi Zhicong relayed the following information to Shan Wei: (i) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.); (ii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iii) the collateral was comprised of two buildings (when in facts the Station is a single building and the collateral was the ground lease, not the real property itself); and (v) construction on the Project had already commenced using public funds (which was false).

D.  On the basis of these several misrepresentations, Shan Wei signed a subscription agreement to become a Phase I Investor. Shan Wei was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. In fact, Shan Wei received no legal documents in Chinese. Shan Wei believed they were investing in a government-backed project with a first lien on the bus Station itself.

57.   ***Shen Congying (沈聪英)***

A.  Shen Congying is an individual and resident of the People's Republic of China.

B.  In 2011, Shen Congying was informed of the GWB Bus Station Redevelopment Project (Phase 1) by Gu Ruiheng, the Owner of the Beijing office of Wailian, a marketing agent hired by NYCRC to promote its investment projects.

C.  Gu Ruiheng relayed the following false information to Shen Congying: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iii) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (v) construction on the Project had already commenced using public funds (which was false); and (vi) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue, as the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the

only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).  Shen Congying was also told that the world's top project management company, Skanska, would provide a certificate for the EB-5 project, guaranteeing that this project will be finished. Shen Congying never saw or received this certificate.

D.   On the basis of these several misrepresentations, Shen Congying signed a subscription agreement to become a Phase 1 Investor.  Shen Congying was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment.  Shen Congying believed they were investing in a government-backed project with a first lien on the bus Station itself.

58.   ***Shen Huiyu* (沈慧瑜)**

A. Shen Huiyu is an individual and resident of the State of California.

B. In 2011, Shen Huiyu was informed of the GWB Bus Station Redevelopment Project (Phase 1) by Lu "Cherry" Yinyu, an employee at the Suzhou and Zhangshu offices of Wailian, a marketing agent hired by NYCRC to promote its investment projects.  Shen Huiyu was given a brief of the project by e-mail.

C.   Cherry relayed the following false information to Shen Huiyu: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its

loan from the Special SPV, the Special SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.); (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in fact the Station is a single building and the collateral was the ground lease, not the real property itself); (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vi) construction on the Project had already commenced using public funds (which was false); and (vii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal.  None of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).

D.  On the basis of these several misrepresentations, Shen Huiyu signed a subscription agreement to become a Phase 1 Investor.  Shen Huiyu was not

given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment.  When Shen Huiyu asked for details regarding the Project, Cherry explained that it was Wailian's policy to only provide the brief of the project. Futher, Cherry explained that Shen Huiyen would not understand the agreement anyway because it was written in English. Shen Huiyu believed he was investing in a government-backed project with a first lien on the bus Station itself.

59.  ***Shi Yiqun* (石益群)**

A.  Shi Yiqun is an individual and resident of the State of Washington.

B.  In 2014, Shi Yiqun attended a meeting at the Beijing office of Kun Peng, a marketing agent hired by NYCRC to promote its investment projects.

C.  At the meeting, Dong Chun Li, an employee of Kun Peng, gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 2).  Shi Yiqun was given promotional materials.

D.  At the meeting, Dong Chun Li relayed the following false information to Shi Yiqun (as Dong Chun Li had been trained to by NYCRC): (i) the Phase 1 project was complete and had been a success; and (ii) the construction on the retail redevelopment project had already commenced using public funds and was told that the Government was a co-investor.

E.  At no time was Shi Yiqun told that (i) The collateral for Phase 2 consisted of only a lien on the shares that the developers owned in the Project (which would be worthless in any bankruptcy or insolvency) or that (ii) the funds

raised in Phase 1 were not sufficient to complete the redevelopment (thus necessitating the Phase 2 capital raise).

F.   On the basis of these several misrepresentations, Shi Yiqun signed the signature page of a subscription agreement in English that Shi Yiqun had been given at the meeting to become a Phase 2 Investor.  Shi Yiqun did not receive any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 2 and the GWB Leverage Lender LLC.  Shi Yiqun believed they were investing in a government-backed project with a first lien on the bus Station itself.

60.   ***Shu Lingli (舒伶俐)***

A.   Shu Lingli is an individual and resident of the Commonwealth of Virginia.

B.   In 2011, Shu Lingli attended at least one meeting at the Shanghai office of Jinghong, a marketing agent hired by NYCRC to promote its investment projects, where Shu Lingli learned about the GWB Bus Station Redevelopment Project (Phase 1) including from Lin Chen, an employee of Jinghong. Shu Lingli was provided with a brochure about the Project and showed NYCRC authorization letters and certificates on the wall of the Jinghong office where Shu Lingli signed only the signature page of the subscription agreement.

C.   At a meeting, Shu Lingli was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) the value of the collateral (which was misrepresented as the entire bus Station

including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iii) the collateral was comprised of two buildings (when in fact the Station is a single building and the collateral was the ground lease, not the real property itself); (iv) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (v) construction on the Project had already commenced using public funds (which was false); and (vi) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue, as the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).  Shu Lingli was also told that Skanska, the world's most famous construction company, would guarantee and provide a certificate of completion of the Project.

D.  On the basis of these several misrepresentations, Shu Lingli signed a subscription agreement at the Shanghai office of Jinghong to become a Phase 1 Investor.  Shu Lingli was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between

Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment.  Shu Lingli believed they were investing in a government-backed project with a first lien on the bus Station itself.

61.  ***Song Chao (宋超)***

A.  Song Chao is an individual and resident of the State of California.

B.  In 2012, Song Chao attended a meeting at the Shanghai office of Wailian, a marketing agent hired by NYCRC to promote its investment projects.

C.  At the meeting, Li Ning an employee of Wailian gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 1). Song Chao was given a brochure and shown a video.

D.  In the meeting described above, Song Chao was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.); (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in fact the Station is a single building and the collateral was the ground lease, not the real property itself); (v) all funds paid by the Port Authority to improve the Station would increase the value of the

collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vi) construction on the Project had already commenced using public funds (which was false); and (vii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue, as the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).

E.   On the basis of these several misrepresentations, Song Chao signed a subscription agreement to become a Phase 1 Investor.  Song Chao was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Song Chao believed he was investing in a government-backed project with a first lien on the bus Station itself.

62.   ***Song Xiaoying (宋晓英)***

A.  Song Xiaoying is an individual and resident of the State of California.

B.  In 2011, Song Xiaoying was informed of the GWB Bus Station Redevelopment Project (Phase 1) by employee(s) of the Shanghai office of

Qiaowai, a marketing agent hired by NYCRC to promote its investment projects. Song Xiaoying was given a brochure and the purchasing agreement.

C.   Zhang Yun, an employee of the Shanghai office of Qiaowai, relayed the following false information to Song Xiaoying: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.); (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in fact the Station is a single building and the collateral was the ground lease, not the real property itself); (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vi) construction on the Project had already commenced using public funds (which was false); and (vii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of

the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).

D.  On the basis of these several misrepresentations, Song Xiaoying signed a subscription agreement to become a Phase 1 Investor.  Song Xiaoying was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment.  Song Xiaoying believed they were investing in a government-backed project with a first lien on the bus Station itself.

63.    ***Sun Hao*** **(孙豪)**

A.  Sun Hao is an individual and resident of the People's Republic of China.

B.  In 2011, Sun Hao was informed of the GWB Bus Station Redevelopment Project (Phase 1) by employee(s) of the Shanghai office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects. Sun Hao attended an introduction meeting located at and hosted by Qiaowai's Shanghai office.  Employee(s) of NYCRC attended the meeting. Sun Hao was given a promotional brochure.

C.  Qiaowai employee(s) relayed the following false information to Sun Hao: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) the value of the collateral (which was

misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iii) construction on the Project had already commenced using public funds (which was false); and (iv) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).  Sun Hao was also told that the Project management company called Skanska would provide a certificate for the EB-5 project, guaranteeing that this project will be finished.

D.  On the basis of these several misrepresentations, Sun Hao signed a subscription agreement to become a Phase 1 Investor.  Sun Hao was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Sun Hao believed they were investing in a government-backed project with a first lien on the bus Station itself.

64.  *Sun Xin (孙欣)*

A.  Sun Xin is an individual and resident of the State of California.

B.  In 2011, Sun Xin was informed of the GWB Bus Station Redevelopment Project (Phase 1) by Weihang Hu and Lijuan Yin, employees of the Beijing office of Kunpeng, a marketing agent hired by NYCRC to promote its investment projects. Sun Xin was given a promotional brochure and purchasing agreement.

C.  Weihang Hu and Lijuan Yin told Sun Xin that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.) (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in fact the Station is a single building and the collateral was the ground lease, not the real property itself) (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vi) construction on the Project had already commenced using public funds (which was false); and (vii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a

first lien on the entire Project (which was entirely untrue, as the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).  Sun Xin was also told that the Project management company called Skanska would provide a certificate for the EB-5 project, guaranteeing that this project will be finished and that the Project had $11 million in funds from SJM Partners, a top tier American realtor. Sun Xin never saw or received any documents pertaining to this part of the investment.

D.  On the basis of these several misrepresentations, Sun Xin signed a subscription agreement to become a Phase 1 Investor. Sun Xin was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Sun Xin believed they were investing in a government-backed project with a first lien on the bus Station itself.

65. ***Sun Yan (孙艳)***

A.  Sun Yan is an individual and resident of the People's Republic of China.

B.  In 2014, Sun Yan was informed of the GWB Bus Station Redevelopment Project (Phase 2) by Yun Zhangm an employee at the office of Hui Qiao, a marketing agent hired by NYCRC to promote its investment projects. Sun

Yan was given a brochure and showed a video.

C.  Yun Zhang relayed the following false information to Sun Yan (as Yun Zhang had been trained to by NYCRC): (i) the Phase 1 project was complete and had been a success; (ii) the funds from the Phase 2 EB-5 investors would be used for an additional expansion of the bus Station, as the Phase 1 project was complete; (iii) the Phase 2 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station; (iv) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because the Phase 2 investors would maintain their position as the senior secured creditor on the entire Project (Phase 2 investors had the first lien); (v) construction on the retail redevelopment project had already commenced using public funds and was told that the Government was a co-investor; and (vi) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide a small percentage of the total capital, but obtain a first lien on the entire Project. Sun Yan was always told that the project was going well.

D.  At no time was Sun Yan told that (i) The collateral for Phase 2 consisted of only a lien on the shares that the developers owned in the Project (which would be worthless in any bankruptcy or insolvency) or that (ii) the funds raised in Phase 1 were not sufficient to complete the redevelopment (thus necessitating the Phase 2 capital raise).

E.  On the basis of these several misrepresentations, Sun Yan signed the signature page of a subscription agreement in English that Sun Yan had been

given to become a Phase 2 Investor.  Sun Yan did not receive any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 2 and the GWB Leverage Lender LLC, or that disclosed any risks relating to the investment. At the time of the investment, Sun Yan was only provided the signature page of the English language subscription agreement. Sun Yan believed they were investing in a government-backed project with a first lien on the bus Station itself.

66.     *Sun Yuxin* **(孙宇新)**

A.  Sun Yuxin is an individual and resident of the People's Republic of China. Sun Yuxin applied on behalf of her husband, Yu Sun.

B.   In 2011, Sun Yuxin was informed of the GWB Bus Station Redevelopment Project (Phase 1).

C.   Sun Yuxin was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.) (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in fact the Station is a single building and the collateral was the ground lease, not the

real property itself); (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vi) construction on the Project had already commenced using public funds (which was false); and (vii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue, as the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).  Sun Xin was also told that the Project management company called Skanska would provide a certificate for the EB-5 project, guaranteeing that this project will be finished and that the Project had $11 million in funds from SJM Partners, a top tier American realtor.

D.  On the basis of these several misrepresentations, Sun Xin signed a subscription agreement to become a Phase 1 Investor. Sun Xin was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Sun Xin believed they were investing in a government-backed project with a first lien on the bus

Station itself.

67. ***Tan Manfang* (谭满芳）**

A. Tan Manfang is an individual and resident of the People's Republic of China.

B. In 2011, Tan Manfang was informed of the GWB Bus Station Redevelopment Project (Phase 1) by employee(s) of the Hangzhou office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects. Tan Manfang was given an introduction booklet from Xiang Chai, Qiaowai's General Manager.

C. Qiaowai's employee(s) relayed the following false information to Tan Manfang: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.); (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in fact the Station is a single building and the collateral was the ground lease, not the real property itself); (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as

the senior secured creditor on the entire Project (which was false); and (vi) construction on the Project had already commenced using public funds (which was false).

D.   On the basis of these several misrepresentations, Tan Manfang signed a subscription agreement to become a Phase 1 Investor.  Tan Manfang was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Tan Manfang believed they were investing in a government-backed project with a first lien on the bus Station itself.

68.    *Teng Lezhi* **(滕乐知)**

A.   Teng Lezhi is an individual and resident of the State of Florida.

B.   In 2011, Teng Lezhi was informed of the GWB Bus Station Redevelopment Project (Phase 1) by employee(s) of the Shanghai office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects.

C.   Qiaowai employee(s) relayed the following false information to Teng Lezhi: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iii) construction on the Project had already commenced using public funds (which

was false); and (iv) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing, and which constituted the only collateral for the EB-5 loan.).

D.   On the basis of these several misrepresentations, Teng Lezhi signed a subscription agreement to become a Phase 1 Investor. Teng Lezhi was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. In fact, Teng Lezhi received only the signature page of the purchasing agreement they signed.  Teng Lezhi believed they were investing in a government-backed project with a first lien on the bus Station itself.

69.   ***Wan Lili (万丽丽)***

A.  Wan Lili is an individual and resident of the People's Republic of China.

B.  In 2014, Wan Lili was informed of the GWB Bus Station Redevelopment Project (Phase 2) by Dong Chunli an employee at the Beijing office of Kun Peng, a marketing agent hired by NYCRC to promote its investment projects. Wan Lili also spoke with employees of NYCRC who mentioned the

advantages and application process of the Project.

C.  Dong Chun Li relayed the following false information to Wan Lili (as Dong Chun Li had been trained to by NYCRC): (i) the Phase 1 project was complete and had been a success; (ii) the funds from the Phase 2 EB-5 investors would be used for an additional expansion of the bus Station; (iii) the Phase 2 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station; (iv) if the borrower of EB-5 funds were to default on its loan, the Phase 2 investors could take possession of the Station's bus terminal and redevelop it into additional retail space; (v) construction on the retail redevelopment project had already commenced using public funds and was told that the Government was a co-investor; and (vi) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide a small percentage of the total capital, but obtain a first lien on the entire Project.

D.  At no time was Wan Lili told that (i) The collateral for Phase 2 consisted of only a lien on the shares that the developers owned in the Project (which would be worthless in any bankruptcy or insolvency) or that (ii) the funds raised in Phase 1 were not sufficient to complete the redevelopment (thus necessitating the Phase 2 capital raise).

E.  On the basis of these several misrepresentations, Wan Lili signed the signature page of a subscription agreement in English that Wan Lili had been given to become a Phase 2 Investor. Wan Lili did not receive any formal documentation that described the actual structure of the investment or the

nature of the agreement between Dev. Fund 2 and the GWB Leverage Lender LLC, or that disclosed any risks relating to the investment. At the time of the investment, Wan Lili was only provided the signature page of the English language subscription agreement. Wan Lili believed they were investing in a government-backed project with a first lien on the bus Station itself.

70.  ***Wang Yingming* (王英明)**

A.  Wang Yingming is an individual and resident of the People's Republic of China.

B.  In 2014, Wang Yingming was informed of the GWB Bus Station Redevelopment Project (Phase 2) by Hunan Zhang and Lin Zhou employees of the Beijing office of Wu Tong, a marketing agent hired by NYCRC to promote its investment projects. Wang Yingming was given a brochure.

C.  Hunan Zhang and Lin Zhou relayed the following false information to Wang Yingming (as Hunan Zhang and Lin Zhou had been trained to by NYCRC): (i) the Phase 2 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station; (ii) if the borrower of EB-5 funds were to default on its loan, the Phase 2 investors could take possession of the Station's bus terminal and redevelop it into additional retail space; (iii) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because the Phase 2 investors would maintain their position as the senior secured creditor on the entire Project (Phase 2 investors had the first lien); and (iv) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide a small

percentage of the total capital, but obtain a first lien on the entire Project.

D.  At no time was Wang Yingming told that (i) The collateral for Phase 2 consisted of only a lien on the shares that the developers owned in the Project (which would be worthless in any bankruptcy or insolvency) or that (ii) the funds raised in Phase 1 were not sufficient to complete the redevelopment (thus necessitating the Phase 2 capital raise).

E.  On the basis of these several misrepresentations, Wang Yingming signed the signature page of a subscription agreement to become a Phase 2 Investor. Wang Yingming did not receive any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 2 and the GWB Leverage Lender LLC, or that disclosed any risks relating to the investment.  At the time of the investment, Wang Yingming was only provided the signature page of the English language subscription agreement. Wang Yingming believed they were investing in a government-backed project with a first lien on the bus Station itself.

71.  ***Wang Chao*** (王超)

A.  Wang Chao is an individual and resident of the People's Republic of China.

B.  In 2011, Wang Chao was informed of the GWB Bus Station Redevelopment Project (Phase 1) by employee(s) of the Hangzhou office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects.

C.  Qiaowai employee(s) relayed the following false information to Wang

Chao: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the Special SPV, the Special SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.); (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in fact the Station is a single building and the collateral was the ground lease, not the real property itself); and (v) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal.  None of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing, and which constituted the only collateral for the EB-5 loan.).

D.   On the basis of these several misrepresentations, Wang Chao signed a subscription agreement to become a Phase 1 Investor.  Wang Chao was not given any formal documentation that described the actual structure of the

investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Wang Chao believed they were investing in a government-backed project with a first lien on the bus Station itself.

72. ***Wang Chuanhong (王传红)***

A.  Wang Chuanhong is an individual and resident of the State of California.

B.  In 2011, Wang Chuanhong was informed of the GWB Bus Station Redevelopment Project (Phase 1) at the Qingdao office of Wailian, a marketing agent hired by NYCRC to promote its investment projects. Wang Chuanhong was provided with a brochure.

C.  Wailian employee(s) told Wang Chuanhong that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.); (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue, as the $277 figure represented $199

146

million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing, and which constituted the only collateral for the EB-5 loan.). Wang Chuanhong was also told in this meeting that Skanska would guarantee and provide a certificate of completion of the Project.

D.  On the basis of these several misrepresentations, Wang Chuanhong signed a subscription agreement to become a Phase 1 Investor.  Wang Chuanhong was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Wang Chuanhong believed they were investing in a government-backed project with a first lien on the bus Station itself.

73.  ***Wang Ninghong* (王宁红)**

A.  Wang Ninghong is an individual and resident of the State of Oregon.

B.  In 2011, Wang Ninghong was informed of the GWB Bus Station Redevelopment Project (Phase 1) at the Jiangsu office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects. Wang Ninghong was provided with a brochure.

C.  Qiaowai employee(s) told Wang Ninghong that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail

portion); (ii) If the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.); (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; and (iv) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing, and which constituted the only collateral for the EB-5 loan.). Wang Ninghong was also that Skanska would guarantee and provide a certificate of completion of the Project.

D.  On the basis of these several misrepresentations, Wang Ninghong signed a subscription agreement to become a Phase 1 Investor. Wang Ninghong was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Wang Ninghong believed they were investing in a government-backed project with a

first lien on the bus Station itself.

74. ***Wang Yang*** (王洋)

A.   Wang Yang is an individual and resident of the State of California.

B.  In 2011, Wang Yang attended a consultation at the Beijing office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects.

C.  At the meeting, Deng Xiao Yu an employee of Qiaowai and Bai, Qiaowai's General Manager, gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 1).  The substance of the presentation had been previously provided to Qiaowai by NYCRC. Wang Yang was given promotional materials.

D.  In that meeting, Wang Yang was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possessions of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan); (iii) the value of the collateral (which was mispresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in facts the Station is a single building and the collateral was the ground lease, not the real property itself; (v) all funds paid by the Port

Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vi) construction on the Project had already commenced using public funds (which was false); and (vii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.)

E.   On the basis of these several misrepresentations, Wang Yang signed a subscription agreement to become a Phase 1 Investor.  Wang Yang was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. In fact, Wang Yang received only the signature page of the subscription agreement on the day they signed it.  Wang Yang believed they were investing in a government-backed project with a first lien on the bus Station itself.

75.   ***Wang Yatao* (王雅涛)**

A.   Wang Yatao is an individual and resident of the State of California.

B.  In 2011, Wang Yatao attended a meeting at the Beijing office of Kunpeng, a marketing agent hired by NYCRC to promote its investment projects.

C.  At the meeting, Mei Li Xue and Mei Huang employees of Kunpeng, gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 1).  The substance of the presentation had been previously provided to Kunpeng by NYCRC. Wang Yatao was given a brochure.

D.  In that meeting, Wang Yang was told that: (i) Dev. Fund 1 would have a first lien mortgage; (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possessions of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan); (iii) the value of the collateral (which was mispresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in facts the Station is a single building and the collateral was the ground lease, not the real property itself; (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vi) construction on the Project had already commenced using public funds (which was false); and (vii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue;

the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.). Wang Yatao was also told that a famous construction contractor was involved with the Project and had already issued a letter ensuring that the Project would finish as scheduled.

E.   On the basis of these several misrepresentations, Wang Yang signed a subscription agreement to become a Phase 1 Investor.  Wang Yang was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Wang Yang believed they were investing in a government-backed project with a first lien on the bus Station itself.

76.   ***Wang Jianping*** (王建平**)**

A.  Wang Jianping is an individual and resident of the State of California.

B.  In 2011, Wang Jianping was informed of the GWB Bus Station Redevelopment Project (Phase 1) by Zhang Yu Ran, an employee at the Shanghai office of Wailian, a marketing agent hired by NYCRC to promote its investment projects.  Wang Jianping was given a brochure.

C.  Zhang Yu Ran told Wang Jianping that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the

Station (when in fact the security interest only related to the retail portion); (ii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iii) the collateral was comprised of two buildings (when in fact the Station is a single building and the collateral was the ground lease, not the real property itself); (iv) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (v) construction on the Project had already commenced using public funds (which was false) and (vi) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing, and which constituted the only collateral for the EB-5 loan.).

D.  On the basis of these several misrepresentations, Wang Jianping signed a subscription agreement to become a Phase 1 Investor.  Wang Jianping was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Wang

Jianping believed they were investing in a government-backed project with a first lien on the bus Station itself.

77.   *Wu Ding* (武丁)

A.  Wu Ding is an individual and resident of the State of New York.

B.  In 2011, Wu Ding was informed of the GWB Bus Station Redevelopment Project (Phase 1) by employee(s) of the Beijing office of Kunpeng, a marketing agent hired by NYCRC to promote its investment projects. Wu Ding was given a brochure.

C.  Kunpeng employee(s) relayed the following false information to Wu Ding: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iii) construction on the Project had already commenced using public funds (which was false); and (iv) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the

only collateral for the EB-5 loan.).

D.  On the basis of these several misrepresentations, Wu Ding signed a subscription agreement to become a Phase 1 Investor.  Wu Ding was not given any formal documentation to that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Wu Ding believed they were investing in a government-backed project with a first lien on the bus Station itself.

78.  ***Xiong Xin (熊欣)***

A.  Xiong Xin is an individual and resident of the State of California.

B.  In 2011, Xiong Xin was informed of the GWB Bus Station Redevelopment Project (Phase 1) by the Beijing office of Qiaowai's owner, Bai Xiao and Luo Xing Na, and employee of the the Beijing office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects.  Xiong Xin was given a brochure.

C.  Bai Xiao and Luo Xing Na relayed the following false information to Xiong Xin: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.); (iii) the value of the collateral (which

was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in fact the Station is a single building and the collateral was the ground lease, not the real property itself); (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vi) construction on the Project had already commenced using public funds (which was false); and (vii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).

D. On the basis of these several misrepresentations, Xiong Xin signed a subscription agreement to become a Phase 1 Investor. Xiong Xin was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. In fact, Xiong Xin received only the signature page of the subscription agreement on the day

they signed it.  Xiong Xin believed they were investing in a government-backed project with a first lien on the bus Station itself.

79.  ***Xu Jieping (徐洁平)***

A.  Xu Jieping is an individual and resident of the People's Republic of China.

B.  In 2011, Xu Jieping was informed of the GWB Bus Station Redevelopment Project (Phase 1) by emplpyee(s) of the Shanghai office of Wailian, a marketing agent hired by NYCRC to promote its investment projects.  Xu Jieping was given a brochure.

C.  Wailian employee(s) told Xu Jieping that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.); (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in fact the Station is a single building and the collateral was the ground lease, not the real property itself); (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vi) construction on the Project had already

commenced using public funds (which was false); and (vii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).

D.  On the basis of these several misrepresentations, Xu Jieping signed a subscription agreement to become a Phase 1 Investor.  Xu Jieping was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Xu Jieping believed they were investing in a government-backed project with a first lien on the bus Station itself.

80.    *Xu Minxia* (徐敏霞)

A. Xu Minxia is an individual and resident of the State of California.

B.  In 2011, Xu Minxia attended a meeting at the Hangzhou Wyndam Grand Plaza Royale Hotel hosted by the Hangzhou office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects.

C.  At the meeting, employees of Qiaowai and a male representative of NYCRC, gave a presentation regarding the GWB Bus Station Redevelopment

Project (Phase 1). Xu Minxia was given a brochure.

D.  In the meeting described above, Xu Minxia was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.); (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in fact the Station is a single building and the collateral was the ground lease, not the real property itself); (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vi) construction on the Project had already commenced using public funds (which was false); and (vii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into

the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.). During the Project, Xu Minxia was told by the immigration consultants that everything was going well.

E.   On the basis of these several misrepresentations, Xu Minxia signed a subscription agreement to become a Phase 1 Investor.  Xu Minxia was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment.  Xu Minxia believed they were investing in a government-backed project with a first lien on the bus Station itself.

81.   ***Yang Li (杨丽)***

A.  Yang Li is an individual and resident of the State of California.

B.  In 2011, Yang Li attended a meeting at the Guangzhou Zhujiang Newton Hotel, hosted by the Guangzhou office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects.  Yang Li was given a brochure.

C.  At the meeting, Ding Hao, the Vice General Manager Guangzhou's Qiaowai office, gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 1).  The substance of the presentation had been previously provided to Qiaowai by NYCRC.

D.  In the meeting described above, Yang Li was told that: (i) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5

investment; (ii) the collateral was comprised of two buildings (when in fact the Station is a single building and the collateral was the ground lease, not the real property itself); (iii) construction on the Project had already commenced using public funds (which was false); and (iv) the EB-5 investments would only provide 20% of the total capital but obtain a first lien on the entire Project. Yang Li was also told by Jin Yi that they will get the 99-year-lease income of the entire mall as their payback.

E.   On the basis of these several misrepresentations, Yang Li signed a subscription agreement to become a Phase 1 Investor. Yang Li was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment.  Yang Li believed they were investing in a government-backed project with a first lien on the bus Station itself.

82.    ***Yang Meng* (杨朦)**

A.   Yang Meng is an individual and resident of the State of New Jersey. Yang Meng's parents handled the investment process because Yang Meng was in America.

B.   In 2011, Yang Meng's parents attended a meeting at the Guangzhou Zhujiang Newton Hotel, hosted by employee(s) of the Guangzhou office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects.

C.  At the meeting, an American employee of NYCRC, gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 1).  Yang Meng's parents were given a brochure and showed a video.

D.  In the meeting described above, Yang Meng's parents were told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.) (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (v) construction on the Project had already commenced using public funds (which was false); and (vi) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being

injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.). Yang Meng's parents were also told (i) The George Washington Bridge is a public transportation hub and its municipal construction that will rebuild the bus station as a modern transportation hub to increase the capability and efficiency; (ii) in addition to the 141 EB5 investors who contributed a total of $72 million, the Commonwealth of Pennsylvania invested $279 million, and the GWB Public Hub Dev. LTD invested $14 million to bring the total cost of the Project to $365 million; and (iii) even though investing in a program comes with risk, the investors had the first lien and this investment's assets have much more value than the EB% investment, so there is a very small risk.

E.   On the basis of these several misrepresentations, Yang Meng signed a subscription agreement to become a Phase 1 Investor.  Yang Meng was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. In fact, Yang Meng received only the signature page of the subscription agreement on the day they signed it.  Yang Meng believed they were investing in a government-backed project with a first lien on the bus Station itself.

83.   *Yang Xueli* (杨学莉)

A.  Yang Xueli is an individual and resident of the State of Illinois.

B.  In 2011, was informed of the GWB Bus Station Redevelopment Project (Phase 1) by Liu Zhangna, the General Manager of the Guangzhou office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects.

C.  Liu Zhangna told  Yang Xueli that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion).

D.  On the basis of this misrepresentation, Yang Xueli signed a subscription agreement to become a Phase 1 Investor.  Before signing, Yang Xueli was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Yang Xueli believed they were investing in a government-backed project with a first lien on the bus Station itself.

84.  *Ye Qiang* (叶强)

A.  Ye Qiang is an individual and resident of the State of Connecticut.

B.  In 2011, Ye Qiang was informed of the GWB Bus Station Redevelopment Project (Phase 1) by NYCRC representatives and employee(s) of the Shanghai office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects.  Ye Qiang was shown a PowerPoint presentation.

C.  NYCRC representatives and Qiaowai employee(s) told Ye Qiang that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only

related to the retail portion); (ii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iii) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (v) construction on the Project had already commenced using public funds (which was false); and (vi) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).

D.  On the basis of these several misrepresentations, Ye Qiang signed a subscription agreement to become a Phase 1 Investor.  Ye Qiang was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Ye Qiang believed they were investing in a government-backed project with a first lien on the bus Station itself.

85.   *Ye Xin* (叶新)

A.  Ye Xin is an individual and resident of the People's Republic of China.

B.  In 2011, Ye Xin was informed of the GWB Bus Station Redevelopment Project (Phase 1) by Sun Lixiang an employee at the Shanghai office of Wailian, a marketing agent hired by NYCRC to promote its investment projects.

C.  Sun Lixiang told Ye Xin that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.); (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; and (iv) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal.  None of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which

constituted the only collateral for the EB-5 loan.).  Ye Xin was also told that the Project was guaranteed by the American government and that they would not let an infrastructure project fail.

D.  On the basis of these several misrepresentations, Ye Xin signed a subscription agreement to become a Phase 1 Investor.  Ye Xin was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Ye Xin believed they were investing in a government-backed project with a first lien on the bus Station itself.

86.    *Yin Yougeng* (印有庚)

A.  Yin Yougeng is an individual and resident of the State of Ohio.

B.  In 2011, Yin Yougeng went to the Shanghai office of Wailian, a marketing agent hired by NYCRC to promote its investment projects, to inquire about available immigration projects.

C.  At the office, Pin Wang and Jie Guo employees of Wailian, informed Yin Yougeng of the GWB Bus Station Redevelopment Project (Phase 1).  The substance of the presentation had been previously provided to Wailian by NYCRC. Yin Yougeng was given a brochure.

D.  In the meeting described above, Yin Yougeng was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan

from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.); (iii) construction on the Project had already commenced using public funds (which was false).

E.   On the basis of these several misrepresentations, Yin Yougeng signed a subscription agreement to become a Phase 1 Investor.  Yin Yougeng was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Yin Yougeng believed they were investing in a government-backed project with a first lien on the bus Station itself.

87.   ***Ying Jianfeng* (应剑锋)**

A.   Ying Jianfeng is an individual and resident of the city of Shanghai People's Republic of China.

B.   In the summer of 2011, Ying Jianfeng attended a one-on-one meeting at the Shanghai City office of Wailian, a marketing agent hired by NYCRC to promote its investment projects.

C.   At the meeting, Ms. Joyce Xie, an employee of Wailian, gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 1).  The substance of the presentation had been previously provided to Wailian by NYCRC. Ying Jianfeng was given a brochure.

D.   In that meeting, Ying Jianfeng was told that: (1) Dev. Fund 1 would have

a first lien mortgage on both the retail and public (bus terminal) portions of the station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.); (iii) the value of the collateral (which was misrepresented as the entire bus station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) all funds paid by the Port Authority to improve the station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (v) the "government" was providing $277 million for the Project and that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).

E.   On the basis of these several misrepresentations, Ying Jianfeng signed a subscription agreement to become a Phase 1 Investor.  Ying Jianfeng was not given any formal documentation that described the actual structure of the

investment or the nature of the agreement between Dev. Fund 1 and the GWB

Dev. Co., or that disclosed any risks relating to this investment.  Ying

Jianfeng believed they were investing in a government-backed project with a

first lien on the bus station itself.

88.   *Yu Qizhen* (俞其珍)

A.  Yu Qizhen is an individual and resident of the People's Republic of China.

B.  In 2011, Yu Qizhen was informed of the GWB Bus Station

Redevelopment Project (Phase 1) by employee(s) of Wailian, a marketing

agent hired by NYCRC to promote its investment projects. Yu Qizhen was

given a brochure.

C.  Wailian employee(s) told Yu Qizhen that: (i) all funds paid by the Port

Authority to improve the Station would increase the value of the collateral

because Dev. Fund 1 would maintain its position as the senior secured creditor

on the entire Project (which was false); and (ii) construction on the Project

had already commenced using public funds (which was false).

D.  On the basis of these several misrepresentations, Yu Qizhen signed a

subscription agreement at the Wailian office to become a Phase 1 Investor.

Yu Qizhen was not given any formal documentation that described the actual

structure of the investment or the nature of the agreement between Dev. Fund

1 and the GWB Dev. Co., or that disclosed any risks relating to this

investment.  Yu Qizhen believed they were investing in a government-backed

project with a first lien on the bus Station itself.

89.   *Yu Zhaohui* (喻朝晖)

170

A.  Yu Zhaohui is an individual and resident of the State of California.

B.  In 2011, Yu Zhaohui was informed of the GWB Bus Station Redevelopment Project (Phase 1) by employee(s) of the Shanghai office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects.  Yu Zhaohui received a brochure.

C.  Qiaowai employee(s) told Yu Zhaohui that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possessions of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan); (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.). Yu Zhaohui was also told in

171

this meeting that Skanska would guarantee and provide a certificate of completion of the Project.

D.  On the basis of these several misrepresentations, Yu Zhaohui signed a subscription agreement to become a Phase 1 Investor.  Yu Zhaohui was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment.  In fact, Yu Zhaohui received only the signature page of the subscription agreement on the day they signed it.  Yu Zhaohui believed they were investing in a government-backed project with a first lien on the bus Station itself.

90.   *Yvonne Zhu* (朱玲)

A.  Yvonne Zhu is an individual and resident of the State of California.

B.  In 2011, Yvonne Zhu attended a meeting at the Qingdao office of Wailian, a marketing agent hired by NYCRC to promote its investment projects.

C.  At the meeting, Yan Liu, Wailian's Qingdao office Manager, gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 1).  Yvonne Zhu was given a brochure.

D.  In the meeting described above, Yvonne Zhu was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus

terminal portion of the Station was not included in the collateral pledged to the EB-5 loan); (iii) the value of the collateral (which was mispresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in facts the Station is a single building and the collateral was the ground lease, not the real property itself; (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vi) construction on the Project had already commenced using public funds (which was false); and (vii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).

E.  On the basis of these several misrepresentations, Yvonne Zhu signed a subscription agreement to become a Phase 1 Investor.  Yvonne Zhu was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB

Dev. Co., or that disclosed any risks relating to this investment. Yvonne Zhu believed they were investing in a government-backed project with a first lien on the bus Station itself.

91.   *Zhang Hui (张晖)*

A.  Zhang Hui is an individual and resident of the People's Republic of China.

B.  In 2014, Zhang Hui attended a meeting at the Beijing office of Kun Peng, a marketing agent hired by NYCRC to promote its investment projects.

C.  At the meeting, Deng Xiaoyu and employee of Kun Peng, gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 2).  Zhang Hui was given promotional materials.

D.  At the meeting, Dong Chun Li, Li Zhou Yen, Yue Chun Hong, and Li Xue Mei relayed the following false information to Zhang Hui (as Dong Chun Li had been trained to by NYCRC): (i) The Phase 1 project was complete and was a success; (ii) the funds from Phase 2 was going to be used to do different aspects of the overall project; (iii) the Phase 2 funds would be a small percentage (approximately 25%) of the cost of the overall "phase 2 project"; and (iv) that the only risk to his investment was that his I-829 wouldn't be approved because I-829 approval requires that the investment be "at risk" and his investment wasn't really "at risk" as required by EB5 rules because the Port Authority was guaranteeing it.

E.  At no time was Zhang Hui told that (i) the collateral for Phase 2 consisted of only a lien on the shares that the developers owned in the Project (which would be worthless in any bankruptcy or insolvency) or that (ii) the funds

174

raised in Phase 1 were not sufficient to complete the redevelopment (thus necessitating the Phase 2 capital raise).

F.   On the basis of these several misrepresentations, Zhang Hui signed the signature page of a subscription agreement in English that Zhang Hui had been given at the meeting to become a Phase 2 Investor.  Zhang Hui did not receive any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 2 and the GWB Leverage Lender LLC, or that disclosed any risks relating to the investment. Zhang Hui believed they were investing in a government-backed project with a first lien on the bus Station itself.

92.   ***Zhang Pingjun*** **(张平军)**

A.   Zhang Pingjun is an individual and resident of Canada.

B.   In 2011, Zhang Pingjun was informed of the GWB Bus Station Redevelopment Project (Phase 1) by Tina Wu, the Assistant Manager of the Shanghai office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects. Tina Wu invited Zhang Pingjun to attend a meeting at the Shanghai office of Qiaowai.

C.   At the meeting, Tina Wu introduced Qiaowai and then asked Wu Ling, an employee of NYCRC to give a presentation regarding the Project.

D.   Wu ling stated that: (i) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possessions of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral

pledged to the EB-5 loan); (ii) the collateral was comprised of two buildings (when in facts the Station is a single building and the collateral was the ground lease, not the real property itself; (iii) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (iv) construction on the Project had already commenced using public funds (which was false);  and (v) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).

E.   On the basis of these several misrepresentations, Zhang Pingjun signed a subscription agreement to become a Phase 1 Investor.  Zhang Pingjun was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Zhang Pingjun believed they were investing in a government-backed project with a first lien on the bus Station itself.

93.   *Zhang Qian* (张谦)

A.  Zhang Qian is an individual and resident of the State of California.

B.  In 2011, Zhang Qian was informed of the GWB Bus Station Redevelopment Project (Phase 1) by employee(s) of the Guangzhou office of Wailian, a marketing agent hired by NYCRC to promote its investment projects. Zhang Qian was given a brochure.

C.   Wailian employee(s) told  Zhang Qian that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); and (ii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment.

D.  On the basis of these several misrepresentations, Zhang Qian signed a subscription agreement to become a Phase 1 Investor.  Zhang Qian was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment.  Zhang Qian believed they were investing in a government-backed project with a first lien on the bus Station itself.

94.   *Zhang Shoutao* (张守涛)

A.  Zhang Shoutao is an individual and resident of the State of California.

B.  In 2011, Zhang Shoutao was informed of the GWB Bus Station Redevelopment Project (Phase 1) by employee(s) of the Qingdao office of

Wailian, a marketing agent hired by NYCRC to promote its investment projects. Zhang Shoutao was also sent e-mails from Wailian employee(s) and given promotional materials, including a brochure.

C.  From the sources described above, Zhang Shoutao was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iii) construction on the Project had already commenced using public funds (which was false); and (iv) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).

D.  On the basis of these several misrepresentations, Zhang Shoutao signed a subscription agreement to become a Phase 1 Investor.  Zhang Shoutao was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB

Dev. Co., or that disclosed any risks relating to this investment. Zhang Shoutao believed they were investing in a government-backed project with a first lien on the bus Station itself.

95.     ***Zhang Xuemei* (张雪梅)**

A.  Zhang Xuemei is an individual and resident of the Commonwealth of Massachusetts.

B.  In 2011, Zhang Xuemei attended a meeting at the Shanghai office of Wailian, a marketing agent hired by NYCRC to promote its investment projects.

C.  At the meeting, Joyce Xie, an employee of Wailian, gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 1).  The substance of the presentation had been previously provided to Wailian by NYCRC. Zhang Xuemei was given promotional materials regarding the Project.

D.  In the meeting described above, Zhang Xuemei was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the station (when in fact the security interest only related to the retail portion); (ii) the value of the collateral (which was misrepresented as the entire bus station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iii) that construction on the Project had already commenced using public funds (which was false); (iv) that the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a

first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.); and (v) the developer had already invested $14 million into the Project that would not be secured by projects assets (which was also not true.)

E.   On the basis of these several misrepresentations, Zhang Xuemei signed a subscription agreement to become a Phase 1 Investor. Zhang Xuemi was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Zhang Xuemei believed they were investing in a government-backed project with a first lien on the bus station itself.

96.   ***Zhang Yuesheng* (张月生)**

A.   Zhang Yuesheng is an individual and resident of the Commonwealth of Massachusetts.

B.   In 2011, Zhang Yuesheng was informed of the GWB Bus Station Redevelopment Project (Phase 1) at a seminar hosted by Jinghong, a marketing agent hired by NYCRC to promote its investment projects.

C.   Jinghong employee(s) told  Zhang Yuesheng that: (i) Dev. Fund 1 would

have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.) (iii) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); and (v) construction on the Project had already commenced using public funds (which was false).

D.  On the basis of these several misrepresentations, Zhang Yuesheng signed a subscription agreement to become a Phase 1 Investor.  Zhang Yuesheng was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Zhang Yuesheng believed they were investing in a government-backed project with a first lien on the bus Station itself.

97.    ***Zhang Yumei*** (张玉梅)

A.  Zhang Yumei is an individual and resident of the People's Republic of China.

B.  In 2011, Zhang Yumei attended a meeting at the Qingdao office of Wailian, a marketing agent hired by NYCRC to promote its investment projects.

C.  At the meeting, Mei Liu and other employees of Wailian, gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 1).  Zhang Yumei was given a brochure.

D.  In the meeting described above, Zhang Yumei was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iii) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); and (iv) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).

E.   On the basis of these several misrepresentations, Zhang Yumei signed a subscription agreement to become a Phase 1 Investor. Zhang Yumei was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Zhang Yumei believed they were investing in a government-backed project with a first lien on the bus Station itself.

98.   ***Zhang ZeYu (张泽宇)***

A.   Zhang ZeYu is an individual and resident of the State of California.

B.   In 2011, Zhang ZeYu attended a meeting at the Shanghai office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects. NYCRC's Paul Levinsohn attended the meeting.

C.   At the meeting, an employee of Qiaowai, gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 1).

D.   In the meeting described above, Zhang ZeYu was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.); (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice

the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in fact the Station is a single building and the collateral was the ground lease, not the real property itself); (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); and (vi) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).

E.   On the basis of these several misrepresentations, Zhang ZeYu signed a subscription agreement to become a Phase 1 Investor.  Zhang ZeYu was not given any formal documentation to that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment.  Zhang ZeYu believed they were investing in a government-backed project with a first lien on the bus Station itself.

99.   ***Zhao Jiaxu*** (赵佳绪)

A.  Zhao Jiaxu is an individual and resident of the State of Missouri.

B.  In 2011, Zhao Jiaxu was informed of the GWB Bus Station Redevelopment Project (Phase 1) by employee(s) of the Beijing office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects. Zhao Jiaxu was given a brochure.

C.  Qiaowai employee(s) told Zhao Jiaxu that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.); (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in fact the Station is a single building and the collateral was the ground lease, not the real property itself); (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vi) construction on the Project had already commenced using public funds (which was false); and (vii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire

Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).

D.  On the basis of these several misrepresentations, Zhao Jiaxu signed a subscription agreement to become a Phase 1 Investor.  Zhao Jiaxu was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Zhao Jiaxu believed they were investing in a government-backed project with a first lien on the bus Station itself.

100.  ***Zhao Mengshi* (赵泱泱)**

A.  Zhao Mengshi is an individual and resident of the Commonwealth of Virginia.

B.  In the summer of 2011, Zhao Mengshi attended a few meetings at the Shanghai office of Jinhong, a marketing agent hired by NYCRC to promote its investment projects.

C.  At the meetings, Nancy Shen and Vivian Xu, employees of Jinhong, gave presentations regarding the GWB Bus Station Redevelopment Project (Phase 1).  The substance of the presentation had been previously provided to Jinhong by NYCRC. was given promotional materials.

186

D.  In that meeting, Zhao Mengshi was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the station (when in fact the security interest only related to the retail portion); (ii) the value of the collateral (which was misrepresented as the entire bus station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iii) all funds paid by the Port Authority to improve the station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (iv) that construction on the Project had already commenced using public funds (which was false); and (v) that the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).  In addition, Zhao Mengshi was told she would receive his capital back, together with interest, within 5 years, which was inconsistent with the agreement between the fund and the developer.

E.  After the conclusion of the seminar, Zhao Mengshi met with two Wailian employees who gave an additional presentation to her.  The substance of the

presentation had been previously provided to Wailian by NYCRC. During this meeting, the Wailian employees told Zhao Mengshi that: (i) the collateral for the EB5 loan included the bridge and the bus station such that in the event of a default, the money collected from tolls on the GWB and from rents in the bus station couldbe used to pay back the EB-5 investors; (ii) this was an extremely safe project because it was a government project and the government is investing heavily in it; and (iii) construction on the Project had already begun.

F.  Zhao Mengshi was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. At the time of the investment, Zhao Mengshi was only provided the signature page of the subscription agreement.

101.  ***Zhao Yangyang* (赵泱泱)**

A.  Zhao Yangyang is an individual and resident of the State of California.

B.  In 2011, Zhao Yangyang attended a meeting at the Guangzhou City office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects.

C.  At the meeting, Ms. Jin, an employee of Qiaowai, gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 1).  The substance of the presentation had been previously provided to Qiaowai by NYCRC.  Zhao Yangyang was given a brochure and showed a video.

D.  In that meeting, Zhao Yangyang was told that: (1) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions

of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.); (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (v) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).

E.  On the basis of these several misrepresentations, Zhao Yangyang signed a subscription agreement to become a Phase 1 Investor.  Zhao Yangyang was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment.  Zhao Yangyang believed they were investing in a government-backed project with a first lien on the bus Station itself.

102.  *Zheng Hongfei* (郑宏飞)

A.  Zheng Hongfei is an individual and resident of the State of California.

B.  In 2011, Zheng Hongfei was informed of the GWB Bus Station Redevelopment Project (Phase 1) by Yunfan Wang, an employee at the Suzhou office of Wailian, a marketing agent hired by NYCRC to promote its investment projects.  Zheng Hongfei was given a brochure.

C.  Yunfan Wang told Zheng Hongfei that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.); (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings

190

(when in fact the Station is a single building and the collateral was the ground lease, not the real property itself); (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vi) construction on the Project had already commenced using public funds (which was false); and (vii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).

D.  On the basis of these several misrepresentations, Zheng Hongfei signed a subscription agreement to become a Phase 1 Investor.  Zheng Hongfei was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Zheng Hongfei believed they were investing in a government-backed project with a first lien on the bus Station itself.

### 103.   *Zheng Yong* (郑勇)

A.  Zheng Yong is an individual and resident of the State of New York.

B.  In 2011, Zheng Yong was informed of the GWB Bus Station Redevelopment Project (Phase 1) at a promotional meeting by employee(s) of the Shanghai office of Wailian, a marketing agent hired by NYCRC to promote its investment projects.

C.  In the meeting described above, Zheng Yong was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.); (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); and (v) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail

192

mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).

D.  On the basis of these several misrepresentations, Zheng Yong signed a subscription agreement to become a Phase 1 Investor.  Zheng Yong was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Zheng Yong believed they were investing in a government-backed project with a first lien on the bus Station itself.

104.  ***Zhou Lina* (周莉娜)**

A.  Zhou Lina is an individual and resident of the State of Texas.

B.  In 2011, Zhou Lina attended a seminar conducted by NYCRC at the Shangri-La Hotel in Qingdao. The seminar was co-hosted by Wailian, a marketing agent hired by NYCRC to promote its investment projects.

C.  At the seminar, a representative of NYCRC gave a presentation regarding the GWB Bus Station Redevelopment Project (Phase 1). Zhou Lina was given promotional materials.

D.  In that meeting, Zhou Lina was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iii) all funds paid by the Port Authority to improve

the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (iv) that construction on the Project had already commenced using public funds (which was false); and (v) that the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).  In addition, Zhou Lina was told she would receive his capital back plus interest within 5 years, which was inconsistent with the agreement between the fund and the developer.

E.   After the conclusion of the seminar, Zhou Lina met with two Wailian employees who gave an additional presentation to her.  The substance of the presentation had been previously provided to Wailian by NYCRC. During this meeting, the Wailian employees told Zhou Lina that: (i) the collateral for the EB5 loan included the bridge and the bus Station such that in the event of a default, the money collected from tolls on the GWB and from rents in the bus Station couldbe used to pay back the EB-5 investors; (ii) this was an extremely safe project because it was a government project and the

government is investing heavily in it; and (iii) construction on the Project had already begun.

F. Zhou Lina was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. At the time of the investment, Zhou Lina was only provided the signature page of the subscription agreement.

105. **_Zhou Yin_ (周吟)**

A. Zhou Yin is an individual and resident of the State of New York.

B. In 2011, Zhou Yin was informed of the GWB Bus Station Redevelopment Project (Phase 1) at a promotional meeting by employee(s) of the Shanghai office of Qiaowai, a marketing agent hired by NYCRC to promote its investment projects. Zhou Yin was given a brochure.

C. In the meeting described above, Zhou Yin was told that: (i) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (ii) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); and (iii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was

providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).

D.  On the basis of these several misrepresentations, Zhou Yin signed a subscription agreement to become a Phase 1 Investor.  Zhou Yin was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment.  Zhou Yin believed they were investing in a government-backed project with a first lien on the bus Station itself.

106.  *Zhu Fengbo* (朱丰博)

A.  Zhu Fengbo is an individual and resident of the State of California.

B.  In 2011, Zhu Fengbo was informed of the GWB Bus Station Redevelopment Project (Phase 1) by Xiaoli Ma, an employee at the Shanghai office of Jinghong, a marketing agent hired by NYCRC to promote its investment projects.

C.  In the meeting described above, Zhu Fengbo was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) if the borrower of EB-5 funds were to default on its loan from the SPV, the SPV could take possession of the Station's bus terminal and

redevelop it into additional retail space (which was false because the bus terminal portion of the Station was not included in the collateral pledged to the EB-5 loan.); (iii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iv) the collateral was comprised of two buildings (when in fact the Station is a single building and the collateral was the ground lease, not the real property itself); (v) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (vi) construction on the Project had already commenced using public funds (which was false); and (vii) the "government" was providing $277 million for the Project so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).

D.  On the basis of these several misrepresentations, Zhu Fengbo signed a subscription agreement to become a Phase 1 Investor.  Zhu Fengbo was not given any formal documentation that described the actual structure of the

investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment.  Zhu Fengbo believed they were investing in a government-backed project with a first lien on the bus Station itself.

107.  ***Zhu Liyi* (朱里轶)**

A. Zhu Liyi is an individual and resident of the State of California.

B. In 2011, Zhu Liyi was informed of the GWB Bus Station Redevelopment Project (Phase 1) by Yinhua Yu, an employee at the Shanghai office of Jinghong, a marketing agent hired by NYCRC to promote its investment projects. Zhu Liyi was given promotional materials including a brochure.

C.  In the meeting described above, Zhu Liyi was told that: (i) Dev. Fund 1 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station (when in fact the security interest only related to the retail portion); (ii) the value of the collateral (which was misrepresented as the entire bus Station including the public portion) was worth more than twice the anticipated $72 million EB-5 investment; (iii) the collateral was comprised of two buildings (when in fact the Station is a single building and the collateral was the ground lease, not the real property itself); (iv) all funds paid by the Port Authority to improve the Station would increase the value of the collateral because Dev. Fund 1 would maintain its position as the senior secured creditor on the entire Project (which was false); (v) construction on the Project had already commenced using public funds (which was false); and (vi) the "government" was providing $277 million for the Project so that the

EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project (which was entirely untrue; the $277 figure represented $199 million in funds the Port Authority was providing for the repair and improvement of the George Washington Bridge itself and $78 million on the bus terminal, and none of those funds were being injected into the capital stack for the retail mall renovation, which was the only project that the EB-5 investors were financing and which constituted the only collateral for the EB-5 loan.).

D.   On the basis of these several misrepresentations, Zhu Liyi signed a subscription agreement to become a Phase 1 Investor.  Zhu Liyi was not given any formal documentation that described the actual structure of the investment or the nature of the agreement between Dev. Fund 1 and the GWB Dev. Co., or that disclosed any risks relating to this investment. Zhu Liyi believed they were investing in a government-backed project with a first lien on the bus Station itself.

## CAUSES OF ACTION

### First Cause of Action

**(Fraudulent Inducement – Brought by the Phase 1 Investor Plaintiffs)**

108.   Plaintiffs repeat and reallege the allegations of the preceding paragraphs.

109.   Each of the Phase 1 Investor Plaintiffs, defined above, are investors in Dev. Fund 1.

110.   None of the Phase 1 Investors were sophisticated investors and NYCRC was aware of the same when it marketed Dev. Fund 1 to them and when it reported to them on the status of their investment between 2011 and 2020.

111.    None of the Phase 1 Investors were fluent in written or spoken English, and NYCRC was aware of the same when it marketed Dev. Fund 1 to them (in Mandarin) and when it reported to them on the status of their investments between 2011 and 2020 (in Mandarin).

112.    In 2011, NYCRC, both directly and through its China-based marketing agencies, made each of the several misrepresentations regarding the Project and the collateral set forth above to each of the Phase 1 Investor Plaintiffs.

113.    Each of the Phase 1 Investor Plaintiffs relied on these misrepresentations in making their EB-5 investments in the Project through NYCRC.

114.    Between 2011 and 2019, NYCRC actively deceived each of the Phase 1 Investor Plaintiffs regarding the status of their investments in the Project by, among other things:

- Withholding material negative information (including events that constituted events of default) from all Mandarin-language, written updates to the investors in Dev. Fund 1;

- Telling certain investors in late 2019, following the bankruptcy, that they were protected because Dev. Fund 1 had a first lien on assets that were worth multiples of Dev. Fund 1 and Dev. Fund 2's combined investment.

115.    Due to NYCRC's active and continuing misrepresentations, none of the Phase 1 Investor Plaintiffs became actually aware of NYCRC's misrepresentations until around November 2020.

116.    As a result of the above, each of the Phase 1 Investor Plaintiffs has lost all of the $500,000 in capital they each invested, which should have been returned with interest in the third quarter of 2020 if the investments performed (or had been structured) as NYCRC had represented (but the representations were false).

**Second Cause of Action**

**(Fraudulent Inducement – Brought by the Phase 2 Investor Plaintiffs)**

117.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs.

118.    Each of the above-defined Phase 2 Investor Plaintiffs is an investor in Dev. Fund 2.

119.    In 2014, NYCRC, both directly and through its China-based marketing agencies, made each of the several misrepresentations regarding a purported "Phase 2" of the Project and the collateral set forth above to the Phase 2 Investor Plaintiffs, which the Phase 2 Investor Plaintiffs relied on in making an investment in Dev. Fund 2.

120.    The Phase 2 Investor Plaintiffs are not sophisticated investors and NYCRC was aware of the same when it marketed Dev. Fund 2 to them and when it reported to them on the status of their investments between 2014 and 2020.

121.    The Phase 2 Investor Plaintiffs were not fluent in written or spoken English, and NYCRC was aware of the same when it marketed Dev. Fund 2 to them (in Mandarin) and when it reported to them on the status of their investments between 2014 and 2020 (in Mandarin).

122.    Between 2011 and 2019, NYCRC actively deceived the Phase 2 Investor Plaintiffs regarding the status of their investments in the Project by, among other things:

• Withholding material negative information (including events that constituted events of default) from all Mandarin-language written updates to the investors in Dev. Fund 2; and

• Telling certain investors in late 2019, following the bankruptcy, that they were protected because Dev. Fund 1 had a first lien on assets that were worth multiples of Dev. Fund 1 and Dev. Fund 2's combined investment and that Dev. Fund 2 held a second position lien

on all the same assets.

123.    Due to NYCRC's active and continuing misrepresentations, the Phase 2 Investor Plaintiffs did not become actually aware of NYCRC's misrepresentations until no earlier than November 2020.

124.    As a result of the above, the Phase 2 Investor Plaintiffs have lost all of their respective $500,000 capital investments in Dev. Fund 2.

### Third Cause of Action

**(Breach of Fiduciary Duty – Brought by the Phase 1 Investor Plaintiffs on Behalf of Themselves and Derivatively on Behalf of Dev. Fund 1)**

125.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs.

126.    NYCRC was (and is) the sole managing member of Dev. Fund 1, with the rights and duties of management irrevocably granted to it in Dev. Fund 1's operating agreement.

127.    Each of the Phase 1 Investor Plaintiffs is a non-managing member of Dev. Fund 1.

128.    As the managing member of Dev. Fund 1, NYCRC owed each of the Phase 1 Investor Plaintiffs a fiduciary duty under New York law.

129.    Under New York law, it is elemental that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interests the fiduciary is required to protect. This is a sensitive and inflexible rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interests of those owed a fiduciary duty.

130.    As set forth above, as the managing member of Dev. Fund 1, NYCRC took several actions between 2011 and 2019 that (unbeknownst to the Phase 1 Investor Plaintiffs at the time) placed NYCRC's economic interests above those of the non-managing members, i.e.

the Phase 1 Investor Plaintiffs, including but not limited to, refusing to declare defaults under the operative loan agreements to GWB Dev. Co., withholding important negative information from the non-managing members.

131.     Some of these misdeeds were taken with respect to the Dev. Fund 1 as a whole, and others with respect to each individual Phase 1 Plaintiff Investor.

132.     Demand upon NYCRC to cause Dev. Fund 1 to commence a lawsuit against NYCRC would be futile.

133.     As a result of NYCRC's breaches of fiduciary duty, each of the Phase 1 Investor Plaintiffs has lost all or substantially all of their respective $500,000 capital investment, and NYCRC was unjustly enriched by accepting management fees that, had it acted in accordance with its fiduciary duties, it may never have received, but that, because it breached such duties, it was able to receive without interruption.

### Fourth Cause of Action

**(Breach of Fiduciary Duty – Brought by the Phase 2 Investor Plaintiffs behalf of themselves and derivatively on Behalf of Dev. Fund 2)**

134.     Plaintiffs repeat and reallege the allegations of the preceding paragraphs.

135.     NYCRC was (and is) the sole managing member of Dev. Fund 2, with the rights and duties of management irrevocable granted to it in Dev. Fund 2's operating agreement.

136.     Each of the Phase 2 Investor Plaintiffs is a non-managing member of Dev. Fund 2.

137.     As the managing member of Dev. Fund 2, NYCRC owed the Phase 2 Investor Plaintiffs a fiduciary duty under New York law.

138.     Under New York law, it is elemental that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interests the fiduciary is required to protect. This

is a sensitive and inflexible rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interests of those owed a fiduciary duty.

139.    As set forth above, as the managing member of Dev. Fund 2, NYCRC took several actions between 2014 and 2019 that (unbeknownst to the Phase 2 Investor Plaintiffs at the time) placed NYCRC's economic interests above those of the non-managing members, i.e., the Phase 2 Investor Plaintiffs, including but not limited to, refusing to declare defaults under the operative loan agreements, and withholding important negative information from the non-managing members.

140.    Some of these misdeeds were taken with respect to Dev. Fund 2 as a whole, and others with respect to each individual investor.

141.    Demand upon NYCRC to cause Dev. Fund 2 to commence a lawsuit against NYCRC would be futile.

142.    As result of NYCRC's breaches of fiduciary duty, the Phase 2 Investor Plaintiffs have lost all or substantially all of their respective $500,000 capital investment, and NYCRC was unjustly enriched by accepting management fees that, had it acted in accordance with its fiduciary duties, it may never have received, but that, because it breached such duties, it was able to receive without interruption.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendant and an award of such actual damages as they shall prove at trial, but in an amount not less than $57,780,000 in direct damages to the Investor Plaintiffs, damages to Dev. Fund 1 and Dev. Fund 2 in an amount to be established at trial, plus punitive damages, prejudgment interest at the statutory rate and for the reasonable fees, costs, and disbursements of this action.

Dated:   New York, New York

August 29, 2022

FORD O'BRIEN LANDY LLP

Robert S. Landy
Renée L. Jarusinsky
Stephen R. Halpin III
275 Madison Ave.
24th Floor
New York, NY 10016
(212) 858-0040
rlandy@fordobrien.com

*Attorneys for Plaintiffs*

# EXHIBIT 1 TO COMPLAINT

**Bai Wen et al., vs. New York City Regional Center LLC.**

This transcript was exported on Jun 29, 2022 - view latest version here.

Speaker 2:

Okay, welcome everyone. Thanks for getting online. And this is our first presentation with this technology. So I think it's going to be wonderful.

Speaker 1:

[foreign language 00:00:24]

Audience:

[foreign language 00:00:24].

Speaker 2:

I would ask that everyone take a lot of notes because we're going to go through a lot of the same material, but we're going to provide you nice features, sale points and things to mention to your clients while pre-selling this.

Speaker 1:

[foreign language 00:00:45].

Audience:

[foreign language 00:00:45]

Speaker 2:

Now, it's really important to [Chau Wei 00:01:11], obviously Vivian, as well as to New York City Regional Center that we keep all this information close to our vest while we pre-sell to clients or talk to clients because we have a launch on July 9th.

Speaker 1:

[foreign language 00:01:32].

Audience:

[foreign language 00:01:32]

Speaker 2:

And grateful as we are to be invited, we are going to help Guangzhou, the new office in the Chau Wei system launch with a very nice project.

Speaker 1:

[foreign language 00:01:59].

Speaker 2:

For all of you who have worked so hard on the east river waterfront, I have really good news. Yesterday, we were pre-approved by USCIS on the East River Waterfront project. Congratulations, and thank you.

This transcript was exported on Jun 29, 2022 - view latest version here.

Audience:

[foreign language 00:02:34].

Speaker 3:

Waterfront.

Speaker 1:

[foreign language 00:02:34].

Speaker 2:

Also, so you know, I believe Doreen has some good news with regard to the MBA.

Speaker 1:

[foreign language 00:02:48]. They already know.

Speaker 2:

Oh, sorry. That wasn't a surprise.

Speaker 1:

[foreign language 00:02:57].

Audience:

[foreign language 00:03:19].

Speaker 2:

One or two people have an open line there. I'm sorry. They should mute their phone until they have a question.

Speaker 1:

[foreign language 00:06:15].

Audience:

[foreign language 00:06:19]

Speaker 2:

Hold questions for last minute.

Audience:

[foreign language 00:06:22]

Speaker 1:

[foreign language 00:06:25].

This transcript was exported on Jun 29, 2022 - view latest version here.

Audience:

[foreign language 00:06:26]

Speaker 2:

Are they muted? Okay, good. All right. Thank you, Doreen. And we appreciate all your hard work on getting your clients to wire funds and the source of funds packages. That's very important for us to bring new and better products for you to sell for the New York City Regional Center.

Speaker 1:

[foreign language 00:06:43].

Speaker 2:

So today's presentation is a little bit like all of our presentations because all of our projects are the same.

Speaker 1:

[foreign language 00:07:08].

Speaker 2:

Washington Bridge is named after the first president of the United States. And it's located on the Upper West Side of Manhattan.

Speaker 1:

[foreign language 00:07:25].

Speaker 2:

It connects the state of New Jersey to the state of New York.

Speaker 1:

[foreign language 00:07:36].

Speaker 2:

Over the Hudson river, which is on the west side of Manhattan.

Speaker 1:

[foreign language 00:07:43].

Speaker 2:

Below the bridge on the New York side, which is the lower portion of the photograph is Columbia University and Columbia University Medical School.

Speaker 1:

[foreign language 00:07:57].

This transcript was exported on Jun 29, 2022 - view latest version here.

Speaker 2:

To the north or above the photograph or the white roof, other famous... Someone's not muted.

Speaker 1:

[foreign language 00:08:20].

Speaker 2:

[foreign language 00:08:32]. Above the roof, in the northern part of that neighborhood called Washington Heights is Yeshiva University, which is a famous international school spelled Y-A-S-H-I-V-A. And Washington Heights is a very heavily-populated residential area as well.

Speaker 1:

[foreign language 00:08:55].

Audience:

[foreign language 00:08:56].

Speaker 1:

[foreign language 00:09:01].

Speaker 2:

So as I said before, I'm telling a story that helps you sell this project because it's important with this photograph alone your investors to understand what they're looking at.

Speaker 1:

[foreign language 00:09:26].

Speaker 2:

The bridge is the most heavily traveled bridge in the United States. It's a two story or two level bridge, both directions, I mean, north, south, up and down, upper deck, lower deck.

Speaker 1:

[foreign language 00:09:57].

Speaker 2:

The project involves the bridge, the project involves the bus station and the transportation components of the bus station. And together with those two components, we are creating a lot of unutilized space, which will then be redeveloped into retail shops where over 50 million cars and trucks travel every year.

Speaker 1:

[foreign language 00:10:49].

Speaker 2:

This transcript was exported on Jun 29, 2022 - view latest version here.

And because the New York City Regional Center provides your investors first mortgage security on real estate is the retail real estate in the bus station building that becomes so valuable with all of this traffic over the bridge, as well as the two universities and the residential neighborhood in the area that is largely underserved by any retail in the area.

Speaker 1:

[foreign language 00:11:28].

Speaker 2:

The bridge is owned by government and the governmental agency that owns it and operates it, the bridge as well as the bus station and all these buildings rather, is the Port Authority of the state of New York and New Jersey. It's the largest port agency in the country of the United States.

Speaker 1:

[foreign language 00:12:44].

Speaker 2:

Very important. The Port Authority owns and operates all the bridges and tunnels, airports, and other transportation networks in New York City and New Jersey and collects toll money every day, cash every day. They're self-funded. They have their own money on account. All of the money going into this project is on account.

Speaker 1:

[foreign language 00:13:41].

Speaker 2:

This money is cash flow. It comes in the door every day, and they're doing several projects in the state of New York and New Jersey as we speak, some of which we hope to involve Chau Wei.

Speaker 1:

[foreign language 00:13:59].

Speaker 2:

Even though we would provide you a letter of evidence of this money from the Port Authority, please do not ask me if the money is on account because it is.

Speaker 1:

[foreign language 00:14:21].

Speaker 2:

We'll be honest, as we always do. As you know, New York City Regional center was approved in 2008 for the benefit of all of you. We're up over 850 investors in our company with five projects. And all of our I-526s so far have been approved.

This transcript was exported on Jun 29, 2022 - view latest version here.

Speaker 1:

[foreign language 00:15:08].

Speaker 2:

So you know that some investors I know are going to begin asking about our level of approval from USCIS.

Speaker 1:

[foreign language 00:15:18].

Speaker 2:

While you might not be able to read it on the screen, every project that we're working on right now is approved by USCIS. The project and the components of the project are qualified projects for the New York City Regional Center to do. You should not be concerned and you should be confident when you answer that question, there will be no problem.

Speaker 1:

[foreign language 00:15:49].

Speaker 2:

So when you get a question like that from an investor, you should turn it around and say to the investor, you should be very careful out there because not only are there regional centers marketing projects who are not yet approved regional centers by USCIS, they're marketing projects where they're not qualified to market those components in the project as EB-5. This is very important for you to use against your investors when they ask you that question.

Speaker 1:

[foreign language 00:17:23]

Speaker 2:

Please write these points down when I give them to you. Also, you should know that we have TEAs from the state of New York, the highest agency that we're allowed to obtain authority from on our project. That is not true of many other regional centers. Also mention that to your client because this TEA is becoming the source of issues with USCIS on job calculations.

Speaker 1:

[foreign language 00:18:55].

Speaker 2:

A good rule to remember is don't answer questions with documents. Respond to the question as you know you are confident you've been given all the information. And for such evidentiary questions or that require evidence like the TEA, you should know that New York City Regional Center has not one letter TEA, but it has two supporting letters for that TEA from the New York State Economic Development Corporation and the US Department of Labor and Statistics.

This transcript was exported on Jun 29, 2022 - view latest version here.

Speaker 1:

[foreign language 00:20:08].

Speaker 2:

Moving forward, as you know, we've sold out of Brooklyn Navy Yard, Steiner Studios, arena project as well, the East River Waterfront Manhattan redevelopment project, and Pier A. All very successful. New York City Regional Center once again appreciates all of your hard work, Chau Wei.

Speaker 1:

[foreign language 00:20:33].

Speaker 2:

Again, our philosophy is making it all about the green card and not about taking unnecessary risks. And we do this providing first mortgage security, specific assets as collateral, and together with government on government-owned land, we're able to generate significant job creation.

Speaker 1:

[foreign language 00:21:20].

Audience:

[foreign language 00:21:41].

Speaker 1:

[foreign language 00:21:42].

Speaker 2:

Making it safe and secure requires additional documents. So we go beyond just offering a promissory note and we provide a loan agreement as you know, a security agreement, collateral, description of the collateral and all other related documents that are required to make it safe and secure for your clients to invest in our program.

Speaker 1:

[foreign language 00:22:44].

Speaker 2:

And in our documents, the investor's legally defined as a secured investor, a point that should always be communicated to your investors when marketing our projects.

Speaker 1:

[foreign language 00:22:56].

Speaker 2:

This transcript was exported on Jun 29, 2022 - view latest version here.

These four points, again, the hallmark of our program should always be repeated to your clients. All of our projects are on government-owned land. We bring in additional political and financial support, significantly supporting your EB-5 investors investments, as well provide specific assets and first mortgage security, creating a surplus in job creation. All of these points are our mantra. Repeat it all the time to your clients.

Speaker 1:

[foreign language 00:23:42].

Speaker 2:

Now you know everything is the same. This particular section of the presentation is right out of the storybook. So you can essentially take the storybook on East River Waterfront and just put in the next PPT and you've got the presentation that you need to sell any client.

Speaker 1:

[foreign language 00:25:10].

Audience:

[foreign language 00:25:10].

Speaker 1:

[foreign language 00:25:10].

Audience:

[foreign language 00:25:10].

Speaker 2:

Again, repeating again, government-owned land, minimizing risk by involving government, a lot of support. As you know from all of our projects, we have a huge amount of government money that does not need to be repaid, something that should always be repeated to your client. Not having to repay that money allows us to provide first mortgage security to your client.

Speaker 1:

[foreign language 00:26:12].

Audience:

[foreign language 00:26:12].

Speaker 1:

[foreign language 00:26:12].

Speaker 2:

Now, the Brooklyn Navy Yard is a little bit different in this regard. But all of our projects and Pier A slightly, all of our projects have EB-5 money that is 30% or less of total project costs.

This transcript was exported on Jun 29, 2022 - view latest version here.

Speaker 1:

[foreign language 00:26:31].

Speaker 2:

While many other regional centers offer EB-5 that are 60% or more, up to 100% of total project costs.

Speaker 1:

[foreign language 00:26:49].

Speaker 2:

So all of our government capital, as it's free, eliminates a lot of the risk in the capital stack where typical EB-5 is placed. And we'll begin to start to show you how to respond to clients who mention other type projects and how you can identify risk for them.

Speaker 1:

[foreign language 00:27:21]

Speaker 2:

Very important to note that we arrive at seminars a lot of times, many times, and the investor does not know who we are or what we do.

Speaker 1:

[foreign language 00:28:05].

Speaker 2:

They don't know the relationship of New York City Regional Center to Chau Wei, to New York City government, to the investor. All of these things you should be able to inform the client to bring them at ease, because it's all very useful information to know.

Speaker 1:

[foreign language 00:28:49].

Speaker 2:

New York City Regional Center and Chau Wei are marketing partners. We cooperate with one another. We are not financially tied to one another by ownership. That's very important.

Speaker 1:

[foreign language 00:29:06].

Speaker 2:

New York City Regional Center is a lender, a bank, lending on government-owned projects to private developers to create economic activity and jobs in the city and state of New York.

This transcript was exported on Jun 29, 2022 - view latest version here.

Audience:

[foreign language 00:29:46].

Speaker 1:

[foreign language 00:29:46].

Audience:

[foreign language 00:29:46].

Speaker 1:

[foreign language 00:29:46].

Speaker 2:

New York City Regional Center is a preferred institutional lender for the city and the state of New York. Very important.

Speaker 1:

[foreign language 00:29:56].

Speaker 2:

We spent two years before our approval by USCIS and a year following our approval by USCIS negotiating with, using our relationships on behalf of this program with the city and state of New York to earn that status.

Speaker 1:

[foreign language 00:30:31].

Audience:

[foreign language 00:30:31].

Speaker 2:

But it's our credentials in real estate development in New York City, real estate law, real estate investment in banking, and the combination of all of that that allows us the opportunity to get...

PART 1 OF 5 ENDS [00:31:04]

Speaker 4:

... that allows us the opportunity to get free capital from the government of New York City and New York state. And this is one significant benefit that other regional centers in our area and in our country do not have. I know how other immigration firms work in China. They offer a menu of choices to the client. They don't influence them. They don't know about the regional center. They have none of this information. You have an opportunity to market to these investors everything about your firm and our firm, which enhances their experience to successfully follow the procedures and process in this program and get permanent resident status and their money back. It's so important.

This transcript was exported on Jun 29, 2022 - view latest version here.

Speaker 4:

Experience is a wonderful thing. It does all the talking for you. Chawei is not just any immigration firm. They've actually returned clients' money. That is such a huge selling point, and experience speaks to your success, as well, New York City Regional Center. We've developed real estate in New York City. We've done all the lending and legal work on all these projects. And New York City and New York state recognize that and give us free money. That's how powerful it is. So know all these relationships among all the parties because it's important because your competition is throwing stones. They're smearing us, and people in glass houses should not throw stones.

Speaker 4:

Now for the presentation. This is the George Washington Bridge that travels over the Hudson River connecting the state New Jersey with the state of New York. It's a transportation and infrastructure project that is the redevelopment of the George Washington Bridge Bus Station Terminal. That is the official name. It is the transformation of the George Washington Bridge Bus Station Terminal. And as your colleagues who visited New York City with us most recently know, those are not computer generated white arrows. That's the actual roof of the Georges Washington Bridge Bus Station Terminal.

Speaker 4:

It's one of the largest bus stations in New York City. And redeveloping this particular building, the traffic flow of all the buses, creating more parking and better transportation experience creates other opportunities to build out underutilized space. So try to give you a feel without having seeing it, the bus station and the bus traffic comes off the bridge up the white ramps under the roof, does their thing, waits, picks up passengers and then leaves again. And the building space underneath the roof, as well as in the lower right hand corner of the picture, is all available space for redevelopment and retail. An exceptional opportunity for real estate, a significant cash profitable real estate equation for you and your clients to participate in.

Speaker 4:

Here's the outline of the project. To the left, you see a map of Manhattan, which you're familiar with from the [inaudible 00:39:04] project. If you're looking at the photograph and at the map, you see the star on the map is where the bridge is. It crosses over Manhattan. On the upper west side of Manhattan, it is a DEA. The island of Manhattan, at that point, forms a neck with the East River and the Hudson River. You should know from the photograph that there are ingress access from the bridge on both sides of the island for the east side and the west side of Manhattan going to the highways that extend all the way downtown and around the bottom of the east side. So the heavy flow of traffic is on both riverfronts. And then the cross streets and avenues in Manhattan form a grid, and that's how people get around.

Speaker 4:

The picture to the lower right is a good picture to focus on with your clients because it shows that the bridge is two levels high, very significant, supporting over 50 million automobiles and trucks a year. And for those of you in Shanghai and Beijing and Guangzhou who were in New York recently in May and did a video, some of your offices should use that video, that was taken in the upper right hand photograph below the white roof in front. That's the vantage point that you're looking at with Jersey off to the lower right. The big picture in the middle, you're actually looking west towards the state of New Jersey and the upper portion of the photograph. And the smaller picture to the upper right, you're actually looking

This transcript was exported on Jun 29, 2022 - view latest version here.

east. The highway that this bridge connects is called Interstate 95. It's the longest highway, north-south, in the country of the United States, extending from the state of Maine all the way down through Florida. This is the main trucking route that services the East Coast of the United States and it passes right through New York City. It's a DEA, it's a wonderful project for your clients.

Speaker 4:

This particular slide shows three pictures at the bottom that is basically the redevelopment of the George Washington Bridge Bus Station. And like all of our projects, we are focused on job creation, government support, both political and financial as you know, and investor security in the form of first mortgages. This is a $358 million project for the city or port authority of New York and New Jersey. The project's already begun. It's going to happen anyway regardless of EB-5. That's the significant point to make to your investors about New York City Regional Center projects.

Speaker 4:

Since these projects are going to happen anyway, regardless of EB-5, very important to write down a note to your clients that the flow of funds is from government first while all of the EB-5 investors are being processed for their I-526, adding collateral value to your investors security all the while. Regional centers who offer product, very important to understand. Regional centers who offer product that fund a hundred percent of the project offer product that have government bonds or offer product that have a commercial bank involved. Those regional centers must raise all EB-5 funds before the project begins to fund. Very important.

Speaker 4:

If the project out there in those examples has already begun, then the regional center is funding one component with government and one component with EB-5. That is very risky. Because USCIS will catch that there has to be a connection with all the government money in the same project. This is very important for all of you to understand and explain to counter measures of competition. So there's plenty of material that I could provide all of you, that if you write down, you can provide your investor to raise doubt about other regional centers and other projects while you're selling art.

Speaker 4:

Job creation. Job creation as of six weeks ago was 38%. But three weeks ago, you should know that the multipliers using rims too as a methodology for calculating jobs, all increase in the state of New York. This is not a marketing opportunity only for George Washington Bridge Bus Station, but as you speak to your clients on the NBA, as you speak to your clients on Waterfront, as you speak to your clients on Pier A, understand that these multipliers may affect positively all of our projects, particularly on Waterfront and Pier A. So as you speak with clients to update them on little tidbits like this that are very positive for their immigration experience, hope to get additional friends and relatives involved in EB-5 with Chawei. That's how we do it.

Speaker 4:

So it's a $358 million project. We're looking for 140 in EB-5 investors or 70 million, leaving $277 million plus of government funding that is all provided by Port Authority of New York, New Jersey. And you see different perspectives of the bus station on the next slide where we discuss about the renovation of this transportation hub. Those are traffic lanes, but the bus is leading up to the bus station where they service customers and then leave again. Very busy bus station, and again, redeveloping and rewriting

This transcript was exported on Jun 29, 2022 - view latest version here.

these buses will create additional under-utilized space that will transform into a retail mall at this location, a very densely populated location that experiences very high traffic volumes.

Speaker 4:

Here is a closer look at the bus station and some of the existing space on the lower right, which is what it looks like today and what it will look like when the project is done on the lower left. And on the upper right, you have a model of what it'll look like after the project is done. This is sort of a before and after. On the left, you have what it looks like today. Very ugly, black and white. And beautiful on the right when it's finished. Very important. Your collateral to the firstly sold mortgage security for your investors is the George Washington Bridge Bus Station and the retail that's created in that bus station, all assignments of rent, leases, operating accounts, furnitures and fixtures. Very, very good collateral in this project.

Speaker 4:

As you can see, it's 120,000 square feet or almost 11,200 square units. I'll give you an idea of the tenants that are in line for this, but there's a very aggressive competition for tenants for this space because of the high traffic volumes, the two universities and the densely populated neighborhood in the area. So when your investor, who doubts everything in the world, when they come into the room, asks you, "What if this fails," you say to them, "What retail tenant, what company would not want to have a store at a location with two universities, a densely populated neighborhood and 50 million cars and trucks traveling through the store every year?" And of course, there's infrastructure work on the bridge, again, being used or performed with the capital from the government and EB-5. Very important. The bridge is old, it needs repair, and some of that work is going into this particular part of the project.

Speaker 4:

Here's the money that is used to calculate job creation and we can use all of it for job creation. It's a little bit over $277 million of government on account, $70 million from EB-5 and $11 million from SJM Partners, a hand-selected government contractor-developer by the Port Authority. Port Authority of the state of New York and New Jersey, the largest port agency, the largest government in agency in the United States. They own and operate all the transit hubs in New York and New Jersey. They take tolls every day on bridges and tunnels, taxes at airports and bus terminals. They make cash every day. They're autonomous. They have the money on account for this particular project.

Speaker 4:

So the $277 is there and will be provided for in a letter from the Port Authority of New York and New Jersey. But again, a separate government agency that collects those funds every day. They are cash rich for any of your doubting investors. And other than the George Washington Bridge Bus Station and the George Washington Bridge, these are some other examples of properties that they own and operate, namely the airport terminals that John F. Kennedy Airport, which many of you have been to, the Port Authority Plus Terminal in Manhattan and all the tunnels, including Holland Tunnel that connect the state of New Jersey with the state of New York. As always, our projects are on government [inaudible 01:00:37], and in this case, as a separate government agency owned by the Port Authority of New York, New Jersey.

Speaker 4:

This transcript was exported on Jun 29, 2022 - view latest version here.

Here's the pie chart that we always like to use. EB-5 in yellow, $70 million representing only 19% of total project costs. Minimal risk, very low exposure, government providing $277 million plus for this particular project. And that money is all free, does not need to be repaid. Make no mistake and be very confident, this is not a government bond. Bonds need to be repaid. No matter what project you're talking about, know that one fact.

PART 2 OF 5 ENDS [01:02:04]

Speaker 6:

... SJM Partners, a very significant development partner for the Port Authority of New York and New Jersey. They are handpicked by the Port Authority for their experience on government projects, namely student housing, office buildings, and retail centers.

Speaker 6:

When your investor says, they're not as big as Forest City or they're not a public company, you need to understand one important thing, and it's no different in China than it is in the United States, when working on transportation systems, particularly bridge and tunnel traffic, there is high security in China, as well as high security in the United States.

Speaker 6:

So they need three requirements for the Port Authority. One, they have the development expertise to handle this job. Two, they have experience working for the United States Army and the United States Post Office. And three, they have the reputation and security clearance to operate with the Port Authority of New York and New Jersey.

Speaker 6:

So this is a government project with SJM Partners as the hand selected developer by the Port Authority of New York, New Jersey, to perform the work and operate the retail on behalf of your investors. That should be repeated to your client, ad nauseam. Because all of our borrowers, all of our developers get compared with the last one, no matter what. And in this particular case, it's more important their relationship with government, their experience with government, and their clearance with government.

Speaker 6:

As always first lease hold mortgage on the George Washington Bridge bus station and related retail, including all rents, leases, furniture, fixtures, and operating accounts, very significant, very safe, its first highest priority ahead of all government and SJM. The safest EB-5 project on the market today.

Speaker 6:

And now you see in the center, lower center, picture a rendering of what this will look like when it's done, much more beautiful than you've seen in prior photographs. Now there are two documents that are important documents in this project and they're very similar to other ones, but I'm not sure we've emphasized for made clear what these documents mean, but they're so significant to your [inaudible 01:07:42].

Speaker 6:

This transcript was exported on Jun 29, 2022 - view latest version here.

This is a government project that is dedicated to EB-5. And because the New York City Regional Center together with your investor behaves like a bank, but it's not a commercial bank, we on behalf of your investors negotiate a much stronger instrument for them to rely on. This instrument is so significant to your investor and it's the one document of the two that should be so important for you to explain to them.

Speaker 6:

As your investors, [inaudible 01:09:13] asset manager, the New York City Regional Center behaves like a bank, but is not a commercial bank, so we negotiate with government to wrap the EB-5 in a government blanket by having them underwrite the project, approve the business plan for EB-5, and approve all methodologies by which EB-5 will be repaid. They've done that and they've provided this recognition agreement to prove it.

Speaker 6:

The government project with the New York City Regional Center and your investor involved this recognition agreement further states that the mortgage that we hold on the property is law in the state of New York, very significant for your investors to know and appreciate. We already know of two regional centers try to emulate us on this because it is so important and they have had trouble getting it. So it is a very, very good tool to sell our projects to your investors.

Speaker 5:

[inaudible 01:11:27].

Speaker 6:

The second most significant document in this document set you'll find is a third party 100% completion guarantee provided by the general contractor on this project named Scansca. Very important, as I said before, to understand the relationship of all the parties in the project to the EB-5 investor. Safe to say Scansca is not a part of Chouway. They're not a part of the New York City Regional Center. They're not a part of the Port Authority. They have no relationship with SJM. They are the fifth largest contracting company in the world. They have bonding and insurance exceeding $7 billion and they 100% guarantee completion of this project and all of its components. With such an important asset to the state of New York and New Jersey, there can be no mistake on the George Washington Bridge or the bus station. Their sales, their revenues, their balance sheet has assets exceeding 16 and as high as $21 billion per year, very significant company in the world of contracting.

Speaker 6:

They are entrusted by almost every nice country in the world to do the $1 billion redevelopment of the United Nations in New York City, as well all the renovation on the Brooklyn Bridge, and most of the work being done to rebuild the World Trade Centers is all being done by Scansca, a very significant company. Now the completion guarantee that we had on the Brooklyn Arena and infrastructure project was wonderful, was great.

Speaker 5:

[inaudible 01:15:26].

This transcript was exported on Jun 29, 2022 - view latest version here.

Speaker 6:

That was provided by the borrower in the EB-5 transaction called Forest City Enterprises. This is better because it provides an independent objective third party, not only doing the work on the project, but using their balance sheet to guarantee that the project is completed. And this does three things for your client.

Speaker 5:

[inaudible 01:16:26].

Speaker 6:

It provides your client certainty that this project will be completed. It guarantees that all the money in the project of $358 million used to calculate jobs will be spent. And when you do that, you effectively guarantee job creation, as we've represented using the multipliers in New York today. And of course we'll use and continue to use Citibank as our escrow agent working very well with [inaudible 01:17:38] document processing and Milimar, of course, we have a still a perfect approval rate on I-5-46s, and they're coming in every day now, hopefully on all of our projects.

Speaker 6:

I think you're all familiar with our structure, but just to repeat it quickly. These two blue boxes are single purpose entity, we cause to be formed that are dedicated to the EB-5 immigration process. You need to be able to explain this to your clients. These two boxes are single purpose entities isolated and insulated from all activities of New York City Regional Center and SJM Partners, as we behave like a bank lending, 70 million to the project.

Speaker 6:

In the box on the left, your investors have all the protection of all of our documents, including the promissory note. And in addition to the promissory note, the mortgage security that we hold against the collateral, which is held in the box at the right. We can take that anytime they fail. All the value, and all the cash, all the leases, and everything is held in this right hand box, and it's very direct for us to have. It's the safest way to structure EB-5.

Speaker 6:

The arrow connecting the boxes is a secured loan transaction, 140 investors at $500,000 makes up 70 million of secured loan to the project. The money goes into the project, creates the jobs, and after five years, bank to bank transactions, the money is returned directly to the individual EB-5 investors. This is a bank loan transaction no different than the Bank of China or the Bank of New York. And again, it is authorized and approved by the Port Authority of New York with the recognition agreement, very safe, very secure.

Speaker 5:

[inaudible 01:22:20].

Speaker 6:

As you know we have other projects coming. One of the projects, again, very similar to this same four points, government land, government investment, first mortgage security specific assets, and plenty of

This transcript was exported on Jun 29, 2022 - view latest version here.

job creation. [inaudible 01:23:22] the government, all of our projects are the same, the project will be less than 30%, in this case 24%, less than 30% of total project costs with significant job creation and as well, a completion guarantee. And your investors will have the same team involved, Chouway, New York City Regional Center, and our asset management capabilities, our experience to shepherd them through this whole process and return their money after five years.

Speaker 6:

I think it's important for all of you to emphasize with your clients, what we have done historically in asset managing and reporting to existing investors. We provide all of the documents. We provide welcome packages, which details information about the project. Letters from government, letters from the developer. We provide updates. Letters from the developer. We provide updates from our newsletter, that update all projects and activities as well. We provide monthly progressive series of photographs that show progress on the project.

Speaker 6:

We were in Shanghai this weekend and in office seminar, very heavily populated. Everyone stayed. Everyone was focused. But when we brought out the pictures and we talked about the four different projects that have been sold out, everyone got excited, because they see a series of projects. They see a series of photographs where they see progress on real projects. Very exciting for them to see all this. And this is a very good tool for all of you to use.

Speaker 6:

All of this is meant to help you as tools to tell the story. And the photographs are the best story to tell. In the photograph that you're seeing right now, as you know, the smears try to attack us on certain things about our project. You can look at this photograph and you can tell every single client that there's work being done on all three components of this project, all at the same time, all using government funds, all using EB-5 funds, and developer funds. This one photograph can dispel many of the smears and you should use it. All we hear about is we can't do this, because someone's worried about a smear here. You see a photograph where there's work being done on all three components. It dispels over 75% of the smears.

Speaker 6:

Further, all of your offices have been to this particular site. All of your offices have been to New York City. They've taken photographs. They've taken videos of these projects, which is a completely objective view of what's happening at these projects to counter these smears. So if you come to us and you say, we've heard this smear or the client is seeing this smear on the internet, you're not using all the tools that your company and my company has provided you to overcome these objections by the client.

Speaker 6:

Again at the bottom of the photograph, subway and infrastructure being done. Top of the photograph, you have the rail yard being expanded and worked on. And then you have the arena above both of those. And if none of these, if these smears were true, why would we have I-5-26s? And then here's a money shot. You see the arena in the left hand portion down below and how close this transportation hub is to the city or the island of Manhattan, up on the top of the screen. A very good photograph to explain to your clients.

This transcript was exported on Jun 29, 2022 - view latest version here.

Speaker 6:

Again, we deliver government projects. They're on government land and they're supported both politically and financially by government. We involve a developer because we need the private government partnership for the better of EB-5. And that's why we are all successful. They're safe and secure and they're authorized by government-

PART 3 OF 5 ENDS [01:33:04]

Speaker 7:

They're safe and secure and they're authorized by government, and the banking transaction that we're entering into with SJM and other developers on these projects on behalf of your investors, are recognized, and blessed by government, very significant.

Speaker 8:

[foreign language 01:33:42]

Speaker 7:

So again, we appreciate your hard work, [inaudible 01:33:55], everyone out there who's worked on the MBA, Waterfront PRA. I think this is every bit as good, if not much better, than our other projects. It's a strong government project, and that's the presentation. Wish you good luck and I can answer any questions you might have.

Speaker 8:

[foreign language 01:34:15]

Speaker 7:

Let's control the information. We're not sending anything out until we authorize it. This presentation is for you to have and hold and use in in-office presentations to pre-sell your clients.

Speaker 8:

[foreign language 01:35:01]

Speaker 8:

A question from Nanjing, an investor, searching on the internet, I find a news report on February the 2nd, 2009, and saying that back at that time, there is the same TWB transportation project, and it is invested by both Port Authority and Acadia. And Port Authority allocated 152 million US dollars on that project. So the question is, are those two projects the same, or what are the relations?

Speaker 7:

No, that was before we got involved and introduced EV5. So they changed the equation to do it differently. And this is the project that was intended to be that project, this is that project now.

Speaker 8:

[foreign language 01:37:25]

This transcript was exported on Jun 29, 2022 - view latest version here.

Speaker 8:
So the original plan has been canceled?

Speaker 7:
Yes.

Speaker 8:
[foreign language 01:38:01].

Speaker 7:
Good question though, thank you.

Speaker 8:
[foreign language 01:38:10]

Speaker 8:
So a question from Mr. Yun in [inaudible 01:38:41]. The question is, he read an article in Shanghai Daily that there is a project in Seattle, it is also a bridge 520 bridge renovation. So in that project, there is a government fund involved. So compared with ours, what is the strength of our project?

Speaker 7:
Well, I know very little about that particular project, [inaudible 01:39:07], but you can say to people that no one at the seminar who asked a question, got an answer. Secondly, you could also say that's a very large project and the government bond is ahead of EV5. So that needs to be repaid before EV5 is repaid.

Speaker 8:
[foreign language 01:39:25]

Speaker 7:
The investor, the EV5 investor, is unsecured in that project because of the bond.

Speaker 8:
[foreign language 01:40:06]

Speaker 7:
And just as an aside, there are a few immigration firms marking that that know nothing about EV5. So all of that together is a problem.

Speaker 8:
[foreign language 01:40:26].

Speaker 8:

This transcript was exported on Jun 29, 2022 - view latest version here.

There was a question from Nanjing, because initially, they thought that the bank loan is to Skanska, the affiliate of Skanska. Then I explained, it's to SJM rather than Skanska. So their question actually is why we will lend the money to the affiliate rather than the parent company.

Speaker 7:
It's not an affiliate, it is a single purpose entity dedicated to EV5 that we caused to be formed, isolated and insulated from anything else that SJM might do in business.

Speaker 8:
[foreign language 01:42:15]

Speaker 7:
It's the easiest and most secure way to legally perfect the mortgage and take the collateral should we ever need to, which in this case, Port Authority is never going to let a group of foreign investors control the bus station.

Speaker 8:
[foreign language 01:43:04]

Speaker 8:
What is the collateral? Maybe because it's too fast for the change of the slides, they didn't see that very clearly, the collateral.

Speaker 8:
[foreign language 01:45:05]

Speaker 7:
Collateral is the bus station and the 120,000 square feet or 11,148 square meters of retail space, the assignment of all rents and leases, operating accounts, furnitures, and fixtures.

Speaker 8:
[foreign language 01:45:52]

Speaker 7:
I can tell you that the value of this collateral is well in excess of two times the EV5 investment.

Speaker 8:
[foreign language 01:46:12]

Speaker 7:
The transaction is 19% of the total project cost, and we have a recognition agreement as well as a completion guarantee on this EV5 project that makes it extra safe and extra secure for your investors.

Speaker 8:

This transcript was exported on Jun 29, 2022 - view latest version here.

[foreign language 01:46:33]

Speaker 8:

This is the original PPT, we make the changes. [foreign language 01:47:04].

Speaker 8:

The question is that in China, maybe the bus station belong to the government, so it's different in the US. So it's hard to convince the investor that we can use this first lease hold mortgage against this bus station.

Speaker 7:

Okay. So as you know, the New York City Regional Center does real estate projects. This building, which happens to have on its roof, bus traffic, this building is worth more than two to one to your EV5 investors' investment. Pure and simple. That's the answer.

Speaker 8:

[foreign language 01:48:23]

Speaker 7:

And it's actually two buildings, as you saw in the earlier photograph, more easily seen here, the one with the funny white roof, then you have the circular plaza, and then you have the building below. That's the collateral.

Speaker 8:

[foreign language 01:49:06]

Speaker 7:

So the real value of this real estate transaction is the location where 50 million cars and trucks travel and service this retail, as well as two universities and a densely populated neighborhood. This retail will be very valuable, a lot of cash flow, and you'll appreciate it when you see it.

Speaker 8:

[foreign language 01:49:50]

Speaker 7:

The only place where the buses roll are on the roof. Your colleagues in other offices can attest to that and when you see their videos, it's the buses on the roof, and only on the roof, where they'll be parked that may be confusing you.

Speaker 8:

[foreign language 01:50:35]

Speaker 7:

This transcript was exported on Jun 29, 2022 - view latest version here.

So when you talk about collateral with your clients, this is a real estate project in a AAA location with demographics so powerful that it would even outdo any location in China.

Speaker 8:

[foreign language 01:51:02] The Chinese investor will confuse the why the government is willing to give the bus station as part of the collateral.

Speaker 7:

They're leasing it for 99 years. It's not a give. Remember, they're leasing it [inaudible 01:53:22] effective ownership for SJM that allows us to mortgage it. So it's a right to use for 99 years. The buses come up this ramp, they travel under the roof, they turn around, and then they leave again

Speaker 8:

[foreign language 01:53:36]

Speaker 7:

Only they go over the real estate, and then they get on and off the buses, all those people access the stores down below and over here.

Speaker 8:

[foreign language 01:53:46]

Speaker 7:

I can get a better, I can get a different graphic for you to explain it, if you want.

Speaker 8:

[foreign language 01:54:09].

Speaker 7:

With the collateral, the government, the recognition agreement, the completion guarantee, I don't know why you'd need it and have such a hard time explaining it. But if it's cultural, then we'll fix it.

Speaker 8:

[foreign language 01:54:23]

Speaker 7:

So the buses effectively go up and over the real estate.

Speaker 8:

[foreign language 01:54:47] So if anything should go wrong, what can we do with this bus station?

Speaker 7:

It's retail stores. You're getting all the stores. It's a retail mall.

This transcript was exported on Jun 29, 2022 - view latest version here.

Speaker 8:

[foreign language 01:55:20] The question is, again, if anything [inaudible 01:55:46], what can we do with that? We know what we can do with the stores, but what we can do with the bus station?

Speaker 7:

The buses have to go over the building, over the real estate, right? But the roof is a part of the real estate, so that's why you get the bus station and all of the retail stores as collateral. It's a lease, which is a right to use at a discounted rate, very inexpensive for SJM. So you have a lot of value for the actual real estate asset value, then you have the cash value that cash flows from all the retail stores. Very significant. 50 million people cross through this passage way every year, plus the two universities and all the people that live in the area that need this retail.

Speaker 8:

[foreign language 01:58:01]

Speaker 7:

We'll present it differently. Interesting, I [inaudible 01:58:11] so compelling. I'm shocked.

Speaker 8:

[foreign language 01:58:16] They are not challenging you or they [inaudible 01:58:22]-

Speaker 7:

I know. No, no, I know. I'm just [inaudible 01:58:23]-

Speaker 8:

They just want to know what the investors can do with the bus station if this project failed.

Speaker 7:

We can close it all down and put more stores. That wouldn't be what fails the project, the bus station. That's not going away.

Speaker 8:

[foreign language 01:58:48]

Speaker 7:

The bus station, that is the demand generator, that makes the stores so successful.

Speaker 8:

[foreign language 01:58:57]

Speaker 7:

It's a free delivery service of people who are willing to spend money at your store that we don't have to pay for, but yet we get the asset value and the cash value of all of that activity.

This transcript was exported on Jun 29, 2022 - view latest version here.

Speaker 8:
[foreign language 01:59:18]

Speaker 8:
Now they understand.

Speaker 8:
[foreign language 01:59:48]

Speaker 8:
He said that we should remember that Port Authority has issued the recognition guarantee. So when they feel comfortable that SJM can repay the investors, they will issue that guarantee. So we shouldn't think of even that way, anything will not go right.

Speaker 7:
[inaudible 02:01:20] You're the best.

Speaker 8:
[foreign language 02:01:29]

Speaker 8:
And he says that just, not because [inaudible 02:02:05] has some doubts about this, we fully trust you. It's just that we need a better explanation to the investors.

Speaker 7:
And we'll get you one. No, I understand that. I understand that.

Speaker 8:
Oh, they understand. And they-

Speaker 7:
It's not that the investors would culturally have an issue with the buses and the retail together, because that's foot traffic, that's money in the bank that adds value to the collateral for your investor.

Speaker 8:
Now they understand your answer.

Speaker 7:
Yeah.

Speaker 9:
[foreign language 02:02:37]

This transcript was exported on Jun 29, 2022 - view latest version here.

PART 4 OF 5 ENDS [02:04:04]

Speaker 10:

[foreign language 02:04:00].

Speaker 11:

[foreign language 02:05:13].

Speaker 10:

[foreign language 02:05:15].

Speaker 11:

[foreign language 02:05:19].

Speaker 10:

[foreign language 02:05:21]. [crosstalk 02:05:27].

Speaker 12:

[foreign language 02:06:00].

Speaker 11:

[foreign language 02:06:02]. [crosstalk 02:06:11].

Speaker 10:

[foreign language 02:06:03].

Speaker 12:

[foreign language 02:09:24].

Speaker 10:

[foreign language 02:09:25].

Speaker 11:

[foreign language 02:11:51]. [crosstalk 02:11:52].

Speaker 10:

[foreign language 02:11:52]. [crosstalk 02:15:15].

Speaker 12:

[foreign language 02:15:22].

Speaker 10:

[foreign language 02:15:22].

This transcript was exported on Jun 29, 2022 - view latest version here.

Speaker 11:

[foreign language 02:15:46].

Speaker 10:

[foreign language 02:15:46].

Speaker 11:

[foreign language 02:17:17]. [crosstalk 02:17:17].

Speaker 10:

[foreign language 02:17:20].

Speaker 12:

[foreign language 02:19:00].

Speaker 11:

[foreign language 02:19:00].

Speaker 10:

[foreign language 02:19:02].

Speaker 11:

[foreign language 02:19:03].

Speaker 13:

[foreign language 02:19:03].

Speaker 11:

[foreign language 02:19:05]. [crosstalk 02:19:08].

Speaker 14:

[foreign language 02:19:09]. [crosstalk 02:19:31].

Speaker 11:

[foreign language 02:19:35].

Speaker 12:

[foreign language 02:19:38].

Speaker 14:

[foreign language 02:19:44].

Speaker 11:

This transcript was exported on Jun 29, 2022 - view latest version here.

[foreign language 02:19:45] actual example.

Speaker 10:
Helen.

Speaker 11:
Hey.

Speaker 10:
[foreign language 02:19:58].

Speaker 11:
[foreign language 02:20:00].

Speaker 10:
[foreign language 02:20:01] actual example [foreign language 02:20:03].

Speaker 11:
Oh.

Speaker 10:
[foreign language 02:20:10].

Speaker 11:
Oh.

Speaker 10:
[foreign language 02:20:16] actual example [foreign language 02:20:17] rank 2. Rank 2 [foreign language 02:20:32] actual example.

Speaker 11:
[foreign language 02:20:36].

Speaker 10:
[foreign language 02:20:38] actual example. Actual [foreign language 02:20:45].

Speaker 11:
[foreign language 02:23:09].

Speaker 10:
[foreign language 02:23:11].

Speaker 13:

This transcript was exported on Jun 29, 2022 - view latest version here.

[foreign language 02:24:29].

Speaker 11:
[foreign language 02:24:33].

Speaker 10:
Okay [foreign language 02:24:37] New York and New Jersey. [Foreign language 02:24:59].

Speaker 10:
[Crosstalk 02:25:09].

Speaker 10:
[foreign language 02:25:11].

Speaker 15:
Oh, okay. [foreign language 02:25:16].

Speaker 10:
[foreign language 02:25:18] university [foreign language 02:25:19].

Speaker 15:
Yeah. [foreign language 02:25:22].

Speaker 10:
[foreign language 02:25:22].

Speaker 15:
[foreign language 02:25:31].

Speaker 10:
[foreign language 02:25:34].

Speaker 16:
Would you please spell the Yeshiva University once again? Y-A...

Speaker 12:
Y-E-S-H-I-V-A.

Speaker 10:
I-V-A. Y-E-S-H-I-V-A. Yeshiva. Yeshiva [foreign language 02:25:52].

Speaker 17:
Famous international university, predominately of the Jewish faith.

This transcript was exported on Jun 29, 2022 - view latest version here.

Speaker 10:
[foreign language 02:26:05].

Speaker 16:
Mm. Ah.

Speaker 12:
Highly acclaimed university in New York, as you might understand.

Speaker 15:
[foreign language 02:26:15].

Speaker 11:
[foreign language 02:26:19].

Speaker 16:
When did this project start?

Speaker 12:
I'll get you the date. I don't know exactly.

Speaker 10:
[foreign language 02:26:30].

Speaker 11:
[foreign language 02:26:36].

Speaker 10:
[foreign language 02:26:47]. [crosstalk 02:26:52].

Speaker 11:
[foreign language 02:26:56].

Speaker 10:
[foreign language 02:27:08].

Speaker 11:
[foreign language 02:27:08].

Speaker 10:
[foreign language 02:27:09].

Speaker 11:

This transcript was exported on Jun 29, 2022 - view latest version here.

[foreign language 02:27:55].

Speaker 10:
[foreign language 02:27:56].

Speaker 18:
[foreign language 02:28:04]. Right. When will the project finish?

Speaker 12:
The three components, the bus station, the retail and the bridge all have different timelines. The bridge is out towards 4 years, the bus station is a little over 2 years, and the retail is a little longer than 2 and a half years.

Speaker 10:
[foreign language 02:28:32].

Speaker 11:
[foreign language 02:29:03].

Speaker 16:
Another question about the money put in by Port Authority, the 277.2 million. On the internet, they say that in 2008 they have already dedicated, like, 70 million. Will that be apart of the 277 or not?

Speaker 17:
No. Anything you read on the internet is not true. First of all, it's five years ago, or four years ago. Second, it's a completely different project, with different parties, and different needs. Back then, the need to redevelop the bridge was not real at that moment.

Speaker 10:
[foreign language 02:30:02].

Speaker 11:
[foreign language 02:30:02].

Speaker 10:
[foreign language 02:30:03].

Speaker 11:
[foreign language 02:30:05].

Speaker 10:
[foreign language 02:30:22].

This transcript was exported on Jun 29, 2022 - view latest version here.

Speaker 11:

[foreign language 02:30:22].

Speaker 19:

[foreign language 02:30:30].

Speaker 10:

[foreign language 02:30:37]. [crosstalk 02:30:44].

Speaker 16:

It's stated in a letter from Port Authority to [inaudible 02:30:52]. The jury said they will go back and review the document, and [inaudible 02:31:00].

Speaker 20:

[foreign language 02:31:07]. [crosstalk 02:31:11].

Speaker 17:

I think it's important for Cha Wei to know understand, EB-5, it gives New York City, New York State and the Port Authority a different opportunity to go to the federal government to generate more federal funding for our region of the country.

Speaker 10:

[foreign language 02:31:45].

Speaker 17:

We've been managing, discussing, negotiating and putting together this project since 2008, and when we came along, that gave the Port authority to structure a different deal involving the bridge, and the level of work that needs to be done to both the bridge, and the bus station.

Speaker 10:

[foreign language 02:32:26].

Speaker 17:

So [foreign language 02:32:29] on the internet stories.

Speaker 10:

[foreign language 02:32:33].

Speaker 11:

[foreign language 02:32:38].

Speaker 10:

[foreign language 02:32:40].

This transcript was exported on Jun 29, 2022 - view latest version here.

Speaker 11:

[foreign language 02:32:42].

Speaker 19:

[foreign language 02:33:34].

Speaker 10:

[foreign language 02:33:36].

Speaker 11:

[foreign language 02:34:02].

Speaker 10:

[foreign language 02:34:03].

Speaker 17:

[inaudible 02:34:08]. Okay, cool. Thanks [inaudible 02:34:16].

Speaker 11:

[foreign language 02:34:19].

PART 5 OF 5 ENDS [02:34:33]