UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------------x

BAI WEN, CAO XIAOLING, CAO YAN, CAO YEQIAN, CHEN BIN, CHEN LI, CHEN QIANG, CHEN WEILI, CHENG FANGZHOU, CHU MIN, FENG YING, GAO GUANGFENG, GU DANHUI, HAN MINGYUAN, HU LAN, HU MIN, HU WENSHU, HUANG HUI, HUANG WEI, HUANG XIUWEN, JIANG GUOSHUN, JIANG PEIYU, JIANG XUEFEN, JING LILI, HAN WENSHENG, KIT PING JACKY KWOK, LAI YONGHE, LAU KWAN, LI HUILING, LI JINLONG, LI LIQIAN, LI MINGHUA, LI PEIJUN, LI QIANG, LI QINGHUA, LI XUE, LI YUHAO, LI YUHUAI, LIANG WEI, LIN SHUANGPING, LIN YONGQIANG, LIU JINGHUI, LIU MING, LIU WENJIE, LIU ZHE, MA AIQIN, MA ZHANHUA, MAO ZHENG, NI LI, PING JIE, QI PEIXIN, WU LIANGLIANG, QUE WEI, REN RONGRONG, SHAN DANDAN, SHAN WEI, SHEN CONGYING, SHEN HUIYU, SHI YIQUN, SHU LINGLI, SONG CHAO, SONG XIAOYING, SUN HAO, SUN XIN, SUN YAN, SUN YUXIN, TAN MANFANG, TENG LEZHI, WAN LILI, WANG YINGMING, WANG CHAO, WANG CHUANHONG, WANG NINGHONG, WANG YANG, WANG YATAO, WANG JIANPING, WU DING, XIONG XIN, XU JIEPING, XU MINXIA,YANG LI, YANG MENG, YANG XUELI, YE QIANG, YE XIN, YIN YOUGENG, YING JIANFENG, YU QIZHEN, YU ZHAOHUI, YVONNE ZHU, ZHANG HUI, ZHANG PINGJUN, ZHANG QIAN, ZHANG SHOUTAO, ZHANG XUEMEI, ZHANG YUESHENG, ZHANG YUMEI, ZHANG ZEYU, ZHAO JIAXU, ZHAO MENGSHI, ZHAO YANGYANG, ZHENG HONGFEI, ZHENG YONG, ZHOU LINA, ZHOU YIN, ZHU FENGBO, and ZHU LIYI, individually and derivatively on behalf of GEORGE WASHINGTON BRIDGE BUS STATION AND INFRASTRUCTURE DEVELOPMENT FUND, LLC and GEORGE WASHINGTON BRIDGE BUS STATION AND INFRASTRUCTURE DEVELOPMENT FUND, PHASE II, LLC,

|  |
|---|
| No. 1:22-cv-07383-LJL |
| Hon. Lewis J. Liman |
| **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS** |

                                          Plaintiffs,

                    – against –

NEW YORK CITY REGIONAL CENTER, LLC,

                                          Defendant.

------------------------------------------------------------------------------x

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS .........................................................................................................3

    A.    NYCRC, Plaintiffs, and the EB-5 Program .........................................................3

    B.    Plaintiffs Represented That They Relied Solely on the Offering
Documents ..........................................................................................................4

    C.    Plaintiffs Represented That They Were Sophisticated Investors...........................6

    D.    The Operating Agreements Grant NYCRC General and Specific Powers
as Manager of the Funds and Exculpate NYCRC Except for Gross
Negligence and Willful Misconduct ....................................................................7

    E.    The Developer's Bankruptcy Proceeding ............................................................8

LEGAL STANDARD.................................................................................................................8

ARGUMENT ...........................................................................................................................8

I.    THE FIRST AND SECOND CAUSES OF ACTION (FRAUDULENT
INDUCEMENT) SHOULD BE DISMISSED ...................................................................8

    A.    The Fraud Claims Are Barred By The Statute of Limitations ...............................8

    B.    Plaintiffs Cannot Show Reasonable Reliance as a Matter of Law.......................12

        1.    Plaintiffs Disclaimed Reliance on the Alleged Misrepresentations...........12

        2.    Plaintiffs Failed to Conduct Minimal Diligence.......................................13

        3.    The OMs Undermine Plaintiffs' Claimed Reliance on the Alleged
Oral Misrepresentations ........................................................................15

            a)    The 2011 OM Undermines the Phase I Investors' Alleged
Reliance....................................................................................15

            b)    The 2014 OM Undermines the Phase II Investors' Alleged
Reliance....................................................................................17

    C.    Plaintiffs Have Not Alleged Scienter.................................................................18

II.    THE THIRD AND FOURTH CAUSES OF ACTION (BREACH OF
FIDUCIARY DUTY) SHOULD BE DISMISSED.........................................................19

A.      Plaintiffs Fail to State a Breach of Fiduciary Duty Claim Based on
        NYCRC's Alleged Failure to Call Defaults............................................................19

        1.      Plaintiffs Do Not Adequately Allege a Duty to Call Defaults....................19

        2.      The Complaint Fails to Overcome the Business Judgment Rule...............21

        3.      Plaintiffs' Claims Are Barred by the Exculpation Clauses........................22

        4.      Plaintiffs Do Not Plausibly Allege Damages Caused by NYCRC's
                Alleged Failure to Call Defaults ...............................................................23

B.      Plaintiffs Fail to State a Breach of Fiduciary Duty Claim Based on
        NYCRC's Alleged Failure to Disclose Negative Information About the
        Project ....................................................................................................................24

CONCLUSION...................................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*40 W. 67th St. v. Pullman*,
   100 N.Y.2d 147 (2003) ....................................................................................................21

*Abrams v. Donati*,
   66 N.Y.2d 951 (1985) ................................................................................................19, 24

*Ambac Assur. Corp. v. Countrywide Home Loans, Inc.*,
   202 A.D.3d 462 (1st Dept 2022)....................................................................................12

*Aris Multi-Strategy Fund, L.P. v. Accipiter Life Scis. Fund II (QP), L.P.*,
   89 A.D.3d 454 (1st Dept 2011)................................................................................22, 23

*Armstrong v. McAlpin*,
   699 F.2d 79 (2d Cir. 1983)...............................................................................................9

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)....................................................................................................8, 24

*Ashland Inc. v. Morgan Stanley & Co.*,
   652 F.3d 333 (2d Cir. 2011)...........................................................................................12

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
   493 F.3d 87 (2d Cir. 2007)........................................................................................12, 13

*Brown v. E.F. Hutton Grp., Inc.*,
   991 F.2d 1020 (2d Cir. 1993)..........................................................................................13

*Certain Underwriters at Lloyd's v. Milberg LLP*,
   No. 08 CIV. 7522(LAP), 2009 WL 3241489 (S.D.N.Y. Sept. 30, 2009)................................9

*Chelsea, LLC v. Seventh Chelsea Assocs., LLC*,
   304 A.D.2d 498 (1st Dept 2003)......................................................................................16

*Cusimano v. Schnurr*,
   137 A.D.3d 527 (1st Dept 2016)........................................................................................9

*DeRaffele v. 210-220-230 Owners Corp.*,
   33 A.D.3d 752 (2d Dept 2006) ........................................................................................24

*Dodds v. Cigna Sec., Inc.*,
   12 F.3d 346 (2d Cir. 1993)...........................................................................................9, 10

*Dowe v. Leeds Brown Law, P.C,*
    419 F. Supp. 3d 748 (S.D.N.Y. 2019)................................................................9, 10

*Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*,
    343 F.3d 189 (2d Cir. 2003).......................................................................14

*Epiphany Cmty. Nursery Sch. v. Levey*,
    171 A.D.3d 1 (1st Dept 2019)....................................................................10

*Golub v. Tanenbaum-Harber Co.*,
    88 A.D.3d 622 (1st Dept 2011)...................................................................18

*Guilbert v. Gardner*,
    480 F.3d 140 (2d Cir. 2007)......................................................................11

*Harry v. Total Gas & Power N. Am., Inc.*,
    889 F.3d 104 (2d Cir. 2018)......................................................................24

*Holzer v. Mondadori*,
    40 Misc. 3d 1233(A), 2013 N.Y. Slip Op. 51410(U), (Sup. Ct. N.Y. Cnty.
    2013) ...............................................................................................14

*Kaplin v. Buendia*,
    No. 15 CIV. 649 (PAC), 2021 WL 1405517 (S.D.N.Y. Apr. 14, 2021) ...............................22

*Koch v. Christie's Int'l PLC*,
    699 F.3d 141 (2d Cir. 2012)...................................................................9, 10

*Lee v. New Kang Suh Inc.*,
    No. 17-CV-9502 (NSR), 2020 WL 5504309 (S.D.N.Y. Sept. 11, 2020) .........................11, 15

*Leighton v. Poltorak*,
    No. 17CV3120LAKKNF, 2018 WL 2338789 (S.D.N.Y. May 23, 2018)...................20, 21, 25

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    27 F. Supp. 3d 447 (S.D.N.Y. 2014).............................................................24

*Long v. Amway Corp.*,
    306 F. Supp. 3d 601 (S.D.N.Y. 2018)............................................................11

*Longo v. Butler Equities II, L.P.*,
    278 A.D.2d 97 (1st Dept 2000)..................................................................14

*MacDiarmid v. ING Bank N.V.*,
    No. 02 Civ. 3077(HB), 2003 WL 41995 (S.D.N.Y. Jan. 6, 2003).....................................15

*Max v. ALP, Inc.*,
    203 A.D.3d 580 (1st Dept 2022).............................................................22, 23

*McBeth v. Porges*,
   171 F. Supp. 3d 216 (S.D.N.Y. 2016)..................................................................14

*Moore v. Baron Cohen*,
   No. 21-1702-CV, 2022 WL 2525722 (2d Cir. July 7, 2022).............................12, 13

*MP Cool Invs. Ltd. v. Forkosh*,
   142 A.D.3d 286 (1st Dept 2016)........................................................................14

*Muhan Cui v. Xia*,
   No. 19-CV-615 (NG)(SJB), 2021 WL 925480 (E.D.N.Y. Mar. 2, 2021) ...................... *passim*

*Nguyen v. FXCM Inc.*,
   364 F. Supp. 3d 227 (S.D.N.Y. 2019)..................................................................24

*Nicosia v. Amazon.com, Inc.*,
   834 F.3d 220 (2d Cir. 2016)..............................................................................10

*In re Optimal U.S. Litig.*,
   813 F. Supp. 2d 351 (S.D.N.Y. 2011)..................................................................24

*Parker v. Marglin*,
   56 A.D.3d 374 (1st Dept 2008)..........................................................................25

*Prichard v. 164 Ludlow Corp.*,
   49 A.D.3d 408 (1st Dept 2008)............................................................................9

*Ragone v. Atl. Video at the Manhattan Ctr.*,
   595 F.3d 115 (2d Cir. 2010)..............................................................................11

*In re Sabine Oil & Gas Corp.*,
   562 B.R. 211 (S.D.N.Y. 2016)...........................................................................21

*Sang Lan v. Time Warner, Inc.*,
   No. 11 CIV. 2870 AT, 2014 WL 764250 (S.D.N.Y. Feb. 25, 2014).....................................24

*Shafer Smith, 2424, LLC v. Foster*,
   168 F. Supp. 3d 654 (S.D.N.Y. 2016)..................................................................19

*Sheppard v. Manhattan Club Timeshares Ass'n, Inc.*,
   No. 11 Civ. 4362(PKC), 2012 WL 1890388 (S.D.N.Y. May 23, 2012) ................................15

*Sheth v. New York Life Ins. Co.*,
   308 A.D.2d 387 (1st Dept 2003)........................................................................10

*Silverman v. 3D Total Sols., Inc.*,
   No. 18 Civ. 10231 (AT), 2019 WL 4248040 (S.D.N.Y. Sept. 9, 2019)................................25

*SOL Grp. Mktg. Co. v. Am. President Lines, Ltd.*,
No. 14-cv-9929 (SHS), 2016 WL 205444 (S.D.N.Y. Jan. 15, 2016) ......................................13

*Spartan Cap. Sec., LLC v. Sports Field Holdings, Inc.*,
No. 20 CIV. 4210 (AKH), 2021 WL 665031 (S.D.N.Y. Feb. 19, 2021)...........................21, 22

*Spencer Trask Software & Info. Servs. LLC v. RPost Int'l Ltd.*,
383 F. Supp. 2d 428 (S.D.N.Y. 2003)...................................................................................13

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
547 F.3d 406 (2d Cir. 2008)..................................................................................................10

*TOA Sys., Inc. v. IBM*,
No. 18 CV 10685 (VB), 2019 WL 5693388 (S.D.N.Y. Nov. 4, 2019) ...................................24

*Unique Goals Int'l, Ltd. v. Finskiy*,
178 A.D.3d 626 (1st Dept 2019)............................................................................................14

**Other Authorities**

8 C.F.R. § 103.2 .......................................................................................................................4

8 C.F.R. § 204.6 .....................................................................................................................4, 6

N.Y. C.P.L.R. § 213 ..................................................................................................................8

## PRELIMINARY STATEMENT[1]

This case was brought by wealthy, sophisticated Chinese investors who each invested over $500,000 in one of two funds formed and managed by Defendant New York City Regional Center, LLC ("**NYCRC**"). These were no ordinary investments—each Fund's investment objective was to help Plaintiffs obtain U.S. residency through the EB-5 Immigrant Investor Program (the "**EB-5 Program**") by loaning capital to help fund the redevelopment of the George Washington Bridge Bus Station (the "**Station**"). For investors to qualify for permanent residency, the EB-5 Program required the loans to be placed "at risk" long enough to create a sufficient number of U.S. jobs. The offering documents informed Plaintiffs that they could "lose some or all" of their capital contributions and must be "able to bear the risk of a complete loss." Each Plaintiff represented to NYCRC and certified to the U.S. government that they understood and accepted these risks when they invested and petitioned for U.S. residency. Despite these known risks, the investment met its purpose—the Station was fully redeveloped, and every Plaintiff who pursued permanent residency is now a permanent U.S. resident or has an application pending as a result of their investments.

Plaintiffs now claim they were defrauded back in 2011 and 2014 because the risks they knowingly assumed later materialized. After the redevelopment of the Station was completed, the developer who borrowed the EB-5 capital filed for bankruptcy and, despite NYCRC's best efforts to protect the investors, the EB-5 loans were wiped out along with all other prepetition claims. *See generally In re George Washington Bridge Bus Station Development Venture LLC*, Case No. 19-13196 (DSJ) (Bankr. S.D.N.Y.) ("*GWB*"). Having received the permanent residency they sought, Plaintiffs claim they are also entitled to the return of the capital they placed at risk in exchange for

---

[1] Capitalized terms used but not defined herein shall have the same meaning ascribed to such terms in the Complaint [ECF No. 3] ("Compl."). Unless otherwise indicated, all emphasis is added and citations and internal quotation marks are omitted.

that benefit. Plaintiffs fail to state any claim for which relief can be granted.

The fraud claims must be dismissed because they are barred by the statute of limitations. Plaintiffs all invested more than six years ago and were on inquiry notice by the time they invested. Indeed, Plaintiffs represented in their subscription agreements that they had carefully reviewed and understood information in the offering memoranda that directly contradicted the alleged oral misrepresentations. Plaintiffs also submitted all governing documents to the U.S. government with their immigration petitions, which they certified under penalty of perjury were all true and correct. As a result, Plaintiffs cannot invoke the two-year discovery rule to render their claims timely.

Plaintiffs also fail to adequately plead necessary elements to show fraudulent inducement under New York law. As an initial matter, Plaintiffs disclaimed reliance on the alleged oral misrepresentations when they represented to NYCRC and certified to the U.S. government that they were "relying solely on" the offering documents, and that NYCRC had not "made any representations of any kind or nature to induce" their investments "except as specifically set forth in such documents." In addition, Plaintiffs' apparent failure to conduct basic due diligence before investing $500,000 fatally undermines any claim of reasonable reliance, particularly since they were sophisticated investors who each had at least $5 million in other investments. Moreover, the disclosures in the offering memoranda undermine any asserted reliance on the alleged oral misstatements. Plaintiffs also have not alleged scienter, which is an independent ground to dismiss their fraud claims. The only motive to commit the fraud Plaintiffs allege is that NYCRC earned management fees, but that is true of every investment manager.

Moreover, Plaintiffs fail to adequately allege that NYCRC breached its fiduciary duties by not calling an event of default during the redevelopment. The facts alleged in the Complaint do not constitute any event of default, so NYCRC could not have called one. In any event, NYCRC's

-2-

decisions to call (or not call) defaults are shielded by the business judgment rule, and Plaintiffs allege no basis to overcome its broad protection. In the same vein, the Funds' Operating Agreements expressly exculpate NYCRC of liability for its management decisions, except in cases of gross negligence or willful misconduct, which Plaintiffs do not allege. And in any event, Plaintiffs have not alleged any damages from NYCRC's purported failure to call a default. The developer who borrowed the EB-5 capital completed the redevelopment and Plaintiffs successfully received their green cards—all of which would have been jeopardized if NYCRC had called a default. As Plaintiffs concede, it was subsequent events that occurred in the developer's bankruptcy proceedings that caused Plaintiffs' losses. *See* Compl. ¶ 13.

Finally, NYCRC's alleged failure to disclose so-called negative information does not support a breach of fiduciary duty claim. NYCRC had no duty to disclose any such information and, regardless, Plaintiffs were not damaged in any way because they could not have withdrawn their investments during the redevelopment and term of the loans.

## STATEMENT OF FACTS[2]

### A.    NYCRC, Plaintiffs, and the EB-5 Program

NYCRC is a regional center approved by the U.S. Citizenship and Immigration Services ("**USCIS**") to raise capital via the EB-5 Program. Compl. ¶¶ 4, 24, 26. Enacted by Congress in 1990 as a means to stimulate the U.S. economy, the EB-5 Program allows foreign investors to obtain U.S. residency by investing in real estate and infrastructure projects that meet the job creation and capital contribution requirements of USCIS. Under the EB-5 Program, an investor first applies for conditional U.S. residency by submitting an I-526 petition with evidence showing

---

[2] The facts are taken from the allegations in the Complaint, which are presumed true solely for purposes of this Motion, documents that are incorporated by reference in and/or integral to the Complaint (which are attached to the Declaration of David J. Lender submitted contemporaneously herewith (each, an "**Ex.**")) and publicly available information.

that they placed at least $500,000 "at risk" in a qualifying project that is estimated to create at least 10 jobs for American workers. 8 C.F.R. §§ 103.2(b), 204.6(j). The investor may then apply for permanent residency by maintaining the investment and showing that the project created or will create 10 jobs. *Id.* § 216.6. Since 2008, NYCRC has raised EB-5 capital for 21 economic development projects in New York City, including the installation of high-speed Wi-Fi in all subway stations, the construction of the Barclays Center Arena, and the redevelopment of the Brooklyn Navy Yard. NYCRC, Experience and Track Record, https://nycrc.com/experience.html (last visited Oct. 30, 2022). NYCRC has helped over 5,300 individuals secure green cards, and $852.5 million in EB-5 capital raised and managed by NYCRC has been repaid to date. *Id.*

In this case, Plaintiffs invested in one of two Funds formed and managed by NYCRC to help fund the Station's redevelopment.[3] Each Plaintiff executed a "Subscription Agreement," an "Escrow Agreement," and an "Operating Agreement."[4] Unlike most investment offerings, Plaintiffs took the extra step of submitting these documents and the offering memoranda to USCIS as part of their I-526 petitions for conditional residency. *See* 8 C.F.R. § 204.6(j). Plaintiffs all had to certify to USCIS that this evidence was true and correct under penalty of perjury. *Id.* § 103.2(b).

**B.     Plaintiffs Represented That They Relied Solely on the Offering Documents**

In the Subscription Agreement, the Phase I Investors represented that they were "entering into this Agreement relying solely on the facts and terms set forth in" the Subscription Agreement, the Confidential Private Offering Memorandum dated July 18, 2011 (the "**2011 OM**"), and the

---

[3] The Phase I Investors subscribed to George Washington Bridge Bus Station and Infrastructure Development Fund, LLC ("**Fund I**") in 2011, and the Phase II Investors subscribed to George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC ("**Fund II**," and together with Fund I, the "**Funds**") in 2014.

[4] True and correct copies of these Agreements are attached to the Lender Declaration as Exhibits A, C, D, G, I, and J. The Subscription Agreements (*see* Compl. at 33-199) and Operating Agreements (*see* Compl. ¶¶ 53–58, 89) are incorporated by reference in the Complaint, and the Escrow Agreements are integral to Plaintiffs' claims.

Fund I Operating Agreement. Ex. A at 2. Similarly, the Phase II Investors all represented in the Subscription Agreement that they were "relying solely on the facts and terms set forth in" the Subscription Agreement, the Confidential Private Offering Memorandum dated April 7, 2014 (the "**2014 OM**," and together with the 2011 OM, the "**OMs**"), and the Fund II Operating Agreement. Ex. G at 1, 3. Each Plaintiff further represented that they had "received copies of all such documents," that they had "carefully reviewed" and understood the OM, and that NYCRC had not "made any representations of any kind or nature to induce [them] to enter into this Agreement except as specifically set forth in such documents." Ex. A at 2; Ex. G at 3.

Both OMs disclosed all material terms concerning the investments, including that each Fund's "investment objective" was to make a "qualified investment" under the EB-5 Program so that investors could "obtain conditional or permanent U.S. resident status."[5] Ex. B at 2; Ex. H at 3. Fund I was formed in 2011 and would make a $72 million secured loan to George Washington Bridge Bus Station Development Venture, LLC (the "**Developer**"), pursuant to the "Loan Agreement."[6] Ex. B at 2, 22–23. This loan would fund part of the "George Washington Bridge Bus Station and Infrastructure Project," which included two components: "1) the redevelopment of the [Station] into a modern transit and retail facility; and 2) infrastructure work to allow for the redevelopment, expansion, improved efficiency, and continued use of the [Station]." *Id.* at 14; *see also id.* at 15–18 (describing the two project components). The Project was also expected to include $279 million in funding from the Port Authority, the public agency that owned the Station, and $14 million from the Developer. *Id.* at 14. As the Complaint recognizes, these additional funds

---

[5] A true and correct copy of the 2011 OM is attached to the Lender Declaration as Exhibit B. A true and correct copy of the 2014 OM is attached to the Lender Declaration as Exhibit H. The OMs are incorporated by reference in the Complaint (¶ 67; at 87), and were included as part of Plaintiffs' I-526 petitions to USCIS.

[6] A true and correct copy of the Loan Agreement, which is incorporated in the Complaint (¶¶ 59–62) and was included as part of the Plaintiffs' I-526 petitions to USCIS, is attached to the Lender Declaration as Exhibit E.

would benefit Plaintiffs because they would count towards job creation, an EB-5 requirement. Compl. ¶ 73(B)(6); *see* Ex. B at 1, 2, 9, 14–18. The 2011 OM further explained that the Developer would "enter into a 49-year net ground lease with the Port Authority" (the "**Ground Lease**") for the "GWB Marketplace," which comprised the retail portion of the Station.[7] Ex. B at 2, 23.

Fund II was formed in 2014 to finance "the second phase of construction work related to the redevelopment of the [Station] and adjacent infrastructure improvements." Ex. H at 13. Fund II would make a $19 million loan to GWB Development Partners LLC pursuant to the "Venture LLC Agreement." *Id.* at 3, 13, 18.[8] The 2014 OM explained that this second phase encompassed "new construction work," including "a series of additional base building upgrades and code modifications necessary to continue the transformation of this critical transportation facility into a modern transit hub." *See id.* at 14–15 (describing the "new construction work"). The budget for this second phase was also expected to include $48.2 million from the Port Authority and $9.2 from the Developer. *Id.* at 13–14. All of this funding was "expected to create a sufficient number of EB-5 eligible jobs for all investors from construction of the Project." *Id.* at 14.

### C.    Plaintiffs Represented That They Were Sophisticated Investors

To receive green cards under the EB-5 Program, each Plaintiff had to place $500,000 at risk for a period of years. *See* 8 CFR § 204.6(j). Only wealthy, sophisticated investors able to understand and bear the risk were invited to invest. Indeed, both OMs repeatedly advised Plaintiffs that the offers were "DESIGNED SOLELY FOR SOPHISTICATED INVESTORS WHO ARE ABLE TO BEAR THE ECONOMIC RISK OF THEIR INVESTMENT." Ex. B at 9; Ex. H at 10;

---

[7] A true and correct copy of the Ground Lease, which is referenced and incorporated in the Complaint (¶ 50), is attached to the Lender Declaration as Exhibit F.

[8] The Venture LLC Agreement and the $19 million loan agreement are incorporated by reference in the Complaint (¶¶ 91–94) and attached to the Lender Declaration as Exhibits K and L.

*see also* Ex. B at ii, 2, 8, 37 (further disclosures); Ex. H. at ii, 2, 9, 37 (same).

Each Plaintiff represented in the Subscription Agreement and then certified to USCIS that they were both an "accredited investor" and a "qualified purchaser," which means they had at least $5 million in other investments. Ex. A at 1; Ex. G at 2. Plaintiffs also represented that they had "knowledge and experience in financial and business matters," were "capable of evaluating the merits and risks of" the investment, and were "able to bear the economic risk of a complete loss of" their capital. Ex. A at 2; Ex. G at 3. Plaintiffs further represented that they had "made an investigation of the pertinent facts," and that they "had an opportunity to ask questions of and receive answers from" NYCRC before investing. Ex. A at 2; Ex. G at 3.

### D. The Operating Agreements Grant NYCRC General and Specific Powers as Manager of the Funds and Exculpate NYCRC Except for Gross Negligence and Willful Misconduct

The Operating Agreements "irrevocably appoint NYCRC" as "Manager" and vest NYCRC "with all specific rights and powers," including to "make all decisions concerning" the "management," "monitoring and disposition of Investments," to "collect sums due the [Funds]," and to "bring and defend" actions on behalf of the Funds. Ex. D §§ 7.1, 7.2; Ex. J §§ 7.1, 7.2. The Operating Agreements also exculpate NYCRC for actions taken "in good faith" and within the scope of its authority except for "gross negligence, willful misconduct or willful breach of this Agreement." Ex. D § 8.2; Ex. J § 8.2. Plaintiffs also agreed that NYCRC may "engage in business enterprises similar to the business of the [Funds] and competitive with the business of the [Funds] . . . without restriction." Ex. D § 7.1; Ex. J § 7.1.

Plaintiffs could not withdraw their capital for at least five years. Ex. D § 10.6; Ex. J § 10.6. Capital contributions would be repaid solely to the extent of any "proceeds realized from any sale" or "repayment of principal" from "the Qualifying Investment." Ex. D §§ 4.13(a), 6.1; Ex. J §§ 4.13(a), 6.1. Each Plaintiff expressly acknowledged and agreed that, if such proceeds were "not

sufficient to repay all of a Member's Capital Contribution," they would "lose some or all of [their] Capital Contribution." Ex. D § 4.13(a); Ex. J § 4.13(a).

### E.    The Developer's Bankruptcy Proceeding

The Station's redevelopment was completed in 2017. Compl. ¶ 113. The Developer became embroiled in litigation with its general contractor and filed for bankruptcy in October 2019. *See id.* ¶¶ 13, 105, 116. Despite NYCRC's best efforts to protect the investors, including by providing DIP financing and assisting the Developer in its efforts to market and sell its rights under the Ground Lease, the Bankruptcy Court approved a transaction that provided no consideration on account of the EB-5 loans. *GWB*, ECF No. 604; *see also* Compl. ¶ 13 (alleging that the loans were lost "[a]s a result" of the bankruptcy). The parties entered into a tolling agreement on September 1, 2021, which Plaintiffs terminated shortly before filing this lawsuit. Compl. ¶ 119.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard" requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* A complaint "stops short of the line between possibility and plausibility" where the allegations "are merely consistent with a defendant's liability." *Id.*

## ARGUMENT

### I.    THE FIRST AND SECOND CAUSES OF ACTION (FRAUDULENT INDUCEMENT) SHOULD BE DISMISSED

#### A.    The Fraud Claims Are Barred By The Statute of Limitations

Under New York law, a fraud claim must be brought within either six years of the alleged

fraud, or two years after the plaintiff reasonably could have discovered the fraud. N.Y. C.P.L.R. § 213(8). Because the alleged frauds occurred more than six years before September 1, 2021 (the date of the tolling agreement), Plaintiffs' claims "are timely only if they were brought within two years" from when the frauds "could have been discovered with reasonable diligence." *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 154 (2d Cir. 2012); *see also Prichard v. 164 Ludlow Corp.*, 49 A.D.3d 408, 408 (1st Dept 2008) (fraud claim was "barred by the statute of limitations" where plaintiffs "purchase[d] shares in the corporation" more than six years before filing suit).

The test as to when fraud should have reasonably been discovered "is an objective one." *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983). The two-year discovery period begins "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded," such as when contradictory information was "clearly disclosed in the prospectuses." *Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 350 (2d Cir. 1993).[9] Courts readily dismiss fraud claims pursuant to the two-year discovery rule where the allegations "establish that a duty of inquiry existed and that an inquiry was not pursued." *See, e.g.*, *Koch*, 699 F.3d at 155–56 (citing cases); *Dowe v. Leeds Brown Law, P.C.*, 419 F. Supp. 3d 748, 761 (S.D.N.Y. 2019).

Here, Plaintiffs all possessed information that was materially inconsistent with the alleged misrepresentations by the time they invested. Both Plaintiff-investor groups allege they were told that the Funds "would have a first lien mortgage on both the retail and infrastructure (bus terminal) portions of the Station" and "could take possession of the Station's bus terminal and redevelop it into additional retail space" if the Developer defaulted. Compl. ¶¶ 70(A)–(B), 100(B)–(C).

---

[9] *See also Certain Underwriters at Lloyd's v. Milberg LLP*, No. 08 CIV. 7522(LAP), 2009 WL 3241489, at *8 (S.D.N.Y. Sept. 30, 2009) (duty of inquiry arose when plaintiff possessed "information materially inconsistent with the alleged misrepresentations"); *Cusimano v. Schnurr*, 137 A.D.3d 527, 531 (1st Dept 2016) (discovery period starts "when the plaintiff has knowledge of facts from which the fraud could be reasonably inferred").

However, the 2011 OM expressly stated that Fund I would have a "***Leasehold*** Mortgage" on the "GWB Marketplace," which included "approximately 120,000 square feet of ***retail*** space . . . containing the newly constructed ***retail*** concourse and street level ***retail*** complex," and that Fund I's "only recourse in the event of a Loan default" would "be to realize on the Collateral and exercise its rights under the Leasehold Mortgage." Ex. B at 23, 33.[10] The 2014 OM also contradicted the alleged misrepresentations by expressly stating that Fund II would have only "contractual remedies pursuant to the Venture LLC Agreement," which allowed it to "remove GWB Development Partners, LLC as the Venture Managing Member for Cause." Ex. H at 19, 30. And Plaintiffs all represented that they had "carefully reviewed the" OMs before investing. Ex. A at 3; Ex. G at 4.

These material inconsistencies put Plaintiffs on notice of their fraud claims by the time they invested. *Dodds*, 12 F.3d at 350–51 (warnings in prospectus "put a reasonable investor of ordinary intelligence on notice of" alleged fraud); *Sheth v. New York Life Ins. Co.*, 308 A.D.2d 387, 387 (1st Dept 2003) ("[T]he contracts signed by plaintiffs at the time of their hiring, had they been read by plaintiffs as they could have been, would have clearly apprised them of [the alleged fraud]."). They did "not have to have notice of the entire fraud being perpetrated to be on inquiry notice." *Dodds*, 12 F.3d at 352; *see Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 427 (2d Cir. 2008) ("'Storm warnings' need not detail every aspect of the alleged fraudulent scheme.").

Because the allegations and the offering documents "establish that a duty of inquiry existed and that an inquiry was not pursued," Plaintiffs "cannot rely on the two-year discovery rule to render their claims timely." *Dowe*, 419 F. Supp. 3d at 761, 764; *see also Koch*, 699 F.3d at 155–

---

[10] For purposes of this Motion, the Complaint "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016). This Court may also consider documents that are "integral" to the Complaint, such as "a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint." *Id.* at 230–31.

56; *Epiphany Cmty. Nursery Sch. v. Levey*, 171 A.D.3d 1, 7 (1st Dept 2019) (plaintiff could not invoke discovery rule where agreement was signed without adequate investigation). Plaintiffs were invited to "ask questions" and "obtain any additional information" that NYCRC possessed before investing. Ex. B at 1; Ex. H at 1. They also could have reviewed the Funds' records after investing. *See* Ex. D § 12.3; Ex. J § 12.3. But Plaintiffs do not allege to have made any inquiry at all.

That Plaintiffs allegedly "could not understand" the OMs because they were in English, *see* Compl. ¶ 67, is of no moment. If Plaintiffs did not understand English, they had a duty to make "reasonable effort[s] to have the document[s] explained to" them before signing. *Ragone v. Atl. Video at the Manhattan Ctr.*, 595 F.3d 115, 122 (2d Cir. 2010); *Lee v. New Kang Suh Inc.*, No. 17-CV-9502 (NSR), 2020 WL 5504309, at *5 (S.D.N.Y. Sept. 11, 2020) (plaintiff's "bare assertion" that she did "not speak or understand English" did not support allegations of fraud); *Long v. Amway Corp.*, 306 F. Supp. 3d 601, 609 (S.D.N.Y. 2018) (enforcing agreement despite Chinese plaintiff's "professed unfamiliarity with the English language").[11]

Plaintiffs fail to meet their "burden of establishing that the fraud could not have been discovered" before September 1, 2019, i.e., two years before the tolling agreement. *Guilbert v. Gardner*, 480 F.3d 140, 147 (2d Cir. 2007). Plaintiffs do not identify what, if any, documents "were not fully discoverable" until the Developer's bankruptcy." Compl. ¶ 27. That allegation is further contradicted by their sworn representations in the Subscription Agreements that they carefully reviewed and understood the transaction documents before investing. Ex. A at 3; Ex. G at 4. Moreover, Plaintiffs' admission that they were able to discover their fraud claims after they

---

[11] The OMs specifically advised: "IF THE ENGLISH LANGUAGE IS NOT THE PROSPECTIVE PURCHASER'S PRINCIPAL LANGUAGE IT IS STRONGLY RECOMMENDED THAT THE PROSPECTIVE PURCHASER SEEK ADVICE FROM ADVISORS WHO CAN INTERPRET FOR HIM/HER AND ADEQUATELY EXPLAIN THIS MEMORANDUM." Ex. B at 1; Ex. H at 1.

"share[d] information and compare[d] stories," Compl. ¶ 118, confirms that Plaintiffs already possessed all of the information they needed to discover the alleged fraud.

Indeed, Plaintiffs submitted this very information to USCIS as part of their I-526 petitions for conditional residency, and again approximately 5 years later as part of their I-829 petitions for permanent residency. Plaintiffs cannot reasonably claim they were unaware of information that they represented they had carefully reviewed and understood and certified to be true and correct under penalty of perjury, and which allowed them to obtain U.S. residency.

In sum, both fraud claims are untimely because Plaintiffs all were "on inquiry notice of [their] fraud claims" more than "two years before the parties entered the tolling agreement." *Ambac Assur. Corp. v. Countrywide Home Loans, Inc.*, 202 A.D.3d 462, 463 (1st Dept 2022).

**B.      Plaintiffs Cannot Show Reasonable Reliance as a Matter of Law**

Reasonable reliance "is a required element of common law fraud" under New York law. *Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 339 (2d Cir. 2011). Plaintiffs cannot show reasonable reliance for three reasons. *First*, Plaintiffs all disclaimed reliance on the alleged oral misrepresentations. *Second*, Plaintiffs failed to conduct basic due diligence before investing. *Third*, the OMs undermine Plaintiffs' claimed reliance on the alleged contrary oral representations.

1.      Plaintiffs Disclaimed Reliance on the Alleged Misrepresentations

"[W]hen a provision of a contract . . . states that a contracting party disclaims the existence of or reliance upon specified representations, that party will not be allowed to claim that he was defrauded into entering the contract in reliance on those representations." *Moore v. Baron Cohen*, No. 21-1702-CV, 2022 WL 2525722, at *2 (2d Cir. July 7, 2022) ); *Muhan Cui v. Xia*, No. 19-CV-615 (NG)(SJB), 2021 WL 925480 (E.D.N.Y. Mar. 2, 2021) (dismissing EB-5 investor's fraud claims). For this reason, courts "quickly dispose of" fraud claims based on oral representations where the executed agreements "plainly" state "that the only promises, restrictions, and warranties

to the transaction were those set forth in the transaction documents." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 105 (2d Cir. 2007); *see, e.g.*, *Spencer Trask Software & Info. Servs. LLC v. RPost Int'l Ltd.*, 383 F. Supp. 2d 428, 460 (S.D.N.Y. 2003) (plaintiffs failed to allege reasonable reliance on oral representations where they had acknowledged in documents they "signed when they made the $500,000 investment . . . that they did not rely on 'any representations or other information (whether oral or written) other than as set forth' in the aforementioned documents").

Plaintiffs all represented and certified that they were "relying *solely* on the facts and terms set forth in" the Subscription Agreement, the OM, and the Operating Agreement, and disclaimed reliance on any representations "except as specifically set forth in such documents." Ex. A at 2–3; Ex. G at 3. These admissions "destroy[]" Plaintiffs' allegations that they invested "in reliance upon [any] contrary oral representations." *Moore*, 2022 WL 2525722, at *2; *ATSI*, 493 F.3d at 105.

### 2.  Plaintiffs Failed to Conduct Minimal Diligence

Plaintiffs also fail to plead reasonable reliance because, as alleged, they failed to perform even minimal diligence before investing $500,000 in the Funds. Indeed, Plaintiffs allege that they invested based solely on oral representations—without reviewing "any formal documentation that described the actual structure" or "disclosed any risks relating to" the investments. *See, e.g.*, Compl. at 32–33. Plaintiffs cannot now claim they were defrauded when it is their "own evident lack of due care which is responsible for [their] predicament." *SOL Grp. Mktg. Co. v. Am. President Lines, Ltd.*, No. 14-cv-9929 (SHS), 2016 WL 205444, at *5–6 (S.D.N.Y. Jan. 15, 2016) (dismissing fraud claim where plaintiff did "not allege that it took any steps to safeguard its interests, even though there were obvious and easy steps that it might have taken").

"[C]ourts will grant a Rule 12(b)(6) motion" where the plaintiff had "access to information that would have revealed the truth with minimal diligence." *Xia*, 2021 WL 925480, at *6 (EB-5 investor "could not have reasonably relied on" oral representations that "the POM's terms directly

contradict[ed]"); *see also Brown v. E.F. Hutton Grp., Inc.*, 991 F.2d 1020, 1032–33 (2d Cir. 1993) (presumptively unsophisticated investors did not reasonably rely on brokers' representations that were contradicted by offering documents). There is no dispute that Plaintiffs had access to such information—they all represented that they had "received copies" of all the offering documents, and that they had "carefully reviewed" and understood the OMs. Ex. A at 2–3; Ex. G at 3–4.

Plaintiffs also all represented and certified that they were "accredited investor[s]" and "qualified purchaser[s]," with "knowledge and experience in financial and business matters that" made them "capable of evaluating the merits and risks of an investment in the [Funds]," and that they were "able to bear the economic risk of a complete loss of" their capital. Ex. A at 1–2; Ex. G at 2–3. These representations show that Plaintiffs were sophisticated investors as a matter of law.[12]

As "relatively sophisticated investors," Plaintiffs "should have understood the risks of investing in a real estate venture without conducting a due diligence investigation or consulting their lawyers and accountants." *Holzer v. Mondadori*, 40 Misc. 3d 1233(A), 2013 N.Y. Slip Op. 51410(U), at *5 (Sup. Ct. N.Y. Cnty. 2013). Plaintiffs' apparent failure to do so renders their claimed reliance unreasonable as a matter of law. *See Unique Goals Int'l, Ltd. v. Finskiy*, 178 A.D.3d 626, 627 (1st Dept 2019) (affirming dismissal of fraud claim for lack of justifiable reliance where "sophisticated investors d[id] not allege that they conducted due diligence to verify defendants' representations . . . or even sought to do so"); *Holzer*, 2013 N.Y. Slip Op. 51410(U),

---

[12] *See Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 196 (2d Cir. 2003) (finding plaintiff to be "a sophisticated investor" where it "represented that it had 'knowledge and experience in financial and business matters' and that it could readily evaluate the risks of the transaction"); *McBeth v. Porges*, 171 F. Supp. 3d 216, 226 (S.D.N.Y. 2016) (plaintiff "plainly qualifie[d] as a sophisticated investor as a matter of law" where plaintiff "specifically affirmed" in subscription documents that, *inter alia*, he was a "qualified purchaser"); *MP Cool Invs. Ltd. v. Forkosh*, 142 A.D.3d 286, 289–90 (1st Dept 2016) (finding it "unrefuted that plaintiff is a sophisticated investor" where plaintiff had represented that it had "such knowledge and experience in financial and business matters" such that plaintiff was "capable of evaluating the merits and risks of its investment"); *Longo v. Butler Equities II, L.P.*, 278 A.D.2d 97, 97 (1st Dept 2000) (finding that plaintiff was a sophisticated investor based on "documentary evidence showing that he was an 'Accredited Investor' within the meaning of the Federal securities laws").

at *5 (plaintiffs were "precluded from asserting reasonable reliance" where, "in their haste to latch onto a 'riskless,' overseas real estate investment . . . plaintiffs threw caution to the wind and wired $2 million before conducting the most basic of inquires").

3.    The OMs Undermine Plaintiffs' Claimed Reliance on the Alleged Oral Misrepresentations

Both OMs disclosed all material terms of the investments, and Plaintiffs "could not have reasonably relied on" conflicting representations. *Xia*, 2021 WL 925480, at *6 (citing cases).[13]

a)    *The 2011 OM Undermines the Phase I Investors' Alleged Reliance*

The Phase I Investors could not have reasonably relied on the alleged misrepresentations concerning the nature of the collateral or Fund I's rights in the event of a default. *See* Compl. ¶ 70(A)–(B), (D). The 2011 OM explained that the collateral was the Ground Lease, not the Station itself, and that Fund I's "only recourse in the event of a Loan default" would "be to realize on the Collateral and exercise its rights under the Leasehold Mortgage." Ex. B at 23, 33–34.[14]

Nor could the Phase I Investors have reasonably relied on any representation that the collateral "was worth more than twice the" $72 million loan. Compl. ¶ 70(C). That representation appears nowhere in the 2011 OM. To the contrary, the 2011 OM warned that the investments were "subject to risks," including the risk of "insufficient collateral." Ex. B at 34. It further warned that there was "no certainty" that Fund I could effectively "exercise its rights and remedies under the Leasehold Mortgage" in the event of a default, that "[f]ull recovery" would be "highly uncertain,"

---

[13] *See also Lee*, 2020 WL 5504309, at *5 ("[W]here 'the alleged misrepresentations conflict with the terms of the [agreement], there can be no reasonable reliance as a matter of law.'"); *Sheppard v. Manhattan Club Timeshares Ass'n, Inc.*, No. 11 Civ. 4362(PKC), 2012 WL 1890388, at *5, *9 (S.D.N.Y. May 23, 2012) (dismissing fraud claim where disclosures in offering documents "directly contradicted" plaintiffs' allegations); *MacDiarmid v. ING Bank N.V.*, No. 02 Civ. 3077(HB), 2003 WL 41995, at *3 (S.D.N.Y. Jan. 6, 2003) ("[W]here provisions in the contract expressly contradict the claimed fraudulent oral representation . . . plaintiff cannot sustain a fraud claim.").

[14] The collateral was not "comprised of two buildings," Compl. ¶ 70(D), but the Developer's leasehold interest was expected to include retail floors at both the East and West Buildings of the Station. *See* Ex. B at 15–16.

-15-

and that "amounts obtained may not be sufficient to make [Fund I] whole for any losses or damages suffered." *Id.* Any reliance that the Phase I Investors claim to have placed on statements concerning the value of the collateral is "fatally undermined" by the 2011 OM, which they represented and certified they had carefully reviewed and understood before investing. *See Chelsea, LLC v. Seventh Chelsea Assocs., LLC*, 304 A.D.2d 498, 498 (1st Dept 2003) ("[A]ny claim by plaintiff of reasonable reliance on representations by defendant is fatally undermined by plaintiff's admission that it discovered all the material facts prior to electing to close.").

The 2011 OM also refuted any suggestion that the government's funding would be "injected into the capital stack for the retail mall renovation." Compl. ¶ 70(G). The 2011 OM stated only that the "Port Authority *expects* to invest a total of approximately $279 million of capital into the Project." Ex. B at 14. It also stated that the Port Authority "IS NOT AND SHALL NOT BE OBLIGATED . . . TO PROVIDE ANY CAPITAL FUNDING OR OTHER MONETARY CONTRIBUTIONS TO THE PROJECT," and warned that "ACTUAL EVENTS OR RESULTS . . . MAY DIFFER MATERIALLY FROM THOSE REFLECTED OR CONTEMPLATED IN SUCH FORWARD-LOOKING STATEMENTS." *Id.* at v–vi. In light of these disclosures, Plaintiffs could not have reasonably believed that the Port Authority was guaranteed to fund any portion of the Project, let alone the retail redevelopment portion. *See Xia*, 2021 WL 925480, at *5–6 (EB-5 investor could not have reasonably relied on "any representations" concerning "the timing of the Project or the return of his investment" where POM only "*anticipate[d]*" project timeline and contained warnings about forward-looking statements) (emphasis in original).[15]

The Phase I Investors' claimed reliance on any representation about Skanska providing a

---

[15] It was neither false nor misleading to represent that the Port Authority was expected to fund $279 million for the Project because, as Plaintiffs recognize, the Port Authority's funding for the infrastructure work would be "used to calculate job creation" to enable Plaintiffs to obtain green cards. Compl. ¶ 73(B)(6); *see also* Ex B at 14–15.

completion guaranty, Compl. ¶ 70(H), fails for the same reason. While the 2011 OM stated that the Developer "will obtain a bonded completion guaranty from Skanska USA," Ex. B at 21, 23, investors were warned not to place undue reliance on such forward-looking statements, *id.* at v. The 2011 OM further warned that this information had been provided by the Developer, and that NYCRC had not "UNDERTAKEN ANY INDEPENDENT INVESTIGATION TO CONFIRM THE ACCURACY OR COMPLETENESS OF SUCH INFORMATION." *Id.* at v.[16]

The two remaining misrepresentations allegedly made to the Phase I Investors, *see* Compl. ¶ 70(E)–(F), are inadequately pled. Plaintiffs merely state that these representations were "false" without explanation. That is insufficient: "Fraud claims cannot rest on conclusory allegations." *Xia*, 2021 WL 925480, at *7 (citing cases and dismissing EB-5 investor's fraud claim where he alleged "only that many of defendants' statements 'were false'").

> b)    *The 2014 OM Undermines the Phase II Investors' Alleged Reliance*

The 2014 OM disclosed that Fund I had helped fund "the first phase of redevelopment." Ex. H at 13. It did not state that Phase I "was complete," Compl. ¶ 100(A), but rather stated that Fund II would help finance "the ***continued*** redevelopment of the" Station. Ex. H at 14. And, as discussed above, the 2014 OM refuted any representations that Fund II would have the same collateral and rights as Fund I. *Compare* Compl. ¶ 100(B)–(C), *with* Ex. H at 19, 30.

No Phase II Investor could have reasonably relied on any representation that the "collateral was worth more than twice the" $19 million loan. Compl. ¶ 100(D). The 2014 OM stated that the $19 million loan was subject to the risk of "insufficient collateral," that there was "no certainty" that Fund II could effectively "exercise its rights and remedies under the Security Documents,"

---

[16] Plaintiffs also cannot show that NYCRC had reason to believe this information was false in 2011. The Ground Lease identified Skanska as the general contractor when it was executed three days after the 2011 OM. Ex. F § 5.7(a). The Complaint also recognizes that Tutor Perini did not replace Skanska until June 2013. *See* Compl. ¶¶ 31, 81.

and that "[f]ull recovery" would be "highly uncertain and amounts obtained may not be sufficient to make [Fund II] whole for any losses or damages suffered." Ex. H at 31.

Further, the 2014 OM did not state that Fund II would be a "senior secured creditor" or that it would have "a first lien on the entire Project." Compl. ¶ 100(E)–(F). To the contrary, the 2014 OM advised that the investments were "Subject to the Risks of Leverage," and that the Developer "may have to incur obligation for borrowed money (directly, or as a guarantor) that will be superior to its obligations to" Fund II. Ex. H at 30.[17]

### C.    Plaintiffs Have Not Alleged Scienter

Plaintiffs also have "not plausibly alleged facts to satisfy the scienter required of a fraud claim." *Xia*, 2021 WL 925480, at *8. "The scienter element for fraud claims under New York common law and under federal securities law is essentially the same." *Id.* at *8 n.8. Plaintiffs had to allege facts showing either "motive and opportunity to commit fraud" or "strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* at *8. "An inference supporting scienter cannot be merely reasonable or permissible—it must be cogent and compelling." *Id.*

Plaintiffs have alleged no circumstantial evidence of conscious misconduct, and the only purported motives they identify are common to every investment manager. They note that NYCRC earned "management fees . . . from the special purpose vehicles it managed." Compl. ¶ 8. But as another district court explained in a case very similar to this one, "[t]hese are the financial terms to which plaintiff[s] (who, it bears mentioning, became . . . lawful permanent resident[s] as a result of [their] investment) agreed—nothing more." *Xia*, 2021 WL 925480, at *8. Plaintiffs also contend

---

[17] The Phase II Investors fail to allege fraud by omission, Compl. ¶ 101(A)–(B), because the Complaint does not allege that there was a fiduciary or special relationship of trust and confidence between the parties before Plaintiffs invested. *See Golub v. Tanenbaum-Harber Co.*, 88 A.D.3d 622, 622 (1st Dept 2011) ("[A]n omission does not constitute fraud unless there is a fiduciary or 'special' relationship between the parties."). In any event, the 2014 OM *did* accurately describe the security for the $19 million loan, and also disclosed that Fund II would fund "new construction work" that was not previously covered in Phase I. *See* Ex. H at 14–15, 19.

that NYCRC sought to maintain "its standing in China's EB-5 market or in the world of New York developers." Compl. ¶ 8. But the "mere desire … to procure investors does not provide a 'strong inference' of motive to commit fraud." *Xia*, 2021 WL 925480, at *8; *Shafer Smith, 2424, LLC v. Foster*, 168 F. Supp. 3d 654, 660 (S.D.N.Y. 2016) (same).

## II. THE THIRD AND FOURTH CAUSES OF ACTION (BREACH OF FIDUCIARY DUTY) SHOULD BE DISMISSED

Despite the fact that the Station's redevelopment was completed and resulted in 377 EB-5 investors and their family members obtaining permanent U.S. residency, Plaintiffs allege that NYCRC breached its fiduciary duties by "refusing to declare defaults" under the loan agreements between 2012 and 2016 and "withholding important negative information."[18] Compl. at 202–04 (¶¶ 130, 139). Neither of these contentions can support a claim for breach of fiduciary duty.

### A. Plaintiffs Fail to State a Breach of Fiduciary Duty Claim Based on NYCRC's Alleged Failure to Call Defaults

For four reasons, Plaintiffs fail to state a breach of fiduciary claim based on NYCRC's alleged failure to call defaults. *First*, Plaintiffs fail to show that any defaults ever occurred under the loan agreements. *Second*, Plaintiffs' claims are barred by the business judgment rule. *Third*, the claims are barred by the Operating Agreements' exculpation clauses. *Fourth*, Plaintiffs fail to plausibly allege damages caused by the alleged failure to call defaults.

#### 1. Plaintiffs Do Not Adequately Allege a Duty to Call Defaults

NYCRC could not have called any defaults because the alleged facts, *see* Compl. ¶¶ 78–79, 83–84, 105–06, 108–11, would not have triggered events of default under the loan agreements. *First*, Plaintiffs do not allege that a default occurred in October 2012 as a result of any damage

---

[18] Plaintiffs improperly commingle derivative and direct claims in alleging that "[s]ome of these misdeeds were taken with respect to [the Funds] as a whole, and others with respect to each individual investor," Compl. at 202–04 (¶¶ 131, 140), which is grounds for dismissal, *Abrams v. Donati*, 66 N.Y.2d 951, 953 (1985) ("A complaint the allegations of which confuse a shareholder's derivative and individual rights will, therefore, be dismissed.").

caused by Hurricane Sandy. Compl. ¶¶ 78-79. There is no allegation that the Station was "in the judgment of" NYCRC "materially injured" or that the Developer was unable to exercise its "restoration rights pursuant to Section 3.08(b) of the Mortgage." Ex. E § 7.01(s). That construction allegedly was delayed, Compl. ¶ 78, also would not have triggered a default because the Loan Agreement gave the Developer time to resume construction in the event of a "flood," "storm," or other "Act of God." Ex. E § 7.01(u)-(v). *Second*, NYCRC could not have called a default in "early 2014," when Plaintiffs claim it "became clear that the retail portion of the Project would cost at least $119 million instead of the approved cost of $102 million." Compl. ¶¶ 83–84. An increase in construction costs would not have triggered a default: the Developer was not bound by the original budget in the Project Cost Statement, and Fund I did not have the right to declare a default simply because costs went up. The purpose of the Project Cost Statement was to *estimate* construction costs for EB-5 job creation, not to put a cap on spending to complete the redevelopment.

*Third*, the mere commencement of a confidential arbitration against the Developer by its general contractor in May 2015, Compl. ¶ 105–06, did not trigger a default. A default would occur only if the Developer became subject to "one or more ***judgments***," Ex. E § 7.01(k); Ex. L § 7.01(k). *Fourth*, a default did not occur in March 2016 merely because the Ground Lease allegedly was amended by the Port Authority. Compl. ¶ 108. Plaintiffs do not allege that this "constitute[d] a material adverse modification" or that the Ground Lease was amended without NYCRC's "prior written consent." Ex. E § 7.01(o); Ex. L § 7.01(o). *Lastly*, Plaintiffs do not allege that NYCRC was aware that the Developer allegedly stopped paying Tutor Perini and other lenders in April 2016. Compl. ¶ 109. Plaintiffs' claim thus "fails because they fail to sufficiently allege a knowing breach." *Leighton v. Poltorak*, No. 17CV3120LAKKNF, 2018 WL 2338789, at *7 (S.D.N.Y. May 23, 2018) (dismissing breach of fiduciary duty claims).

2.      The Complaint Fails to Overcome the Business Judgment Rule

Even if there had been an event of default, the business judgment rule "creates a presumption" that NYCRC acted "in good faith and in the best interests of the" Funds when deciding whether to call a default. *See In re Sabine Oil & Gas Corp.*, 562 B.R. 211, 231 (S.D.N.Y. 2016). Courts regularly dismiss breach of fiduciary duty claims under the business judgment rule where, as here, the allegations fail to show that the defendant "acted (1) outside the scope of its authority, (2) in a way that did not legitimately further the corporate purpose or (3) in bad faith." *40 W. 67th St. v. Pullman*, 100 N.Y.2d 147, 155 (2003); *see also Spartan Cap. Sec., LLC v. Sports Field Holdings, Inc.*, No. 20 CIV. 4210 (AKH), 2021 WL 665031, at *2 (S.D.N.Y. Feb. 19, 2021) (dismissing breach of fiduciary duty claim because defendant's actions were "protected by the business judgment rule"); *Leighton*, 2018 WL 2338789, at *8 (dismissing breach of fiduciary duty claims against LLC manager where allegations did "not amount to a plausible showing that [manager] was not disinterested . . . or otherwise acted fraudulently or in bad faith").

Plaintiffs do not allege that NYCRC acted outside its scope of authority. Nor can they, as NYCRC had authority to "make all decisions" concerning the loans, including whether to call any defaults. Ex. D §§ 7.1, 7.2; Ex. J §§ 7.1, 7.2. Nor do Plaintiffs allege that NYCRC's actions did not legitimately further the Funds' corporate purpose, which was to make a "Qualifying Investment" so that investors could obtain permanent green cards through the EB-5 program—which they have. Ex. D § 3.1; Ex. J § 3.1. To the contrary, calling a default and upending the redevelopment would have prevented investors from obtaining green cards because USCIS regulations required the EB-5 capital to be maintained and spent on construction.

Moreover, the Complaint does not support a finding that NYCRC acted fraudulently or in "bad faith" when it allegedly refused to call defaults. That NYCRC allegedly wanted to continue receiving interest payments that it was contractually entitled to receive from the Developer, Compl.

¶ 6, is "insufficient to support a claim for breach of fiduciary duty," *Leighton*, 2018 WL 2338789, at *8 (plaintiffs' "lone allegation that [defendant's affiliate] received more than $1.5 million" was "insufficient to support a claim for breach of fiduciary duty"); *see also Spartan Cap.*, 2021 WL 665031, at *2 (plaintiff's "conclusory allegation that" directors sought to maintain status quo was "wholly insufficient to constitute self-interested conduct"). Likewise, Plaintiffs' contention that NYCRC wanted to maintain its image in the New York construction industry and in China's capital market, Compl. ¶¶ 7–8, fails because those same interests would have motivated NYCRC to call a default if doing so was in the best interests of the investors.

Plaintiffs also do not explain how they would be better off if NYCRC had called any of the alleged foot-faults. "[A] cause of action will not lie where, as here, the complaint 'merely alleges that a course of action other than that pursued by the [defendant] would have been more advantageous.'" *Max v. ALP, Inc.*, 203 A.D.3d 580, 581 (1st Dept 2022) (dismissing breach of fiduciary duty claim under the business judgment rule). After the purported defaults, the redevelopment was completed and Plaintiffs all qualified for green cards, which was the principal purpose of their investments. This shows that NYCRC's business judgment was sound. If anything, calling a default would have *harmed* Plaintiffs by jeopardizing their objective to obtain permanent residency. Plaintiffs' conclusory allegations thus fail "to overcome the 'powerful presumptions of the business judgment rule.'" *Id.*

### 3.    Plaintiffs' Claims Are Barred by the Exculpation Clauses

In addition, the Operating Agreements' exculpation clauses shield NYCRC from liability for allegedly refusing to call defaults. Those clauses expressly limit NYCRC's liability to acts of gross negligence or willful misconduct. *See* Ex. D § 8.2; Ex. J § 8.2. Courts regularly enforce such provisions, which serve to "exculpate defendants from breach of fiduciary duty claims that do not involve allegations of this misconduct." *Aris Multi-Strategy Fund, L.P. v. Accipiter Life Scis. Fund*

*II (QP), L.P.*, 89 A.D.3d 454, 454–55 (1st Dept 2011); *see also Kaplin v. Buendia*, No. 15 CIV. 649 (PAC), 2021 WL 1405517, at *6 (S.D.N.Y. Apr. 14, 2021) (New York courts "have upheld liability-limitation provisions that exculpated the defendant from broad swaths of liability").

Plaintiffs' allegation that NYCRC "took no action on several events of default when the non-managing members' capital could still have been protected," Compl. ¶ 11, is similar to the claim that was dismissed in *Aris*, 89 A.D.3d at 455. There, plaintiffs alleged that the defendants breached their fiduciary duties by failing to prepare to liquidate and distribute funds "at a time when there was sufficient liquidity" before the 2008 financial crisis. *Id.* The First Department held that such allegations were "insufficient to allege 'gross negligence, willful misconduct, or violation of applicable laws,'" as required to state a claim under the limited partnership agreement. *Id.*

This is an even easier case. Plaintiffs do not allege "gross negligence" or "willful misconduct" anywhere in the Complaint. Nor do they allege that NYCRC consciously disregarded any known or obvious risks or ***intentionally*** failed to act in the investors' best interests. Moreover, Plaintiffs do not and cannot allege any causal relationship between the alleged events of default and the Developer's bankruptcy filing, let alone one that NYCRC could have foreseen. Thus, Plaintiffs "cannot overcome the presumption that" NYCRC's alleged refusals to call defaults were, in fact, good faith "business decisions made on an informed basis." *Aris*, 89 A.D.3d at 455; *see also ALP*, 203 A.D.3d at 582 ("Plaintiffs' attempts to plead around the exculpatory language are conclusory, and insufficient to overcome the [exculpation clauses].").

            4.     <u>Plaintiffs Do Not Plausibly Allege Damages Caused by NYCRC's Alleged Failure to Call Defaults</u>

Plaintiffs also fail to plead damages caused by NYCRC's alleged breach. Plaintiffs acknowledge that their investments were lost "[a]s a result" of the Developer's bankruptcy filing, Compl. ¶ 13, and they do not allege any causal relationship between NYCRC's alleged refusal to

call defaults and the loss of their investments. Plaintiffs' failure to allege "particular facts as to how [they were] damaged does not satisfy *Twombly* and *Iqbal*." *TOA Sys., Inc. v. IBM*, No. 18 CV 10685 (VB), 2019 WL 5693388, at \*2 (S.D.N.Y. Nov. 4, 2019).[19]

If anything, Plaintiffs actually benefitted—after the alleged defaults, the Station was redeveloped, the EB-5 loans were spent, and the resulting job creation allowed Plaintiffs to secure green cards under the EB-5 Program. Because Plaintiffs may have been "helped by" NYCRC's alleged decisions not to call defaults, "it is insufficient to allege that losses are conceivable without more particularity." *Nguyen v. FXCM Inc.*, 364 F. Supp. 3d 227, 240 (S.D.N.Y. 2019) (dismissing aiding and abetting breach of fiduciary duty claim for failure to plead actual damages); *see also Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 115 (2d Cir. 2018) (plaintiff failed to adequately allege damages where complaint provided "just as much support for the proposition that they were *benefited* by [alleged misconduct] as for the proposition that they were *harmed* by it") (emphasis in original); *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 27 F. Supp. 3d 447, 461 (S.D.N.Y. 2014) (damages were "merely 'conceivable'—and thus insufficiently pled" where plaintiffs may have been helped rather than harmed by alleged misconduct).[20]

**B.     Plaintiffs Fail to State a Breach of Fiduciary Duty Claim Based on NYCRC's Alleged Failure to Disclose Negative Information About the Project**

NYCRC had no duty to disclose negative information because there was nothing to

---

[19] *See also Sang Lan v. Time Warner, Inc.*, No. 11 CIV. 2870 AT, 2014 WL 764250, at \*8 (S.D.N.Y. Feb. 25, 2014) (dismissing breach of fiduciary duty claim where plaintiff failed to "allege any causal relationship between [the alleged misconduct] and the conclusory assertion that Plaintiff 'suffered economic loss'"); *DeRaffele v. 210-220-230 Owners Corp.*, 33 A.D.3d 752, 752–53 (2d Dept 2006) (breach of fiduciary duty claim was properly dismissed where plaintiff failed to adequately allege "that any damages were attributable to" board members' actions).

[20] In any event, Plaintiffs cannot assert both direct and derivative claims based on NYCRC's alleged refusal to call defaults. This claim is, at best, derivative because the alleged injury is to the Funds. *See In re Optimal U.S. Litig.*, 813 F. Supp. 2d 351, 377–78 (S.D.N.Y. 2011) (claim that defendants "failed to supervise adequately the investment of the Funds' assets, resulting in the loss of those assets," was derivative). Thus, at a minimum, the direct claims should be dismissed because Plaintiffs lack standing to bring direct claims for any harms suffered by the Funds. *Abrams*, 66 N.Y.2d at 953 (an investor lacks standing to bring a direct claim for harm to the corporation).

disclose: no defaults ever occurred under the Loan Agreements. NYCRC also had no duty to disclose the alleged negative information because the Operating Agreement appointed NYCRC to run the Funds' day-to-day operations and manage all issues relating to the investments. Ex. D §§ 7.1, 7.2; Ex. J §§ 7.1, 7.2. Thus, "[n]either the [OAs] nor [NYCRC's] obligation to operate in good faith and with reasonable care created a duty to disclose" any alleged negative information relating to the renovations. *Leighton*, 2018 WL 2338789, at \*6–7 (manager had no duty to disclose settlement offers to LLC members where operating agreement contemplated that manager "would conduct the [LLC's] day-to-day business . . . which involved litigation and enforcement efforts").

Moreover, Plaintiffs were not damaged by any alleged failure to disclose because they could not have withdrawn their investments prior to dissolution of the Funds, which was not expected to occur "until the later of: (i) five years from the date of the Final Closing, or (ii) termination of the Loan Agreement." Ex. D §§ 10.1, 10.6; Ex. J §§ 10.1, 10.6. Because Plaintiffs could not have withdrawn their investments, they cannot recover damages on account of any alleged failure to disclose any negative information. *Silverman v. 3D Total Sols., Inc.*, No. 18 Civ. 10231 (AT) (GWG), 2019 WL 4248040, at \*12 (S.D.N.Y. Sept. 9, 2019) (plaintiff failed to allege breach of fiduciary duty claim based on alleged failure to disclose where complaint did "not allege any damages that are traceable to that failure to disclose"), *adopted by* 2020 WL 1285049 (S.D.N.Y. Mar. 18, 2020); *Parker v. Marglin*, 56 A.D.3d 374, 374 (1st Dept 2008) (breach of fiduciary duty claim was properly dismissed where "plaintiffs fail[ed] to show how the alleged concealment caused them the money damages they seek to recover").

## CONCLUSION

For the foregoing reasons, the Motion should be granted.

-26-

Dated: New York, New York
       October 31, 2022

                              By:    */s/ David J. Lender*
                                     David J. Lender
                                     Jessica F. Falk
                                     A.J. Green
                                     Weil, Gotshal & Manges LLP
                                     767 Fifth Avenue
                                     New York, New York 10153
                                     David.Lender@weil.com
                                     Jessica.Falk@weil.com
                                     A.J.Green@weil.com
                                     (212) 310-8000

                                     *Counsel for Defendant*