UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 09/28/2023

-------------------------------------------------------------------X
                                                :

BAI WEN, CAO XIAOLING, CAO YAN, CAO    :
YEQIAN, CHEN BIN, CHEN LI, CHEN QIANG, CHEN :
WEILI, CHENG FANGZHOU, CHU MIN, FENG    :
YING, GAO GUANGFENG, GU DANHUI, HAN    :
MINGYUAN, HU LAN, HU MIN, HU WENSHU,    :
HUANG HUI, HUANG WEI, HUANG XIUWEN,    :
JIANG GUOSHUN, JIANG PEIYU, JIANG XUEFEN,  :
JING LILI, HAN WENSHENG, KIT PING JACKY   :
KWOK, LAI YONGHE, LAU KWAN, LI HUILING, LI :
JINLONG, LI LIQIAN, LI MINGHUA, LI PEIJUN, LI :
QIANG, LI QINGHUA, LI XUE, LI YUHAO, LI    :
YUHUAI, LIANG WEI, LIN SHUANGPING, LIN    :
YONGQIANG, LIU JINGHUI, LIU MING, LIU    :
WENJIE, LIU ZHE, MA AIQIN, MA ZHANHUA, MAO :
ZHENG, NI LI, PING JIE, QI PEIXIN, WU    :
LIANGLIANG, QUE WEI, REN RONGRONG, SHAN :
DANDAN, SHAN WEI, SHEN CONGYING, SHEN  :
HUIYU, SHI YIQUN, SHU LINGLI, SONG CHAO,  :
SONG XIAOYING, SUN HAO, SUN XIN, SUN YAN, :
SUN YUXIN, TAN MANFANG, TENG LEZHI, WAN :
LILI, WANG YINGMING, WANG CHAO, WANG   :
CHUANHONG, WANG NINGHONG, WANG YANG,  :
WANG YATAO, WANG JIANPING, WU DING,    :
XIONG XIN, XU JIEPING, XU MINXIA,YANG LI,  :
YANG MENG, YANG XUELI, YE QIANG, YE XIN,  :
YIN YOUGENG, YING JIANFENG, YU QIZHEN, YU :
ZHAOHUI, YVONNE ZHU, ZHANG HUI, ZHANG  :
PINGJUN, ZHANG QIAN, ZHANG SHOUTAO,   :
ZHANG XUEMEI, ZHANG YUESHENG, ZHANG  :
YUMEI, ZHANG ZEYU, ZHAO JIAXU, ZHAO    :
MENGSHI, ZHAO YANGYANG, ZHENG HONGFEI, :
ZHENG YONG, ZHOU LINA, ZHOU YIN, ZHU   :
FENGBO, and ZHU LIYI, individually and derivatively :
on behalf of GEORGE WASHINGTON BRIDGE BUS :
STATION AND INFRASTRUCTURE        :
DEVELOPMENT FUND, LLC and GEORGE    :
WASHINGTON BRIDGE BUS STATION AND   :
INFRASTRUCTURE DEVELOPMENT FUND, PHASE :
II, LLC,                                 :
                                                :

                       Plaintiffs,    :
                                                :

22-cv-7383 (LJL)

OPINION AND ORDER

```
                    -v-                                    :
                                                           :
NEW YORK CITY REGIONAL CENTER, LLC,                        :
                                                           :
                    Defendant.                             :
                                                           :
-------------------------------------------------------------------X
```

LEWIS J. LIMAN, United States District Judge:

Defendant New York City Regional Center, LLC ("Defendant") moves, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the complaint of Plaintiffs,[1] Dkt. No. 3 ("Complaint"), for failure to state a claim upon which relief can be granted, Dkt. No. 12.  For the following reasons, the motion is granted.

## BACKGROUND

The Court accepts the well-pleaded facts of the Complaint, as supplemented by the documents incorporated by reference therein, as true for purposes of this motion.

Like many across the globe today, the Investor Plaintiffs—who were citizens of the People's Republic of China—wanted to immigrate to the United States.  Dkt. No. 3 ¶ 3.  To pursue that dream, they participated in the U.S. Citizenship and Immigration Services ("USCIS") EB-5 visa program.  *Id.* ¶¶ 4–6.  The EB-5 program provides permanent resident status to foreign individuals who invest $500,000 in a qualifying project that creates ten full-time jobs in the United States.  *Id.* ¶ 5; *see also Bai v. Tegs Mgmt., LLC*, 2022 WL 602711, at *1 (S.D.N.Y. Mar. 1, 2022) ("The applicable regulations on qualifying investments require evidence that the petitioner has placed the required amount of capital at risk for the purpose of generating a return

---

[1] The plaintiffs are 107 individuals and two limited liability companies.  89 of these individuals (the "Phase 1 Investors") invested in George Washington Bridge Bus Station and Infrastructure Development Fund, LLC ("Development Fund 1") and 18 of them (the "Phase 2 Investors," and, collectively with the Phase 1 Investors, the "Investor Plaintiffs") invested in George Washington Bridge Bus Station and Infrastructure Development Fund, Phase II, LLC ("Development Fund 2," and collectively with the Investor Plaintiffs and Development Fund 1, the "Plaintiffs").

on the capital placed at risk." (internal quotation marks and citations omitted)); 8 C.F.R. § 204.6(j).  The Investor Plaintiffs placed their funds with Defendant, a USCIS-approved "Regional Center" that pooled capital from foreign investors and financed EB-5-qualifying projects in a particular geographic region.  Dkt. No. 3 ¶ 4.

One such project was the redevelopment of the George Washington Bridge Bus Station (the "Station").  *Id.* ¶¶ 40, 49.  Built in 1963 at the eastern terminus of the George Washington Bridge (the "Bridge") in Manhattan, on top of a stretch of Interstate 95 known as the Trans-Manhattan Expressway, the Station is an important hub for buses in New York City.  *Id.* ¶ 40. By 2005, the Port Authority of New York and New Jersey (the "Port Authority"), which owns and operates the Bridge and Station, *id.* ¶ 32, recognized that the Station's retail spaces and bus terminal required upgrades, *id.* ¶ 41.  The Port Authority also viewed those upgrades as an opportunity to enhance revenue generation, improve the experience for bus passengers, and create jobs in the Washington Heights neighborhood of Manhattan.  *Id.*

After soliciting bids, the Port Authority entered into an exclusivity agreement with the George Washington Bridge Bus Station Development Venture LLC ("GWBDV"), a private company owned by a real estate development firm.  *Id.* ¶¶ 18–19, 42.  In 2008, after two years of negotiations, the Port Authority announced its plan: a public-private partnership to renovate and quadruple the size of the Station's retail spaces and modernize its bus terminal.  *Id.* ¶ 43. GWBDV agreed to spend approximately $100 million to upgrade the retail spaces in exchange for a 49-year lease, while the Port Authority agreed to simultaneously spend approximately $78 million on the bus terminal.  *Id.* ¶ 44.  However, that announcement occurred at the onset of the 2008 financial crisis, which resulted in a delay of more than two years as GWBDV sought capital for the project.  *Id.* ¶ 45.  During that delay, the general contractor whom the Port

3

Authority and GWBDV had chosen for the renovations, Skanska USA Building Inc. ("Skanska"), pulled out of the project.  *Id.* ¶ 47.

In 2011, to secure funding for the project, GWBDV's owner entered into an agreement with Defendant, which agreed to procure EB-5 investments from individuals in China.  *Id.* ¶ 49. Defendant fulfilled that promise by engaging two Chinese companies—the Qiaowai Group ("Qiaowai") in Beijing and the Wailian Group ("Wailian") in Shanghai—to market EB-5 investments in the Station renovation project to Chinese nationals.  *Id.* ¶¶ 29–30, 63.  Defendant provided training and written materials to Qiaowai and Wailian for soliciting investments.  *Id.* ¶¶ 64–65.  But, during those trainings, Defendant's executives allegedly instructed Qiaowai and Wailian to withhold formal legal documentation regarding the investments, including the offering memorandum.  *Id.* ¶ 65.  Instead, the executives told Qiaowai and Wailian to distribute misleading brochures and slides.  *Id.* ¶ 66.

A transcript of one of these training sessions indicates that one of Defendant's executives stated that, when soliciting investments, Qiaowai and Wailian should "keep information close to our vest," not "answer questions . . . with documents," and "not send[] anything out until [Defendant] authorize[d] it."  *Id.* ¶ 73.A.  He also directed them to tell prospective investors that $277 million of government capital would provide the vast majority of funding for the project and support their investments; their investments would be secured by a first mortgage on the entire Station, which was worth more than double the EB-5 investments; Skanska guaranteed completion of the project as the contractor; and the retail renovations would be complete in approximately two and a half years.  *Id.* ¶ 73.B.

According to Plaintiffs, those statements were false and misleading.  *Id.* ¶ 74.  In fact, the Station's retail and bus terminal renovations were separate projects, with private capital

financing the former and government expenditures funding the latter.  *Id.* ¶ 68.  The collateral was merely a lien on the leasehold interest in the retail portion of the Station, which did not extend to the bus terminal portion of the Station or to the real property underlying the Station. *Id.* ¶ 99.  And Skanska had already pulled out of the project amid the multiyear delay in securing funds.  *Id.* ¶¶ 47, 69.  Yet, the falsehoods were repeated to potential investors—including the Phase 1 Investors—who relied on them in deciding to place their funds with Defendant.  *Id.* ¶¶ 74–75.

Only a few of the investors received the offering memorandum prior to executing subscription agreements.  *Id.* ¶ 67.  Those who did received a document that was in English, a language they could not understand.  *Id.*  That offering memorandum allegedly reiterated certain misrepresentations, namely that the EB-5 investment was a small portion of a primarily government-funded project and that Skanska would perform the construction work.  *Id.* ¶¶ 68–69.

Nevertheless, Defendant obtained capital from the Phase 1 Investors.  *Id.* ¶ 75.  Their funds went to Development Fund 1, a limited liability company ("LLC") that Defendant established as its sole manager and initial member.  *Id.* ¶ 53; *see also id.* ¶ 58 (explaining the operating agreement "irrevocably" appointed Defendant "to manage the business affairs of the Company").  Under Development Fund 1's operating agreement, investors each paid $540,500— $500,000 of which was invested as capital in the Station project and $40,500 of which went to Defendant in fees.  *Id.* ¶ 54.  Defendant was also entitled to an annual management fee of 2% of Development Fund 1's total capital under management.  *Id.* ¶ 55.  The investors, as non-managing members, were each entitled to annual distributions of $1,250 until Development Fund 1 recouped its investment to GWBDV.  *Id.* ¶ 56.  The investment in GWBDV was structured as a

five-year loan, with an annual interest rate of 4.75% and an option for GWBDV to extend the loan for another 810 days.  *Id.* ¶¶ 59, 61.  Development Fund 1 was to retain GWBDV's interest payments—less the annual management fee, operating expenses, and annual payments to members—until the final distribution, at which time the non-managing members would recover their initial capital investment, plus 50% of the retained interest, while the remainder would go to Defendant.  *Id.* ¶ 57.

The loan agreement contained several defined events of default including: (a) GWBDV failing to pay interest when due; (b) GWBDV making any materially incorrect representation or warranty; (c) GWBDV becoming subject to any judgment in excess of $250,000 and not paying such judgment in 60 days (unless fully covered by insurance); (d) the "Mortgaged Property" becoming "materially injured" by a natural event; (e) the work not being "diligently and substantially completed" in accordance with the agreed "Project Cost Statement"; and (f) GWBDV's contracts with the Port Authority being materially changed without Defendant's prior approval.  *Id.* ¶ 62.

By the end of 2011, Development Fund 1 had extended the loan to GWBDV and Defendant began collecting management fees.  *Id.* ¶ 76.  But the renovations were soon mired in difficulties.  Superstorm Sandy damaged the Station in October of 2012, delaying the start of construction.  *Id.* ¶ 78.  Defendant, acting as the sole manager of Development Fund 1, did not declare a default on the loan based on the storm damage, and Defendant's newsletters to the Phase 1 Investors in 2012 and 2013 did not mention the storm's impact.  *Id.* ¶ 79.

Construction ultimately began in autumn of 2013, after GWBDV engaged Tutor Perini Corp. ("Tutor Perini") to serve as general contractor.  *Id.*  By early 2014, however, it became clear that the retail renovations would cost at least $119 million instead of the originally

projected cost of $102 million. *Id.* ¶ 83. Yet, Defendant neither declared a default at that time nor apprised investors of the revised cost projections. *Id.* ¶ 84.

Instead, Defendant solicited approximately $19 million in additional EB-5 funds from Chinese investors to cover the shortfall. *Id.* ¶¶ 85, 96. In doing so, Defendant and its marketing agents allegedly failed to disclose the damage from Superstorm Sandy and revised cost estimates that had affected the Station renovation. *Id.* ¶ 96. Defendant and its agents told the Phase 2 Investors that "Phase 1" of the renovations was complete and that additional capital was needed to fund "Phase 2" of the redevelopment. *Id.* ¶ 98. According to Plaintiffs, that characterization was untrue, as the Development Fund 1 investments were meant to finance the entire project and "Phase 2" was nothing more than a shortfall. *Id.* Defendant also allegedly misinformed the Phase 2 Investors that their funds would be added to the same capital stack as the Phase 1 funds and thus would enjoy a first mortgage security on the entire Station. *Id.* ¶ 99. Further, Defendant falsely claimed that the investments would be secured by collateral worth more than twice as much as the private funds and supported by government investments in the Station, which would comprise the vast majority of financing for Phase 2. *Id.* ¶ 100.

The Phase 2 Investors' funds went to Development Fund 2—a second LLC Defendant organized pursuant to an operating agreement that generally paralleled that of Development Fund 1, but entitled Defendant to higher administrative fees. *Id.* ¶¶ 87–89, 104. Unlike Development Fund 1, Development Fund 2 did not fund the redevelopment project through a loan directly to GWBDV. *Id.* ¶ 91. Instead, Development Fund 2 extended a loan to GWBDV via a pass-through entity. *Id.* ¶ 92. That loan was secured by equity in GWBDV, rather than any kind of lien on the Station. *Id.* ¶ 94.

Despite the influx of capital from the Phase 2 Investors, the Station redevelopment

project continued to face challenges.  In early 2015, Tutor Perini, the general contractor, commenced a confidential arbitration against GWBDV alleging mismanagement and defective designs, while GWBDV counterclaimed that Tutor Perini and its subcontractors were responsible for the construction delays and overruns.  *Id.* ¶ 105.  Although Defendant was aware of that arbitration, it did not share that information with the Phase 1 or Phase 2 Investors.  *Id.*  In March 2016, the Port Authority amended the ground lease to defer the beginning of rent payments by four years and the anticipated completion date by six months in exchange for $880,000 in penalties for the delays.  *Id.* ¶ 108.  The following month, the Port Authority temporarily halted funding.  *Id.* ¶ 109.  GWBDV, in turn, paused payments to Tutor Perini and certain lenders, but continued to pay interest on the Development Fund 1 and Development Fund 2 loans.  *Id.*  The Station finally reopened in May 2017, but the retail portion remained closed at that time.  *Id.* ¶ 113.  Defendant did not declare a default in response to any of these events, nor did it inform the Investor Plaintiffs that they had transpired.  *Id.* ¶¶ 111, 113.  But Defendant continued to collect management fees.  *Id.* ¶¶ 112, 114.

In October 2019, GWBDV filed for bankruptcy in the Southern District of New York. *Id.* ¶ 116.  Defendant met with some of the Investor Plaintiffs to discuss the situation and reassured them that the Development Fund 1 and Development Fund 2 loans were secured by a first mortgage on the entire Station.  *Id.* ¶ 117.  Certain investors retained counsel.  *Id.* ¶ 118.  By April 2021, some of the Investor Plaintiffs had discovered that Defendant had misled them when soliciting funds, during the construction, and after the commencement of GWBDV's bankruptcy. *Id.*

As a result of GWBDV's bankruptcy, the Investor Plaintiffs lost the entirety of their investments in Development Fund 1 and Development Fund 2 (collectively, the "Funds"), *id.*

¶ 13, though most "receive[d] either temporary or permanent green cards," *id.* ¶ 15.  By contrast, Defendant made more than $20 million in fees.  *Id.* ¶ 13.

The parties entered a tolling agreement on September 1, 2021, halting all applicable statutes of limitations and repose.  *Id.* ¶ 119.  That agreement ended when Plaintiffs commenced this action.  *Id.*

## PROCEDURAL HISTORY

Plaintiffs filed the operative Complaint against Defendant on August 30, 2022.[2]  *Id.* Plaintiffs claim that Defendant is liable for fraud in the inducement to both the Phase 1 Investors, *id.* ¶¶ 108–16, and the Phase 2 Investors, *id.* ¶¶ 117–24.  Plaintiffs further aver that Defendant's failure to declare defaults and disclose certain events to the Development Fund 1 and Development Fund 2 investors constituted a breach of fiduciary duty.  *Id.* ¶¶ 125–42.  The Phase 1 Investors bring their breach of fiduciary duty claim both on their own behalf and derivatively on behalf of Development Fund 1.  *Id.* ¶¶ 125–33.  Likewise, the Phase 2 Investors bring their breach of fiduciary duty claim on their own behalf and on behalf of Development Fund 2.  *Id.* ¶¶ 134–42.  Plaintiffs seek $57,780,000 in compensatory damages to the Investor Plaintiffs, additional damages to Development Fund 1 and Development Fund 2, punitive damages, prejudgment interest, fees, and costs.  *Id.* at ECF p. 205.  As an exhibit to their Complaint, Plaintiffs attached a purported transcript of a training session between Defendant's executives and Chinese marketing agents.  *Id.* at ECF pp. 206–38.

On October 31, 2022, Defendant filed the instant motion to dismiss the Complaint for failure to state a claim.  Dkt. No. 12.  Defendant also filed an accompanying memorandum of

---

[2] Plaintiffs initially filed a complaint on August 29, 2022, but they were instructed to refile due to a filing error.  *See* Dkt. No. 1.

law, Dkt. No. 13, and declaration of David Lender, Dkt. No. 14, which attaches *inter alia* the

Development Fund 1 and Development Fund 2 offering memoranda, Dkt. Nos. 14-3, 14-12, the

corresponding subscription agreements, Dkt. Nos. 14-1, 14-2, 14-11, the Development Fund 1

and Development Fund 2 operating agreements, Dkt. Nos. 14-6, 14-7, 14-8, 14-14, and the

Development Fund 1 and Development Fund 2 loan agreements, Dkt. Nos. 14-9, 14-16.

Plaintiffs filed a memorandum in opposition to the motion to dismiss on December 9,

2022.  Dkt. No. 19.  Defendant filed a reply in further support of its motion on January 17, 2023.

Dkt. No. 20.

## LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a

complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that

is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 557 (2006)).  "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged."  *Id.*  This "does not impose a probability requirement at the pleading

stage" but rather "calls for enough fact to raise a reasonable expectation that discovery will

reveal evidence [supporting the claim]."  *Twombly*, 550 U.S. at 556; *see also Matrixx Initiatives,

Inc. v. Siracusano*, 563 U.S. 27, 46 (2011) (same).  That is, a complaint need not allege "detailed

factual allegations," but "a plaintiff's obligation to provide the grounds of his entitlement to

relief requires more than labels and conclusions, and a formulaic recitation of the elements of a

cause of action will not do."  *Id.* at 555.

In reviewing a motion to dismiss under Rule 12(b)(6), a court "accept[s] all factual

allegations as true, and draw[s] all reasonable inferences in the plaintiff's favor."  *Austin v. Town*

10

*of Farmington*, 826 F.3d 622, 625 (2d Cir. 2016).  However, "the tenet that a court must accept

as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Iqbal*,

556 U.S. at 678.  "Threadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice."  *Id.*

The ultimate question is whether "[a] claim has facial plausibility, [*i.e.*,] the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is

liable for the misconduct alleged."  *Id.*  "Determining whether a complaint states a plausible

claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its

judicial experience and common sense."  *Id.* at 679.

When a pleading alleges fraud, Rule 9(b) requires a plaintiff to "state with particularity

the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  In order to comply with Rule 9(b),

"the complaint must (1) specify the statements that the plaintiff contends were fraudulent,

(2) identify the speaker, (3) state where and when the statements were made, and (4) explain why

the statements were fraudulent."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006)

(quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

## DISCUSSION

## I.  Documents Cognizable on the Motion to Dismiss

The Court first addresses the documents cognizable on the motion to dismiss.  Defendant

asks the Court to examine the offering memoranda, subscription agreements, operating

agreements, and loan agreements, *see* Dkt. No. 13 at 3 n.2, but Plaintiffs respond that those

documents "should not be considered unless the Court opts to convert [Defendant's] Motion into

a motion for summary judgment,"[3] Dkt. No. 19 at 16 n.4.

---

[3] Plaintiffs urge the Court to consider a training session transcript attached to the Complaint as an exhibit.  *See* Dkt. No. 19 at 13; *see also* Dkt. No. 3 at ECF pp. 206–38.  Defendant does not

When adjudicating a 12(b)(6) motion, a court "may review only a narrow universe of materials." *Lateral Recovery, LLC v. Cap. Merch. Servs., LLC*, 632 F. Supp. 3d 402, 435 (S.D.N.Y. 2022).  Generally, a court will "not look beyond 'facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken.'"  *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (quoting *Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016)); *see Goe v. Zucker*, 43 F.4th 19, 29 (2d Cir. 2022); *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 383 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021).  "To be incorporated by reference, the complaint must make a clear, definite and substantial reference to the documents." *Lateral Recovery*, 632 F. Supp. 3d at 436 (quoting *McKeefry v. Town of Bedford*, 2019 WL 6498312, at *3 (S.D.N.Y. Dec. 2, 2019)); *see also Trump v. Vance*, 977 F.3d 198, 210 n.8 (2d Cir. 2020).  "[A] mere passing reference or even references . . . to a document outside of the complaint does not, on its own, incorporate the document into the complaint itself." *Lateral Recovery*, 632 F. Supp. 3d at 439 (quoting *SEC v. Medallion Fin. Corp.*, 2022 WL 3043224, at *1 (S.D.N.Y. Aug. 2, 2022)).  In addition, the court may "consider on a motion to dismiss documents upon which the plaintiff relies in bringing suit, which are integral to the complaint, and as to which they had notice." *Gray*, 454 F. Supp. 3d at 383; *see also Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (quoting *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)).  A document is integral when "the complaint relies heavily upon its terms and effect." *Goel*, 820 F.3d at 559 (quoting *Chambers v. Time*

---

object to that request.  The Court considers the training session transcript.  *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (explaining documents "attached to the complaint as exhibits" are cognizable on a Rule 12(b)(6) motion); *Nam v. Permanent Mission of Republic of Korea to United Nations*, 581 F. Supp. 3d 643, 647 (S.D.N.Y. 2022) (Nathan, J.); *Sesa, Inc. v. Terrafina*, 2020 WL 6382919, at *3 (S.D.N.Y. Oct. 30, 2020).

*Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).  "Merely mentioning a document in the complaint will not satisfy this standard," nor will limited quotations from the document.  *Id.*  Instead, the document must "appear to have been necessary to the 'short and plain statement of the claim showing that [a plaintiff is] entitled to relief.'"  *Sahu v. Union Carbide Corp.*, 548 F.3d 59, 68 (2d Cir. 2008) (quoting Fed. R. Civ. P. 8(a)(2)).  There also cannot be a "dispute" as to the "accuracy of the document."  *Goe*, 43 F.4th at 29 (quoting *Nicosia*, 834 F.3d at 231); *see Essilor Int'l SAS v. J.P. Morgan Chase Bank, N.A.*, 2023 WL 35176, at *6 (S.D.N.Y. Jan. 4, 2023) ("Even implicit, conclusory, contradictory, or implausible objections to the authenticity or accuracy of a document render consideration impermissible." (alteration omitted) (quoting *Mbody Minimally Invasive Surgery, P.C. v. United Healthcare Ins. Co.*, 2016 WL 4382709, at *7 (S.D.N.Y. Aug. 16, 2016))).

The Court can consider the offering memoranda, subscription agreements, and operating agreements on this motion without converting it to one for summary judgment.  First, the Complaint incorporates them by reference through its "clear, definite and substantial reference[s] to the documents."  *Lateral Recovery*, 632 F. Supp. 3d at 435.  Plaintiffs do not merely cite the offering memoranda; they dedicate paragraphs to detailing their contents.  *See* Dkt. No. 3 ¶¶ 67–69; *id.* at 87.  Similarly, the Complaint is replete with references to the subscription agreements,[4] and it describes the terms of the operating agreements in depth, *id.* ¶¶ 53–58, 89.

Second, even if those documents were not incorporated by reference, they are integral to the Complaint.  Plaintiffs aver that the offering memoranda included misrepresentations that

---

[4] *See* Dkt. No. 3 ¶ 67; *id.* at 33, 35–36, 38, 40, 42–43, 45–46, 48, 50, 52, 54–55, 57, 59–60, 62, 64, 66–67, 69–70, 71, 73, 74, 76, 78–79, 81, 83, 85–86, 87–89, 91–92, 94, 96, 98, 100–03, 105, 107–08, 110, 112–13, 115, 117–18, 120–22, 124–25, 127–28, 130, 132–33, 135–38, 140–45, 147–148, 150, 152–53, 155–56, 158, 160–61, 163–65, 167–70, 172–73, 175–178, 180–81, 183–84, 186, 188, 190–91, 193, 195–97, 199.

form the very foundation of their fraudulent inducement claims.  *See Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("When a complaint alleges, for example, that a document filed with the SEC failed to disclose certain facts, it is appropriate for the court, in considering a Rule 12(b)(6) motion, to examine the document to see whether or not those facts were disclosed."); *Backhaus v. Streamedia Commc'ns, Inc.*, 2002 WL 1870272, at *3 (S.D.N.Y. Aug. 14, 2002); *JPMorgan Chase Bank v. Liberty Mut. Ins. Co.*, 233 F. Supp. 2d 550, 553 & n.2 (S.D.N.Y. 2002).  Although Plaintiffs attempt to analogize to *Nakahata v. New York-Presbyterian Healthcare System, Inc.*, 723 F.3d 192 (2d Cir. 2013), in which the Second Circuit admonished that the district court had erred in reviewing certain collective bargaining agreements at the motion to dismiss stage, Dkt. No. 19 at 16 n.4, *Nakahata* is inapposite because those agreements were solely relevant to "an affirmative defense," rather than the merits of the plaintiffs' claim, 723 F.3d at 203 n.20.

The subscription agreements are also integral to Plaintiffs' Complaint, as Plaintiffs' fraud claims are premised on the assertion that the Investor Plaintiffs were induced into signing those agreements.  *See Lamothe v. Town of Oyster Bay*, 2009 WL 2160983, at *3 (E.D.N.Y. July 10, 2009) ("As the plaintiffs' fraud causes of action allege misrepresentations . . . in order to induce the plaintiffs to purchase the property, the [sales] contract is an integral part of the plaintiffs' claims."); *see also In re Trib. Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 176 (2d Cir. 2021); *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("In most instances where this [integral document] exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—was not attached to the complaint.").

Plaintiffs argue that the offering memoranda and subscription agreements cannot be integral because Defendant and its marketing agents withheld the offering memoranda and full subscription agreements from certain Investor Plaintiffs. Dkt. No. 19 at 16 n.4. But possession is not the *sine qua non* of when a document is integral. *See Chambers*, 282 F.3d at 153. Rather, it is sufficient that the offering memoranda and subscription agreements were documents that Plaintiffs "had knowledge of and upon which they relied in bringing suit." *Id.* Thus, "[w]here plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991).

Likewise, the Development Fund 1 and Development Fund 2 operating agreements are integral to the Complaint. Plaintiffs' claims for breach of fiduciary duty rely on those agreements to establish that Defendant owed such a duty to both the Investor Plaintiffs and the Funds. *See* Dkt. No. 3 at 202–03. The operating agreements are therefore necessary for Plaintiffs' "short and plain statement" of their fiduciary-duty claims. *Sahu*, 548 F.3d at 68 (quoting Fed. R. Civ. P. 8(a)(2)).

Finally, the Court may consider the loan agreements as integral to the Complaint. Plaintiffs' breach of fiduciary claims rest on the contention that certain events constituted defaults under the loan agreements and thus "requests judicial interpretation of their terms." *Chambers*, 282 F.3d at 154 n.4. In such circumstances, "[i]nsofar as the complaint relies on the terms of [an] agreement, . . . [courts] need not accept [a plaintiff's] description of those terms, but may look to the agreement itself." *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 196 (2d Cir. 2005).

Having determined that the offering memoranda, subscription agreements, operating agreements, and loan agreements fall within the universe of materials the Court can properly review in adjudicating Defendant's motion to dismiss, the Court addresses that motion in light of those documents.

## II.  Fraud Claims

Defendant argues that the Investor Plaintiffs' fraud claims are time-barred under the governing statute of limitations.  Dkt. No. 13 at 8.  Plaintiffs respond that statute-of-limitations defenses are premature at the pleading stage and, in any event, their fraud claims are timely.  Dkt. No. 19 at 17–18.

### A.    Affirmative Defenses at the Pleadings Stage

The expiration of a statute of limitations is "an affirmative defense that a defendant must plead and prove." *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 319 (2d Cir. 2021) (quoting *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008)).  As a result, the requirement that a plaintiff provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8, does "not compel a litigant to anticipate potential affirmative defenses, such as the statute of limitations, and to affirmatively plead facts in avoidance of such defenses," *Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007) (citing *Jones v. Bock*, 549 U.S. 199, 215 (2007)).

However, "a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 798 n.12 (2d Cir. 2014).  Nor is a court limited to the complaint in determining whether a claim is time-barred, as the court may consider the full range of documents properly reviewed at the motion to dismiss stage.  *See Staehr*, 547 F.3d at 425.  If a review of the complaint and other permissible documents reveals "that the claims are prima facie time-barred,

the burden is on the plaintiff to 'plausibly alleg[e] that they fall within an exception to the

applicable statute of limitations.'" *Roeder v. J.P. Morgan Chase & Co.*, 523 F. Supp. 3d 601,

611–12 (S.D.N.Y. 2021) (quoting *Twersky v. Yeshiva Univ.*, 993 F. Supp. 2d 429, 436 (S.D.N.Y.

2014)), *aff'd*, 2022 WL 211702 (2d Cir. Jan. 25, 2022) (summary order) .

Those principles apply with equal force when the question is whether a statute of

limitations forecloses a fraud claim based on a plaintiff's ability to discover the wrongdoing—

*i.e.*, whether the plaintiff was on inquiry notice of the fraud.  The Second Circuit has "recognized

in the past that determining 'whether a plaintiff had sufficient facts to place it on inquiry notice is

'often inappropriate for resolution on a motion to dismiss.'"  *Staehr*, 547 F.3d at 412 (quoting *LC

Cap. Partners, LP v. Frontier Ins. Grp., Inc.*, 318 F.3d 148, 156 (2d Cir. 2003)).  But the Second

Circuit has "also stated that courts can 'readily resolve the issue' of inquiry notice as a matter of

law on a motion to dismiss—as has been done in 'a vast number of cases' in this circuit—where

'the facts needed for determination of when a reasonable investor of ordinary intelligence would

have been aware of the existence of fraud can be gleaned from the complaint and papers . . .

integral to the complaint.'"[5]  *Id.* (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 168 (2d

Cir. 2005)); *see also Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 362 (2d Cir. 2013); *Koch v.

Christie's Int'l PLC*, 699 F.3d 141, 155–56 (2d Cir. 2012); *Landow v. Wachovia Sec., LLC*, 966

F. Supp. 2d 106, 127–28 (E.D.N.Y. 2013).

Thus, Plaintiffs' broad assertion that Defendant's "affirmative defense that this action

should be dismissed on statute-of-limitations grounds is not applicable at the pleading stage,"

---

[5] Although *Staehr* concerned storm warnings under federal securities law, it is nevertheless
instructive in assessing inquiry notice under New York law.  *See AXA Versicherung AG v. N.H.
Ins. Co.*, 391 F. App'x 25, 29 n.3 (2d Cir. 2010) ("[F]ederal law on inquiry notice is analogous to
New York law.").

Dkt. No. 19 at 17, is contrary to precedent.  The Court therefore must determine whether it is "evident on the face of the complaint and documents properly considered at the motion to dismiss stage" that Plaintiffs' fraud claims are time-barred.  *BPP Ill., LLC v. Royal Bank of Scot. Grp. PLC*, 603 F. App'x 57, 59 (2d Cir. 2015) (quotation omitted).

### B.       Timeliness of the Investor Plaintiffs' Fraud Claims

New York's statute of limitations dictates that "an action based on fraud" must be commenced "the greater of six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it."  N.Y. C.P.L.R. 213(8).

Plaintiffs do not challenge Defendant's assertion that "the alleged fraud occurred more than six years before September 1, 2021 (the date of the tolling agreement)."  Dkt. No. 13 at 9; *see* Dkt. No. 19 at 18.  "Under New York law, '[a] cause of action to recover damages for fraud cannot accrue until every element of the claim, including injury, can truthfully be alleged.'" *Landow*, 966 F. Supp. 2d at 126 (quoting *Carbon Cap. Mgmt., LLC v. Am. Express Co.*, 932 N.Y.S.2d 488, 495 (2d Dep't 2011)).  There is no dispute here that the fraud claims "accrued upon plaintiffs' making their investments," *Hamrick v. Guralnick*, 146 A.D.3d 606, 607 (1st Dep't 2017)—in 2011 for the Phase 1 Investors, Dkt. No. 3 ¶ 76, and 2014 for Phase 2 Investors, *id.* ¶ 98.

Instead, the parties dispute whether Plaintiffs filed suit "two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it."  N.Y. C.P.L.R. 213(8); *see* Dkt. No. 13 at 9; Dkt. No. 19 at 18.  Plaintiffs broadly allege that "[i]t was not until April 2021, at the earliest, that any of the Investor Plaintiffs [were] in possession of sufficiently complete information to recognize that [Defendant] had misled them in connection with their investment decisions, mislead them in

connection with the status and progress of the [Station redevelopment] Project, and misled them regarding the protection their supposed security interests provided them in connection with the bankruptcy." Dkt. No. 3 ¶ 118. Defendant argues that the Investor Plaintiffs "all possessed information that was materially inconsistent with the alleged misrepresentations by the time they invested," Dkt. No. 13 at 9, and that "a reasonable investor *could* have discovered the alleged fraud by simply reviewing the offering documents by the time [Investor] Plaintiffs signed the agreements," Dkt. No. 20 at 1 (emphasis in original).

"[P]laintiff bears the burden of establishing that the fraud could not have been discovered before the two-year period prior to the commencement of the action." *Guilbert v. Gardner*, 480 F.3d 140, 147 (2d Cir. 2007). "The test as to when fraud should with reasonable diligence have been discovered is an objective one." *Gutkin v. Siegal*, 926 N.Y.S.2d 485, 486 (1st Dep't 2011) (quoting *Armstrong v. McAlpin*, 699 F.2d 79, 88 (2d Cir. 1983)). Under that test, "[w]here the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of the fraud will be imputed to him." *Armstrong*, 699 F.2d at 88 (quoting *Higgins v. Crouse*, 42 N.E. 6, 7 (N.Y. 1895)); *see also Gutkin*, 926 N.Y.S.2d at 486; *In re Merrill, BofA, & Morgan Stanley Spoofing Litig.*, 2021 WL 827190, at *6 (S.D.N.Y. Mar. 4, 2021), *aff'd sub nom. Gamma Traders–I LLC v. Merrill Lynch Commodities, Inc.*, 41 F.4th 71 (2d Cir. 2022).

The duty to inquire is triggered when plaintiffs acquire "information that relates directly to the misrepresentations and omissions the Plaintiffs later allege in their action against the defendants.'" *Landow*, 966 F. Supp. 2d at 130 (quoting *Cohen*, 711 F.3d at 361); *see also Sargiss v. Magarelli*, 909 N.E.2d 573, 576 (N.Y. 2009) ("The inquiry as to whether a plaintiff

could, with reasonable diligence, have discovered the fraud turns on whether the plaintiff was possessed of knowledge of facts from which the fraud could be reasonably inferred."); *Rosenshein v. Meshel*, 688 F. App'x 60, 63 (2d Cir. 2017); *Bai*, 2022 WL 602711, at *9.  "The triggering information 'need not detail every aspect of the [subsequently] alleged fraudulent scheme.'"  *Cohen*, 711 F.3d at 361 (quoting *Staehr*, 547 F.3d at 427); *see also In re Glob. Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 201 (S.D.N.Y. 2003) (Lynch, J.).  Rather, the information must "alert a reasonable person to the probability that there were either misleading statements or significant omissions involved in the [transaction]."  *Brimo v. Corp. Express, Inc.*, 2000 WL 1506083, at *2 (2d Cir. 2000) (summary order) (quoting *Dietrich v. Bauer*, 76 F. Supp. 2d 312, 343 (S.D.N.Y.1999)).  "In turn, the date on which knowledge of a fraud will be imputed to a plaintiff can depend on the plaintiff's investigative efforts.  If the plaintiff makes no inquiry once the duty to inquire arises, knowledge will be imputed as of the date the duty arose.  And if some inquiry is made, the court will impute knowledge of what a plaintiff in the exercise of reasonable diligence should have discovered concerning the fraud, and in such cases the limitations period begins to run from the date such inquiry should have revealed the fraud."  *Cohen*, 711 F.3d at 361–62 (cleaned up).

Inquiry notice fulfills the two "primary purposes of limitations statutes: 'preventing surprises' to defendants and 'barring a plaintiff who has slept on his rights.'"  *Artis v. District of Columbia*, 583 U.S. 71, 91 (2018) (quoting *Am. Pipe & Const. Co. v. Utah*, 414 U.S. 538, 554 (1974)).  By requiring plaintiffs to reasonably and diligently investigate evidence of fraud, the law prevents a contracting party from turning a blind eye to obvious falsehoods.  Otherwise, one who suspects misrepresentation could remain willfully ignorant, enjoy the benefits of a bargain, and then strategically "discover" a fraud that she had suspected all along to avoid performance if

circumstances worsen.  Fraud in the inducement is not an insurance policy.  The doctrine of reasonable diligence prevents a party who is on notice of misrepresentations from overlooking her claim in order to enjoy the benefits of an agreement and to shift its risks onto her counterparty.  *See* Robert T. Miller, *The RMBS Put-Back Litigations and the Efficient Allocation of Endogenous Risk over Time*, 34 Rev. Banking & Fin. L. 255, 263 (2014) (examining the risk-shifting function of fraud statutes of limitations).

Here, the Investor Plaintiffs were on inquiry notice of the fraud that they allege when they executed the subscription agreements.  Plaintiffs aver that Defendant misrepresented the collateral that secured their investments.  The Phase 1 Investors were allegedly told that Development Fund 1 would have a first lien mortgage on both the retail and bus-terminal portions of the Station; that if GWBDV was in default, Development Fund 1 could take possession of the Station's bus terminal and redevelop it into additional retail space; that the value of the collateral, which was misrepresented as the entire bus Station including the bus terminal, was worth more than twice the anticipated $72 million EB-5 investment; that the collateral was comprised of two buildings, when in fact the Station is a single building and the collateral was the ground lease, not the real property itself; that construction on the Project had already commenced using public funds; and that the government was providing $277 million for the project "so that the EB-5 investments would only provide 19% of the total capital but obtain a first lien on the entire Project."  Dkt. No. 3 ¶ 121.1.D.[6]  The Phase 2 Investors were told that

---

[6] *See also id.* ¶¶ 121.2.D, 121.4.D, 121.5.C, 121.6.D, 121.7.D, 121.8.D, 121.11.C, 121.12.D, 121.13.D, 121.14.C, 121.15.D, 121.16.C, 121.17.C, 121.19.D, 121.20.E, 121.21.C, 121.22.D, 121.23.C, 121.25.D, 121.26.C, 121.27.B, 121.28.C, 121.29.D, 121.31.D, 121.32.C, 121.33.C, 121.35.D, 121.38.D, 121.39.C, 121.41.C, 121.42.D, 121.45.D, 121.46.C, 121.47.C, 121.48.D, 121.50.C, 121.51.C, 121.52.D, 121.53.E. 121.54.D, 121.55.C, 121.56.C, 121.57.C, 121.58.C, 121.60.C, 121.61.D, 121.62.C, 121.63.C, 121.64.C, 121.66.C, 121.67.C, 121.68.C, 121.71.C, 121.72.C, 121.73.C, 121.74.C, 121.75.D, 121.76.C, 121.77.C, 121.78.C, 121.79.C, 121.80.C,

Phase 1 of the redevelopment project was complete and had been a success, that Development

Fund 2 would have the first lien mortgage on both the retail and bus-terminal portions of the

Station, and that the government was providing $277 million for the project so that the EB-5

investments would only provide a small percentage of the total capital but obtain a first lien on

the entire project.  *Id.* ¶ 121.3.D.[7]

But the offering memoranda for Development Fund 1 and Development Fund 2

contradicted those alleged misrepresentations.  Under the heading for "Priority and Security," the

Development Fund 1 offering memorandum states that the loan to GWBDV would be "secured

by a leasehold mortgage . . . on the GWB Marketplace," which consisted of "approximately

120,000 square feet of retail space that makes up the Broadway Marketplace at GWB, containing

the newly constructed retail concourse and street level retail complex."  Dkt. No. 14-3 at ECF

p. 31.  It says nothing about a mortgage on real property.  That disclosure is directly inconsistent

with any understanding that the investors in Development Fund 1 would obtain security in the

entire project or in the form of a first lien mortgage on real property.[8]  Likewise, the

Development Fund 2 offering memorandum explains that in the event of a default, Development

Fund 2 would have only "contractual remedies pursuant to the Venture LLC Agreement" which

---

121.81.D, 121.82.D, 121.83.C, 121.84.C, 121.85.C, 121.86.D, 121.87.D, 121.88.C, 121.89.C,
121.90.D, 121.92.D, 121.93.C, 121.94.C, 121.95.D, 121.96.C, 121.97.D, 121.98.D, 121.99.C,
121.100.D, 121.101.D, 121.102.C, 121.103.C, 121.104.D, 121.105.C, 121.106.C, 121.107.C.
[7] *See also id.* ¶¶ 121.9.C, 121.10.G, 121.18.E, 121.24.C, 121.30.D, 121.34.C, 121.36.D,
121.37.D, 121.40.C, 121.43.C, 121.44.C, 121.49.D, 121.59.D, 121.65.C, 121.69.C, 121.70.C,
121.91.D.
[8] The Development Fund 1 offering memorandum also warned potential investors that "[t]here
will be no other security for the Loan. . . .  The Company's only recourse in the event of a Loan
default under the Promissory Note, as the lender, will be to realize on the Collateral and exercise
its rights under the Leasehold Mortgage.  The Company's ability to foreclose and recognize its
rights may be subject to any lenders making senior Third Party Loans to the Borrower."  Dkt.
No. 14-3 at ECF p. 31.

allowed it to remove the pass-through entity's managing member for cause. Dkt. No. 14-12 at ECF pp. 27, 38.[9] That disclosure is inconsistent with Defendant's alleged oral misrepresentation that "Dev. Fund 2 would have a first lien mortgage on both the retail and public (bus terminal) portions of the Station." Dkt. No. 3 ¶ 100.B. And each subscription agreement attested that the investor "has carefully reviewed the Offering Memorandum and understands the nature of the proposed investment in the Company." Dkt. No. 14-1 at ECF p. 6; Dkt. No. 14-11 at ECF p. 7.

An investor of ordinary intelligence would realize that the offering memoranda incorporated into the subscription agreements conflicted with Defendant's alleged misstatements regarding the collateral that would secure their investments in the Station redevelopment project. *See Hamrick*, 146 A.D.3d at 607 ("Plaintiffs were placed on inquiry notice of the alleged fraud . . . when they received the private placement memorandum, which expressly contradicted defendants' alleged oral representations."); *cf. Dodds v. Cigna Sec., Inc.*, 12 F.3d 346, 347 (2d Cir. 1993) (applying the same standard under federal securities laws). The language of the offering memoranda thus put Plaintiffs on inquiry notice of the alleged fraud. Defendant's alleged misrepresentations about the nature of collateral went to "the fundamental nature of the investments," *Coleman & Co. Sec. v. Giaquinto Fam. Tr.*, 236 F. Supp. 2d 288, 310 (S.D.N.Y. 2002) (Chin, J.), and is "[t]he crux of [Plaintiffs'] fraudulent inducement claims," *AXA Versicherung AG v. N.H. Ins. Co.*, 391 F. App'x 25, 29 (2d Cir. 2010). Indeed, the other alleged misrepresentations—regarding the value of the collateral, the extent of and benefits of the

---

[9] The Development Fund 2 offering memorandum states that if there is a "failure or default of the Borrower, . . . the Company will have contractual remedies pursuant to the Venture LLC Agreement, although there is no assurance that the Borrower would be able to make the Company whole for any losses or damages suffered and the Company may lose the value of all of its assets," and that, as a result, "an investment in the Company is speculative and subject to substantial repayment risk." Dkt. No. 14-12 at ECF p. 38.

government investment in the bus terminal portion of the Station, and the progress made on the

Station redevelopment—would have been of note to investors only if they believed the loans

would be secured by first lien mortgages in the entire Station.  They would have been of no

particular significance to a person whose investment was secured only by a leasehold mortgage

or an interest in GWBDV.  Accordingly, the offering memoranda would have enabled an

investor of ordinary intelligence to "perceiv[e] the general fraudulent scheme" Plaintiffs allege in

their Complaint.  *Salinger v. Projectavision, Inc.*, 972 F. Supp. 222, 229 (S.D.N.Y. 1997); *see*

*also In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 302 (S.D.N.Y. 2014),

*aff'd*, 616 F. App'x 442 (2d Cir. 2015).  Put differently, Defendant's misrepresentation of the

nature of the collateral was sufficiently related to the other misrepresentations at issue in this

case for the offering memoranda to provide inquiry notice as to "*the* fraud" as a whole.  N.Y.

C.P.L.R. 213(8) (emphasis added).  The Investor Plaintiffs were therefore under "a duty to

inquire further."  *Dodds*, 12 F.3d at 352; *see also Addeo v. Braver*, 956 F. Supp. 443, 449

(S.D.N.Y. 1997) (Sotomayor, J.).  They do not allege that they did so.  And even if they had

made "some inquiry," in the exercise of reasonable diligence they would have discovered the

fraud at the time they entered the subscription agreements, given the disclosures in the offering

memoranda.  *Cohen*, 711 F.3d at 362 (quoting *Lentell*, 396 F.3d at 168).  Thus, the statute of

limitations began running upon the date of their investment and, as a result, the Investor

Plaintiffs' fraud claims are time-barred.

Plaintiffs do not address the manifest tension between the offering memoranda, which the

Investor Plaintiffs attested to reading and understanding in their subscription agreements, and the

misrepresentations regarding collateral that form the basis of Plaintiffs' fraud claims.  *See* Dkt.

No. 19 at 17–18.  Instead, Plaintiffs argue that those documents could not furnish storm warnings

because "numerous Plaintiffs specifically alleged they were given only a signature page of a subscription agreement in English and did not receive any formal documentation." *Id.* at 18.

As a matter of New York law, "[a] party who executes a contract is presumed to know its contents and to assent to them." *Holcomb v. TWR Express, Inc.*, 782 N.Y.S.2d 840, 841 (2d Dep't 2004) (internal quotation marks and citation omitted); *see also Shklovskiy v. Khan*, 709 N.Y.S.2d 208, 209 (2d Dep't 2000) ("[A] party will not be excused from his failure to read and understand the contents of a [contract]. A party who signs a document without any valid excuse for having failed to read it is conclusively bound by its terms."). That rule applies even when a party to a contract receives only a portion of the agreement: She must request and read the remainder of the contract as she remains bound by the omitted terms. *See Brundage v. Pension Assocs. Ret. Plan., LLC*, 2019 WL 2465146, at *4 (S.D.N.Y. June 13, 2019) ("If Plaintiffs had reviewed the document they signed, they would have noticed that a portion of the contract was missing."); *Crewe v. Rich Dad Educ., LLC*, 884 F. Supp. 2d 60, 74 (S.D.N.Y. 2012) ("[Plaintiff] alone is accountable for his decision to sign the Agreement without reading it and without first requesting a copy of the Terms and Conditions that it expressly incorporated."). A party who receives only a portion of an agreement cannot avoid its effect by disclaiming knowledge of the remainder. New York law assumes a reasonably diligent investor would have requested and reviewed the remainder of the subscription agreement and offering memorandum.[10] *See Sharma v. Walia*, 157 N.Y.S.3d 722, 723 (1st Dep't 2022).

---

[10] Defendant also asserts that the Investor Plaintiffs certified that they had read the offering memoranda in their immigration petitions to the USCIS. *See* Dkt. No. 20 at 1. Because those petitions are neither incorporated by reference in nor integral to the Complaint, the Court will not consider them at the motion to dismiss stage. *See Mathias v. Daily News, L.P.*, 152 F. Supp. 2d 465, 480 (S.D.N.Y. 2001).

Nor were the Investor Plaintiffs relieved of their obligation to read the agreements and offering memoranda due to their inability to understand English. *See* Dkt. No. 3 ¶ 67. "[A] claim of illiteracy in the English language is, by itself, insufficient to avoid the rule that '[a] party who signs a contract without any valid excuse for having failed to read it is conclusively bound by its terms.'" *Kenol v. Nelson*, 581 N.Y.S.2d 415, 417 (2d Dep't 1992) (alteration in original) (quoting *Sofio v. Hughes*, 162 A.D.2d 518, 519 (2d Dep't 1990)). Instead, "[a] person who is illiterate in the English language . . . must make a reasonable effort to have the contract read to them." *Holcomb*, 782 N.Y.S.2d at 842; *Emigrant Mortg. Co., Inc. v. Pub. Adm'r of Kings Cnty.*, 172 N.Y.S.3d 45, 50 (2d Dep't 2022); *Kassab v. Marco Shoes Inc.*, 723 N.Y.S.2d 352, 353 (1st Dep't 2001). True, the New York Court of Appeals stated in the seminal case *Pimpinello v. Swift & Co.*, 170 N.E. 530 (N.Y. 1930), that "[i]f the signer is illiterate, or blind, or ignorant of the alien language of the writing, and the contents thereof are misread or misrepresented to him by the other party, or even by a stranger, unless the signer be negligent, the writing is void." *Id.* at 531. But New York courts have since clarified:

> [T]he rule stated in the *Pimpinello* case is applicable only when the signer of the document is free of negligence. Persons who are blind or illiterate are not automatically excused from complying with the terms of the contracts which they sign simply because their disability might have prevented them from reading the contracts. The cases consistently hold that a person with such a disability must make a reasonable effort to have the document read to him. The same should be true of a person who claims not to understand English. Even assuming [plaintiff] was unable to understand the [contract], he should not have signed it before having it explained to him.

*Sofio*, 556 N.Y.S.2d at 719 (citations omitted). Here, each Investor Plaintiff invested over half a million dollars in a sophisticated venture. *See* Dkt. No. 3 ¶¶ 116, 124. The law expected the Investor Plaintiffs to have the subscription agreements translated before signing them. That

expectation is conclusive notwithstanding the Investor Plaintiffs' decision to enter into an agreement in a language they could not understand.[11]

Finally, Plaintiffs suggest that their fraud claims are not time-barred because Defendant concealed its misrepresentations.  *See* Dkt. No. 19 at 18.  Plaintiffs allege that "[i]t was not until April 2021" and through the efforts of counsel that they came into possession of sufficiently complete information to recognize that they had been defrauded.  Dkt. No. 3 ¶ 118.  Plaintiffs further allege that in meetings with investors after GWBDV filed for bankruptcy protection in October 2019, Defendant "reiterated its misrepresentations regarding the collateral pledged to Dev. Fund 1 and Dev. Fund 2, in order to prevent the investors from taking any formal actions, and to conceal the falsity of their earlier misrepresentations."  *Id.* ¶ 117.

Plaintiffs rely on the doctrine of fraudulent concealment—a particular kind of equitable tolling and equitable estoppel[12]—but that reliance is misplaced.  Fraudulent concealment "is an 'extraordinary remedy,'" *Twersky*, 993 F. Supp. 2d at 442 (quoting *Pulver v. Dougherty*, 871 N.Y.S.2d 495, 496 (3d Dep't 2009)), that tolls a statute of limitations when a plaintiff shows: "(1) the defendant wrongfully concealed material facts relating to defendant's wrongdoing; (2) the concealment prevented plaintiff's discovery of the nature of the claim within the limitations period; and (3) plaintiff exercised due diligence in pursuing the discovery of the claim during the period plaintiff seeks to have tolled," *Roeder*, 523 F. Supp. 3d at 617 (quoting

---

[11] Indeed, the offering memoranda specifically advised: "IF THE ENGLISH LANGUAGE IS NOT THE PROSPECTIVE PURCHASER'S PRINCIPAL LANGUAGE, IT IS STRONGLY RECOMMENDED THAT THE PROSPECTIVE PURCHASER SEEK ADVICE FROM ADVISORS WHO CAN INTERPRET FOR HIM/HER AND ADEQUATELY EXPLAIN THIS MEMORANDUM."  Dkt. No. 14-3 at ECF p. 9; *see* Dkt. No. 14-12 at ECF p. 9.

[12] Plaintiffs' argument sounds in equitable estoppel.  *See Roeder*, 523 F. Supp. 3d at 617 (explaining "equitable tolling under federal law . . . is similar to the principles of equitable estoppel under New York law," and that "fraudulent concealment" is a "particular type of tolling").

*Corcoran v. N.Y. Power Auth.*, 202 F.3d 530, 543 (2d Cir. 1999)); *see also Koral v. Saunders*, 36 F.4th 400, 409–10 (2d Cir. 2022).  Accordingly, "[r]easonable diligence is a prerequisite" to fraudulent concealment.  *Koch*, 699 F.3d at 157; *see Brean Murray, Carret & Co. v. Morrison & Foerster LLP*, 87 N.Y.S.3d 178, 180 (1st Dep't 2018).  Defendant could not have fraudulently concealed the facts regarding its misrepresentations at the time the investments were made because the offering memoranda disclosed facts that placed the Investor Plaintiffs on inquiry notice of the alleged fraud.  The reasonable diligence requirement thus precludes the application of fraudulent concealment because the Investor Plaintiffs failed to uncover the alleged fraud despite material discrepancies between the offering memoranda and alleged oral misrepresentations.  *See AXA Versicherung AG*, 391 F. App'x at 30 ("[A]ny actions taken by [defendant] or its brokers to 'conceal' the language from [plaintiff] would not toll the statute of limitations in this case because the [contracts] themselves would have given [plaintiff] sufficient knowledge to place it under a duty of inquiry.").  And, to the extent Plaintiffs would rely on Defendant's alleged misrepresentations in 2019, those misrepresentations could not have "prevented plaintiff[s'] discovery of the nature of the claim within the limitations period." *Roeder*, 523 F. Supp. 3d at 617.  "[T]he statute of limitations had already run by that time," and "the tolling period cannot delay the expiration of a deadline when that deadline has already expired."  *Koch*, 699 F.3d at 157 (internal quotation marks and citation omitted); *see also Roeder*, 523 F. Supp. 3d at 618 (collecting cases).

   In sum, the Investor Plaintiffs were on inquiry notice of the alleged frauds when they entered the subscription agreements.  Their failure to exercise reasonable diligence is no excuse.[13]  *See Pimpinello*, 170 N.E. at 531 ("If the signer could read the instrument, not to have

---

[13] The Court need not and does not reach Defendant's alternative argument that Plaintiffs' fraud

read it was gross negligence; if he could not read it, not to procure it to be read was equally

negligent; in either case the writing binds him.").  As Plaintiffs did not bring their fraud claims

within "the greater of six years from the date the cause of action accrued or two years from the

time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could

with reasonable diligence have discovered it," N.Y. C.P.L.R. 213(8), those claims are time-

barred.  The Court therefore grants Defendant's motion to dismiss the Investor Plaintiffs' fraud

claims.

### III. Breach of Fiduciary Duty Claims

Defendant also contends that the Complaint fails to state a claim for breach of fiduciary

duty.  Dkt. No. 13 at 19.  According to Defendant, the business judgment rule shields its actions

from judicial scrutiny.  *Id.* at 21.  Plaintiffs contest that assertion.  Dkt. No. 19 at 19–25.

The Court first clarifies the precise claims Plaintiffs are pursuing and then addresses

Defendant's substantive arguments.

### A.      The Nature of Plaintiffs' Claims

Plaintiffs' Complaint claims that Defendant violated its fiduciary duties to the Investor

Plaintiffs as well as to Development Fund 1 and Development Fund 2.  Dkt. No. 3 at ECF

pp. 202–04.  The Investor Plaintiffs bring those claims both on their own behalf and derivatively

---

claims also fail on the merits because the Investor Plaintiffs have not pleaded reasonable
reliance.  *See* Dkt. No. 13 at 12–18.  The Court observes, however, that while reasonable
diligence and reasonable reliance are often similar standards in practice, *see, e.g.*, *Stone v.
Schulz*, 647 N.Y.S.2d 822, 823 (2d Dep't 1996) ("Where, as here, there is a meaningful conflict
between an express provision in a written contract and a prior alleged oral representation, the
conflict negates a claim of a reasonable reliance upon the oral representation."), it is nevertheless
"important to bear in mind the [formal] distinction between 'reasonable diligence,' an element of
the statute of limitations defense, and 'justifiable reliance,' an element of the substantive fraud
claim," *Foxley v. Sotheby's Inc.*, 893 F. Supp. 1224, 1231 (S.D.N.Y. 1995).  Notably,
"reasonable reliance is often a question of fact for the jury rather than a question of law for the
court."  *STMicroelectronics, N.V. v. Credit Suisse Sec. (USA) LLC*, 648 F.3d 68, 81 (2d Cir.
2011).

on behalf of Development Fund 1 and Development Fund 2.[14]  *Id.*  Plaintiffs' fiduciary-duty claims also allege two distinct breaches:  Defendant's failure to disclose the default-trigger events to the Investor Plaintiffs, and Defendant's failure to declare defaults in response to those events.  *Id.*

In its motion to dismiss, Defendant contends that Plaintiffs' nondisclosure theory fails to state a claim because Defendant "had no duty to disclose negative information."  Dkt. No. 13 at 24.  Plaintiffs' response does not oppose that argument; it merely asserts that Defendant breached its fiduciary duty "by failing to declare defaults."  Dkt. No. 19 at 19.  A court can "properly deem a represented party to have abandoned claims if, in opposing a motion to dismiss multiple claims, it addressed only some of them."  *Sullivan v. City of New York*, 2015 WL 5025296, at *4 (S.D.N.Y. Aug. 25, 2015), *aff'd*, 690 F. App'x 63 (2d Cir. 2017); *see also Lonstein L. Off., P.C. v. Evanston Ins. Co.*, 2022 WL 311391, at *12 n.7 (S.D.N.Y. Feb. 2, 2022); *Romeo & Juliette Laser Hair Removal, Inc. v. Assara I LLC*, 2014 WL 4723299, at *7 (S.D.N.Y. Sept. 23, 2014).  By failing to respond to Defendant's arguments for dismissing Plaintiffs' nondisclosure claims, Plaintiffs abandoned those claims so the Court will dismiss them.

Next, Defendant contends that Plaintiffs' fiduciary-duty claims based on Defendant's failure to declare defaults are "at best, derivative" such that "the direct claims should be dismissed."  Dkt. No. 13 at 24 n.20.

Under New York law, a member of an LLC does not have an "individual cause of action" for wrongs to the LLC, "though he loses the value of his investment."  *Abrams v. Donati*,

---

[14] Defendant does not challenge the Investor Plaintiffs' standing to sue derivatively on behalf of Development Fund 1 and Development Fund 2.

489 N.E.2d 751, 751 (N.Y. 1985).  Instead, to vindicate wrongs to the company, "members of LLCs may sue derivatively." *Tzolis v. Wolff*, 884 N.E.2d 1005, 1010 (N.Y. 2008).  But members can bring claims on their own behalf "when the wrongdoer has breached a duty owed to the [members] independent of any duty owing to the [LLC] wronged." *Abrams*, 489 N.E.2d at 752.  Thus, the Court must decide whether "the defendant has violated an independent duty to the [members]." *Excimer Assocs., Inc. v. LCA Vision, Inc.*, 292 F.3d 134, 140 (2d Cir. 2002) (quoting *Ceribelli v. Elghanayan*, 990 F.2d 62, 63 (2d Cir. 1993)).

Defendant's alleged failure to declare defaults under the loan agreements concerns a duty owed directly to Development Fund 1 and Development Fund 2.  Claims based "allegations of mismanagement or diversion of assets by officers or directors to their own enrichment, without more, plead a wrong to the [LLC] only, for which a [member] may sue derivatively but not individually." *Abrams*, 489 N.E.2d at 752.  Indeed, the Investor Plaintiffs aver that they were damaged because Defendant's failure to declare defaults led Development Fund 1 and Development Fund 2 to lose value.  *See* Dkt. No. 3 at 203–04.  As Defendant's actions "only harmed [the Investor Plaintiffs] indirectly by reducing the value of [their] ownership stake[s]," Plaintiffs' claims predicated on Defendant's failure to declare defaults are "quintessentially derivative." *Weidberg v. Barnett*, 752 F. Supp. 2d 301, 308 (E.D.N.Y. 2010); *see HSM Holdings, LLC v. Mantu I.M. Mobile Ltd.*, 2021 WL 918556, at *23 (S.D.N.Y. Mar. 10, 2021).  Accordingly, the Investor Plaintiffs lack standing to bring those claims individually,[15] so the Court dismisses them to the extent the Investor Plaintiffs bring them in an individual capacity.

---

[15] Although New York courts recognize a limited exception to the general rule that breaches of duties to entities must be brought derivatively "where the [member] has sustained a loss disproportionate to that sustained by the [company]," *Cortazar v. Tomasino*, 54 N.Y.S.3d 89, 92 (2d Dep't 2017), that exception is inapplicable here because both the Investor Plaintiffs and the LLCs suffered a total loss.

Having determined that Plaintiffs' remaining breach of fiduciary duty claims are derivative and predicated on Defendant's failure to declare defaults, the Court must decide whether those claims withstand Defendant's arguments on the merits.

### B.   The Merits of Plaintiffs' Claims

Plaintiffs claim that by failing to declare defaults under the loan agreements, Defendant "placed [its] economic interests above those of non-managing members" of Development Fund 1 and Development Fund 2, thereby breaching its "duty of undivided and undiluted loyalty" to the Funds.  Dkt. No. 3 at ECF pp. 202–04.  Specifically, Plaintiffs aver that Defendant did not declare defaults because its "economic interest was to maintain the outstanding loans for as long as possible so it could optimize the amount of quarterly management fees it collected on the money it raised."  *Id.* ¶ 6.  They further allege Defendant acted to preserve its reputation with developers in New York and investors in China.  *Id.* ¶ 7.  Defendant argues that Plaintiffs' fiduciary-duty claims must be dismissed because, even if events of default occurred, the business judgment rule would insulate Defendant's decisions not to declare defaults from judicial scrutiny.  Dkt. No. 13 at 6.

"A managing member of an LLC owes a fiduciary duty to the LLC."  *McKinnon Doxsee Agency, Inc. v. Gallina*, 132 N.Y.S.3d 144, 148 (2d Dep't 2020).  That fiduciary duty consists of several obligations, including "the duty of care [and] duty of loyalty."  *Rennaker Co. Consulting, Inc. v. TLM Grp., LLC*, 2017 WL 2240235, at *4 (S.D.N.Y. Mar. 29, 2017) (citing *DirecTV Latin Am., LLC v. Park 610, LLC*, 691 F. Supp. 2d 405, 438 (S.D.N.Y. 2010)); *see also* N.Y. Ltd. Liab. Co. Law § 409(a) ("A manager shall perform his or her duties as a manager . . . in good faith and with that degree of care that an ordinarily prudent person in a like position would use under similar circumstances.").

The duty of care dictates that a "fiduciary, in the discharge of his responsibilities[,] must use at least that degree of diligence that an 'ordinarily prudent' person under similar circumstances would use." *Hanson Tr. PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 273 (2d Cir. 1986) (citation omitted); *see Gray on Behalf of Furia Org., Inc. v. Furia Org., Inc.*, 896 F. Supp. 144, 148 (S.D.N.Y. 1995). The duty of loyalty imposes "a sensitive and 'inflexible' rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty." *Birnbaum v. Birnbaum*, 539 N.E.2d 574, 576 (N.Y. 1989) (quoting *In re Ryan's Will*, 52 N.E.2d 909, 923 (N.Y. 1943)). "Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior." *Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928) (Cardozo, J.). A fiduciary breaches that duty by "taking 'an action for [its] own improper personal benefit' that is not in the best interests of the party to whom a duty is owed." *Kalaijian v. Grahel Assocs., LLC*, 142 N.Y.S.3d 377, 378 (2d Dep't 2021) (quoting *McKinnon Doxsee*, 132 N.Y.S.3d at 148).

"The business judgment rule 'bars judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes.'" *S.H. & Helen R. Scheuer Fam. Found., Inc., ex rel. Scheuer v. 61 Assocs.*, 582 N.Y.S.2d 662, 664 (1st Dep't 1992) (quoting *Auerbach v. Bennett*, 393 N.E.2d 994, 1000 (N.Y. 1979)). Although the doctrine originated in suits against corporate directors, it also protects the managers of LLCs. *See In re L&N Twins Place LLC*, 2020 WL 7211235, at *5 n.10 (S.D.N.Y. Dec. 4, 2020) (citing *Zuckerbrod v. 355 Co., LLC*, 979 N.Y.S.2d 119, 120–21 (N.Y. App. Div. 2014)). "[T]he business judgment rule . . . provides that, where corporate officers or directors exercise unbiased judgment in determining that certain actions will promote

33

the corporation's interests, courts will defer to those determinations if they were made in good faith." *In re Kenneth Cole Prods., Inc.*, 52 N.E.3d 214, 218 (N.Y. 2016) (citation omitted).

For the business judgment rule to apply, the manager must "possess a disinterested independence and [must] not stand in a dual relation which prevents an unprejudicial exercise of judgment." *Auerbach*, 393 N.E.2d at 1001; *see also In re Croton River Club, Inc.*, 52 F.3d 41, 44 (2d Cir. 1995) ("It is black-letter, settled law that when a director has an interest in a decision, the business judgment rule does not apply."). Under New York law, a manager "may be interested under either of two scenarios: self-interest in the transaction or loss of independence due to the control of an interested [third party]." *In re Comverse Tech., Inc.*, 866 N.Y.S.2d 10, 15 (1st Dep't 2008). Managers are "self-interested in a challenged transaction where they will receive a direct financial benefit from the transaction which is different from the benefit to [members] generally." *Marx v. Akers*, 666 N.E.2d 1034, 1042 (N.Y. 1996). The possibility that a manager could "be held liable for their actions is not enough." *Jiminian v. Seabrook*, 760 F. App'x 38, 42 (2d Cir. 2019) (quoting *Wandel ex rel. Bed Bath & Beyond, Inc. v. Eisenberg*, 871 N.Y.S.2d 102, 105 (1st Dep't 2009)). A manager "is considered to have lost his/her independence where she/he is dominated or otherwise controlled by an individual or entity interested in the transaction at issue." *Higgins v. N.Y. Stock Exch., Inc.*, 806 N.Y.S.2d 339, 357 (Sup. Ct. 2005); *see also Auerbach v. Klein*, 859 N.Y.S.2d 901, 901 (Sup. Ct. 2008), *aff'd*, 887 N.Y.S.2d 248 (2d Dep't 2009). "To establish loss of independence resulting from [a third party's] dominance, plaintiffs must allege particularized facts sufficient to raise the suspicion that [the manager was] beholden to [that party's] . . . coercive control." *Higgins*, 806 N.Y.S.2d at 357.

Plaintiffs argue that Defendant was interested in the alleged defaults, so the business judgment rule does not apply: "while the non-managing members, including the Investor Plaintiffs here, wanted their capital to be carefully managed to optimize the possibility of a quick repayment, [Defendant's] economic interest was to maintain the outstanding loans for as long as possible so it could optimize the amount of quarterly management fees it collected on the money it raised." Dkt. No. 3 ¶ 6. Plaintiffs also argue that Defendant had an interest in preserving its reputation as a flexible lender in the world of New York developers and in maintaining its image in the Chinese capital market as a company that uses EB-5 funds to finance only safe investment projects, neither of which were aligned with the interests of the Investor Plaintiffs.[16] *Id.* ¶ 7.

Those allegations are insufficient to show Defendant was interested in the purported defaults such that its actions fall outside the business judgment rule. On Plaintiffs' theory, any decision by Defendant to forego declaring a default would trigger a violation of the duty of loyalty and would eliminate the protection accorded Defendant by the business judgment rule because every such decision, by definition, would prolong the period of time during which Defendant would continue to earn its management fee. But the decision whether or not to declare a default inherently involves the exercise of business judgment on behalf of each Fund. And Plaintiffs do not allege self-dealing, self-interest in the transaction pursuant to which Development Fund 1 and Development Fund 2 extended capital to GWBDV, or loss of independence.

Every decision Defendant could have made at any of the critical time periods between 2012 and 2016 would have come with both costs and benefits. On the cost side, as Plaintiffs

---

[16] Plaintiffs further note that the Investor Plaintiffs would never be repeat customers due to the nature of the EB-5 program and that Defendant did not invest its own capital in the Station redevelopment project. *Id.* ¶¶ 9–10.

now emphasize, the decision not to declare a default increased the risk to the Funds and thus indirectly to each of the Investor Plaintiffs.  Defendant's decision to maintain the loans to GWBDV after the delays from Superstorm Sandy, the increase in costs beyond the Project Cost Statement, Tutor Perini's arbitration against GWBDV, the Port Authority's amendment of the Station ground lease, and GWBDV's temporary pause on interest payments—each of which was an event of default according to Plaintiff, Dkt. No. 19 at 21–22—increased the risk that the redevelopment project would not be complete and that the Investor Plaintiffs would lose their principal and any remaining interest.  By the same token, however, a decision to declare a default would also have imposed costs on Plaintiffs.  Had Defendant done so, the loans to GWBDV would have become "immediately due and payable."  Dkt. No. 14-9 at ECF p. 41; Dkt. No. 14-16 at ECF p. 37.  Plaintiffs would have no longer enjoyed the continuing income stream of interest payments from the loans.  Moreover, withdrawing the Investor Plaintiffs' capital from the Station redevelopment project early would have jeopardized the express purpose of Development Fund 1 and Development Fund 2—"making the Qualifying Investment" under the "EB-5 Immigrant Investor Program," Dkt. No. 14-6 at ECF pp. 8, 36; Dkt. No. 14-14 at ECF pp. 8, 37—as EB-5 investments must be at risk for at least two years, *see* 8 U.S.C. § 1153(b)(5)(A)(i), and often significantly longer, *see Kaur v. Mayorkas*, 2023 WL 4899083, at *2–3 (S.D.N.Y. Aug. 1, 2023), before the investors become lawful permanent residents of the United States.  Indeed, as a result of Defendant's managerial strategy, eighty of the Investor Plaintiffs are now lawful permanent residents.[17]  Dkt. No. 3 ¶ 16.

---

[17] Defendant represents, and Plaintiffs do not contest, that "every Plaintiff who pursued permanent residency is now a permanent U.S. resident or has an application pending as a result of their investments."  Dkt. No. 13 at 1.

It is only by virtue of hindsight that it appears that Defendant's choice not to declare a default—if Defendant had such a right[18]—was the wrong one.  But the business judgment rule was developed to prevent precisely that kind of judicial Monday-morning quarterbacking of good faith business decisions.  *See In re Kenneth Cole Prods.*, 52 N.E.3d at 218 ("The doctrine is based, at least in part, on a recognition that: courts are ill equipped to evaluate what are essentially business judgments [and] there is no objective standard by which to measure the correctness of many corporate decisions (which involve the weighing of various considerations)."); *Auerbach*, 393 N.E.2d at 1000 ("[B]y definition the responsibility for business judgments must rest with the corporate directors; their individual capabilities and experience peculiarly qualify them for the discharge of that responsibility."); *Roselink Invs., L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 224 (S.D.N.Y. 2004) ("[Plaintiffs'] claims are essentially an attack on the wisdom of defendants' decision.  But the business judgment rule is intended to protect directors against just such attacks because their decisions are not to be second-guessed by courts with the benefit of hindsight.").

The fact that, so long as the loans remained extended, Defendant stood to continue to earn "management fees on the outstanding loans," Dkt. No. 19 at 23, cannot take Defendant's judgments outside the protections of the business judgment rule.  Pursuant to the Development Fund 1 and Development Fund 2 operating agreements, Defendant was paid those fees to

---

[18] It is by no means free from doubt whether Defendant had the right to declare a default.  While Plaintiffs raise colorable arguments that the delay following Superstorm Sandy, the increase in costs beyond the Project Cost Statement, and GWBDV's pause on payments may have constituted defaults, *see* Dkt. No 19 at 21–22, the other purported defaults lack support in the loan agreements.  The Tutor Perini arbitration was not brought under a "federal, state or foreign bankruptcy, insolvency, receivership, or similar law."  Dkt. No. 14-9 at ECF p. 39; *see also* Dkt. No. 14-16 at ECF p. 35.  And even if the Port Authority's modification of the Station ground lease were material, Plaintiffs have not alleged that the modification occurred without Defendant's prior written consent.  *See* Dkt. No. 14-9 at ECF p. 40; Dkt. No. 14-16 at ECF p. 36.

"manage the business affairs of the [Funds], carry on the activities of the [Funds] and to do and to perform any and all things necessary for, or incidental to or connected with carrying on the activities of the [Funds]."  Dkt. No. 14-6 at ECF p. 21; Dkt. No. 14-14 at ECF p. 21.  That included the decision whether or not to declare a default.  The operating agreements also specified that Defendant had the power to "make all decision concerning the . . . management . . . , monitoring and disposition of Investments."  Dkt. No. 14-6 at ECF p. 21; Dkt. No. 14-14 at ECF p. 22.  A fiduciary does not become self-interested merely because she is paid by her principal.  Nor is a fiduciary obligated to terminate her agency at the earliest possible moment, lest any decision she takes that extends that agency deprives the fiduciary of her right to exercise business judgment free from judicial second-guessing.  Alleging that a fiduciary's decision was motivated by a desire to maintain her salary is, without more, insufficient to take that decision outside the protections of the business judgment rule.  *See Owen v. Hamilton*, 843 N.Y.S.2d 298, 302 (1st Dep't 2007) (concluding receipt of a salary did not render a director interested in a challenged transaction); *In re LMI Legacy Holdings, Inc.*, 625 B.R. 268, 287–88 (D. Del. 2020) (applying New York law and dismissing a breach of fiduciary duty claim against two director who allegedly pursued a transaction to "maximiz[e] personal compensation, interests, and keep[] their management positions"); *see also Spartan Cap. Sec., LLC v. Sports Field Holdings, Inc.*, 2021 WL 665031, at *2 (S.D.N.Y. Feb. 19, 2021) ("[Plaintiff's] conclusory allegation that the Directors were motivated to retain their seats on the board, is wholly insufficient to constitute self-interested conduct.").  Virtually every fiduciary is compensated for their services, so treating compensation alone as rendering a fiduciary interested would "permit[] plaintiff[s] to frame their complaint in such a way as to automatically [avoid the business judgment rule], thereby allowing the exception to swallow the rule."  *Hildene Cap. Mgmt., LLC v. Friedman, Billings, Ramsey*

38

*Grp., Inc.*, 2012 WL 3542196, at *3 (S.D.N.Y. Aug. 15, 2012) (Nathan, J.) (quoting *Marx*, 666 N.E. 2d at 1040); *see also In re Wonderwork, Inc.*, 611 B.R. 169, 202 (Bankr. S.D.N.Y. 2020) ("If that were the law, most if not all corporate officers would be in breach.").

The same principle applies when the claim is that the decision at issue has the effect of continuing the fiduciary relationship. A manager is not invariably conflicted if it decides to continue operating a company—and thus retains its position—rather than dissolving the business. Even if it turns out that decision made the company "less valuable as an entity" and the company "eventually became insolvent," courts will not "undercut the utility of the business judgment rule by permitting [members] to second-guess good faith action simply because the [company] ultimately became insolvent." *In re Trib. Co. Fraudulent Conv. Litig.*, 2018 WL 6329139, at *7 (S.D.N.Y. Nov. 30, 2018) (quoting *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 201, 203 (Del. Ch. 2006)), *aff'd*, 10 F.4th 147 (2d Cir. 2021). Thus, Plaintiffs' assertion that the purported events of default increased the risk that Development Fund 1 and Development Fund 2 would fail does not deprive Defendant of the right—and the obligation—to exercise business judgment. Any event of default presumably results in increased risk. Defendant still was under "no absolute obligation . . . to cease operations and to liquidate." *Trenwick*, 906 A.2d at 204.[19]

In any event, Defendant's management fees did not create an impermissible conflict of interest because the offering memoranda fully disclosed them. *See* Dkt. No. 14-3 at ECF p. 14 (detailing how the "Management Fee" would be calculated); Dkt. No. 14-12 at ECF p. 15 (same for the "Service Fee"). "[A] breach of fiduciary duty claim may not be based on a conflict of

---

[19] Although *Trenwick* applied Delaware law, its holding is instructive. *See Ficus Invs., Inc. v. Priv. Cap. Mgmt., LLC*, 61 A.D.3d 1, 9 (1st Dep't 2009) ("Delaware courts have had ample opportunity to address these issues . . . [so] their holdings can be instructive.").

interest or even self-dealing where the conflict was specifically disclosed in the partnership agreement or prospectus." *Schneider v. Wien & Malkin LLP*, 2004 WL 2495843, at *14 (Sup. Ct. 2004); *see also Riviera Cong. Assocs. v. Yassky*, 18 N.Y.2d 540, 548 (1966); *Fannin v. UMTH Land Dev., L.P.*, 2020 WL 4384230, at *15 (Del. Ch. July 31, 2020); *Seafood Funding Ltd. P'shp v. M&M Assocs. II, L.P.*, 672 A.2d 66, 72 (Del. Ch. 1995) ("A conflict of interest disclosed in a prospectus or partnership agreement and a plaintiff's acceptance of the terms of the prospectus or Partnership Agreement precludes the plaintiff from bringing a derivative claim based on the facts disclosed in those documents.").

Plaintiffs' alternative theory—that Defendant was self-interested because it "sought to impress both future project developers and potential new investors," Dkt. No. 19 at 23—is also insufficient. Every fiduciary presumably has an interest in impressing not only her principal but all potential future principals with her business acuity and sound judgment. That does not make every fiduciary self-interested. If anything, such reputational effects should help guard against the imprudent exercise of business judgment. *See* Jonathan G. Rohr, *Corporate Governance, Collective Action and Contractual Freedom: Justifying Delaware's New Restrictions on Private Ordering*, 41 Del. J. Corp. L. 803, 832 (2017) ("When [reputational] forces exert their pressure on corporate fiduciaries, there is simply less work for corporate law to do."); *cf.* Claire A. Hill & Richard W. Painter, *Better Bankers, Better Banks: Promoting Good Business Through Contractual Commitment* 103–04 (2015) (examining the changing role of reputation in capital markets). In any event, those reputational considerations do not qualify as "*direct financial benefit[s]*" that would render Defendant interested for purposes of the business judgment rule. *Marx*, 666 N.E.2d at 1042 (emphasis added). Nor do Defendant's alleged ties to unnamed New York developers and potential Chinese investors establish that Defendant was "controlled or

dominated" by those developers or investors, let alone that those developers or investors were themselves interested in the defaults. *Owen*, 843 N.Y.S.2d at 302; *see also In re Cadus Corp. S'holders Litig.*, 138 N.Y.S.3d 2, 4 (1st Dep't 2020) ("Bare allegations that directors are friendly with, travel in the same social circles as, or have past business relationships with the proponent of a transaction . . . are not enough to rebut the presumption of independence." (quoting *Kahn v. M & F Worldwide Corp.*, 88 A.3d 635, 649 (Del. 2014))); 3 Fletcher Cyclopedia Corporations § 941 (2023) ("[T]he fact that a director has or had an association with entities that have had a commercial relationship with the corporation does not necessarily establish that the director is interested in a given transaction.").

The business judgment rule defeats Plaintiffs' claims. Defendant argues that its decisions not to declare defaults were made "in good faith and in the best interests of the Funds." Dkt. No. 13 at 21 (internal quotation marks and citation omitted). Plaintiffs' sole counterargument is that Defendant was interested in the defaults, Dkt. No. 19 at 23, but Plaintiffs' allegations of interest are inadequate for the reasons discussed above. Accordingly, the Court cannot conclude Defendant lacked a good faith belief that refraining from declarations of default would serve the best interests of Development Fund 1 and Development Fund 2. *See In re Kenneth Cole Prods.*, 52 N.E.3d at 218; *see also Patrick v. Allen*, 355 F. Supp. 2d 704, 710 (S.D.N.Y. 2005) ("New York's business judgment rule creates a presumption that a corporation's directors act in good faith and in the best interests of the corporation."). Indeed, by not declaring defaults, Defendant ensured that the Funds continued to receive interest on their loans to GWBDV and that the Investor Plaintiffs' funds remained in an EB-5-qualified investment while the Investor Plaintiffs pursued lawful permanent residency in the United States. Thus, the Court must "respect

[Defendant's] determinations" pursuant to the business judgment rule, *Auerbach*, 393 N.E.2d at

1000, and dismiss Plaintiffs' fiduciary-duty claims.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss, Dkt. No. 13, is GRANTED.[20]

The Clerk is respectfully directed to close Dkt. No. 13 and to close this case.

SO ORDERED.

Dated: September 28, 2023
      New York, New York
                                   LEWIS J. LIMAN
                           United States District Judge

---

[20] Plaintiffs do not request leave to replead and do not "identify [any] additional facts or legal theories that [they] might assert if given the opportunity to replead.  For this reason and because the Court concludes that any amendment would be futile," the Complaint is dismissed with prejudice.  *Wade Park Land Holdings, LLC v. Kalikow*, 589 F. Supp. 3d 335, 401 (S.D.N.Y. 2022), *amended*, 2022 WL 2479110 (S.D.N.Y. July 6, 2022).